UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

KRISTIN A. CARMODY, M.D, M.H.P.E.

     *Plaintiff*,

       - against -

NEW YORK UNIVERSITY; NYU
GROSSMAN SCHOOL OF MEDICINE; NYU
LANGONE HOSPITALS;  ROBERT I.
GROSSMAN, M.D.; FRITZ FRANCOIS,
M.D.; STEVEN B. ABRAMSON, M.D.;
ANDREW W. BROTMAN, M.D.; and
ROBERT J. FEMIA, M.D.

     *Defendants*.

-------------------------------------------------------

Case No.: 1:21-cv-08186-LGS

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kristin A. Carmody, M.D., M.H.P.E. ("Plaintiff" or "Dr. Carmody"), by her undersigned attorneys, as and for her Amended Complaint against Defendants New York University (the "University Defendant"), NYU Grossman School of Medicine ("Defendant NYUGSOM"), NYU Langone Hospitals ("Defendant Langone") (collectively the "NYU Defendants" or "NYU"), and individual Defendants Robert I. Grossman, M.D., Fritz Francois, M.D., Steven B. Abramson, M.D., Andrew W. Brotman, M.D., and Robert J. Femia, M.D. (collectively the "Individual Defendants," and together with the NYU Defendants/NYU, the "Defendants"), alleges as follows:

## NATURE OF CLAIMS

1.     Dr. Carmody is an award-winning female Emergency Medicine (EM) physician and educator, a renowned researcher, and an internationally published author.  Throughout her 14 years of medical practice, Dr. Carmody maintained a spotless professional record and reputation.  She is widely respected by physicians and students in the medical field for her mentorship and for her selfless dedication to patients and the medical profession.  Dr. Carmody

1

worked on the hospital frontlines in the Defendant Langone and Bellevue Hospital emergency departments ("EDs") from 2013 through 2020, and was there when the COVID-19 crisis hit New York and flooded these EDs with patients.  Defendants have recognized Dr. Carmody's achievements and expertise on numerous occasions.

2.     Dr. Carmody has remained particularly beloved by her colleagues and mentees throughout her career for her fearless approach to pervasive discrimination at medical institutions.  Throughout her tenure with Defendants, Dr. Carmody objected to disparities and inequities within NYU and refused on many occasions to assist Defendants' efforts to shut down the voices of residents and fellow faculty leading equality initiatives.  Dr. Carmody's efforts and objections displeased Individual Defendants who, in the words of her former female colleagues, responded by placing a "target on her back."

3.     In December 2020, Defendants terminated Dr. Carmody's employment as punishment for her increased objections to Defendants' conduct—conduct which had been exacerbated by the COVID-19 pandemic.Defendants retaliated and discriminated against Dr. Carmody because she was a woman who had defended the rights of other women and marginalized groups, because she had objected to women being paid lesser salaries and provided subpar benefits than similarly situated men, and because she had opposed and undermined Individual Defendants' illegal "blacklisting" of groups of NYU's own residents for engaging in legitimate protected activity.

4.     Rather than address the serious issues posed by the international pandemic and protect their employees, Defendants falsely accused Dr. Carmody of committing crimes and sought to silence her, gambling that she would not challenge their outrageous conduct if they made their public attacks on her sufficiently extreme, and designing their public attacks to send a

2

message to others not to oppose their conduct.  Defendants' false, post facto narrative about Dr. Carmody's termination purports to base their unlawful termination on shifting, inconsistent grounds.

5.       Defendants first tried to base Dr. Carmody's termination on a suspicious, unverified letter of complaint submitted by Defendant Francois' friend—apparently at the instigation of Defendant Francois—whose spouse Dr. Carmody had recently treated in the NYU ED.  When that nefarious scheme failed to hold up under scrutiny, Defendants abruptly changed tack and cited Dr. Carmody's chart-keeping practice for that same patient as the reason for termination, even though they knew that Dr. Carmody had used the charting practice that Defendants mandated all ED physicians use department-wide.  A later NYU investigation revealed Defendants themselves had "designed" this practice for their own direct financial benefit rather than to accurately reflect patient care.  The only "investigation" taking place prior to Dr, Carmody's termination occurred over less than a week, and was ultimately refuted by the facts.  At no point did Defendants afford Dr. Carmody any due process whatsoever in direct violation of their own rules, processes, and procedures.

6.       Defendants breached their own protocols and defied reason with their retaliatory firing of Dr. Carmody, but they did not stop at termination alone.  Following Dr. Carmody's illegal termination, the Individual Defendants campaigned to totally destroy Dr. Carmody's career and use her as an example to deter others from challenging Defendants' unfair and illegal employment practices and other misconduct.  Individual Defendants convened a series of meetings following the termination attended by more than 200 of Dr. Carmody's former colleagues and other NYU employees, with the apparent purpose of publicly denigrating Dr. Carmody's career and personally disgracing Dr. Carmody.  Recordings from those and other

meetings reveal that Individual Defendants deliberately disparaged Dr. Carmody and her work in a series of outrageous false statements revolving around their amorphous reasons for terminating her in a pattern of retaliation that continues to this day.

7.      In the months following Dr. Carmody's sudden and unjustified expulsion from NYU, Defendants released internal reports that confirmed the propriety of Dr. Carmody's patient treatment and indicated that her termination was unwarranted.  These reports, which were also distributed outside of NYU, also evidenced problematic institutional issues controlled, perpetuated, and enforced by Individual Defendants.  Though the results of those investigations vindicated Dr. Carmody, the investigations had not been conducted prior to her pretextual termination; thus, the results came to light long after she had incurred irreparable financial, reputational, physical, and emotional damage.

8.      Plaintiff brings this action to address Defendants' discriminatory and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act (29 U.S.C. § 206(d)) (the "EPA"), the New York State Human Rights Law (N.Y. Exec. Law § 290 *et seq.*) (the "NYSHRL"), New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 *et seq.*) (the "NYCHRL"), New York Labor Laws ("NYLL"), and also for Defendants' breach of contract with and defamation of Plaintiff, causing, among other things, physical injury and related severe, long-term emotional damage.

9.      Plaintiff seeks: declaratory relief; compensatory, liquidated, and punitive damages; and other legal and equitable relief to which she may be entitled.

## JURISDICTION, VENUE & STATUTORY PREREQUISITES

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and U.S. Const. Art. III § 2, as this is a case arising under Title VII and the EPA.

11.     The claims Plaintiff brings under the NYSHRL, NYCHRL, NYLL, and New York common law arise out of the same events as the federal claims that are properly before this Court.  Therefore, this Court properly exercises pendent jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)-(2), as on information and belief all Individual Defendants maintain their primary place of business in this district, each NYU Defendant is a corporation having its primary place of business in this district, and a substantial part of the events giving rise to this claim occurred in this district.

13.     On May 25, 2021, Dr. Carmody timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) in compliance with the statutory prerequisite of Title VII, which charge listed all Defendants named in this Amended Complaint.  The EEOC granted Plaintiff her Notice of the Right to Sue on December 2, 2021, thereby perfecting her right to proceed under Title VII.  There is no requirement of administrative exhaustion under the New York City Human Rights Law or the Equal Pay Act.

14.     Plaintiff contemporaneously served a copy of this Amended Complaint upon the New York (a) City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York in satisfaction of the notice requirements of NYCHRL § 8-502(c) and (b) Attorney General in satisfaction of the notice requirements of NYLL § 215(2)(b).

## **PARTIES**

15.     Dr. Carmody is a physician who resided and at all relevant times was employed by Defendants in New York, New York.  Dr. Carmody had clinical privileges at Defendant Langone's ED, where she worked as a supervising, attending physician.  The events giving rise

to this action occurred at Defendant Langone's ED located at 570 First Avenue, New York, New York 10016 (the "Langone ED").

16.     The University Defendant is a tax exempt, private university chartered by the New York State Legislature, and maintains its principal place of business at 70 Washington Square South, New York, New York 10012.  The University Defendant is comprised of numerous schools and colleges, including Defendant NYUGSOM.  During all relevant times, the University Defendant was Plaintiff's employer within the meaning of all applicable statutes and employed Plaintiff in New York, New York.  Throughout the relevant time period, the University Defendant had more than 15 employees.

17.     Defendant NYUGSOM is an unincorporated subdivision of the University Defendant and maintains its principal place of business at 550 First Avenue, New York, New York 10016.  Defendant NYUGSOM operates Defendant Langone, a private hospital system that includes the Langone ED.  Defendant NYUGSOM also operates Bellevue Hospital, a public hospital, under an agency or administration agreement, where Plaintiff also worked clinically. During all relevant times, Defendant NYUGSOM was Plaintiff's employer within the meaning of all applicable statutes and employed Plaintiff in New York, New York.  Throughout the relevant time period, Defendant NYUGSOM had more than 15 employees.

18.     Defendant Langone is a tax-exempt private hospital system operated and staffed by Defendant NYUGSOM personnel, with its principal place of business at 550 First Avenue, New York, New York 10016.  Defendant Langone owns and operates numerous hospitals, inpatient facilities, and ambulatory care facilities in New York, including the Langone ED, which serves alongside Bellevue Hospital as a teaching hospital site for resident physician training.  During all relevant times, Defendant Langone was Plaintiff's employer within the

meaning of all applicable statutes and employed Plaintiff in New York, New York.  Throughout

the relevant time period, Defendant Langone had more than 15 employees.

19.      Defendant Robert I. Grossman, M.D., is an individual who worked at all relevant

times as an employee of the NYU Defendants, including as the Dean of Defendant NYUGSOM

and Chief Executive Officer of Defendant Langone.  Defendant Grossman has his business office

at 550 First Avenue, New York, New York 10016.

20.      Defendant Fritz Francois, M.D., is an individual who worked at all relevant

times as an employee of the NYU Defendants, including as a Professor at Defendant

NYUGSOM and the Chief Medical Officer (CMO) of Defendant Langone.  Defendant Francois

has his business office at 550 First Avenue, New York, New York 10016.

21.      Defendant Steven B. Abramson, M.D., is an individual who worked at all

relevant times as employee of the NYU Defendants, including as the Vice Dean for Education,

Faculty, and Academic Affairs and as a Professor at Defendant NYUGSOM.  Defendant

Abramson has his business office at 550 First Avenue, New York, New York 10016.

22.      Defendant Andrew W. Brotman, M.D., is an individual who worked at all

relevant times as an employee of the NYU Defendants, including as the Senior Vice President

and Vice Dean for Clinical Affairs and Strategy and Professor at Defendant NYUGSOM.

Defendant Brotman has his business office at 550 First Avenue, New York, New York 10016.

23.      Defendant Robert J. Femia, M.D., is an individual who worked at all relevant

times as an employee of the NYU Defendants, including as the Chair of the Emergency

Medicine Department and Associate Professor at Defendant NYUGSOM.  Defendant Femia has

his business office at 550 First Avenue, New York, New York 10016.

24.     At all relevant times, including from 2017 through 2020, each of Defendants Grossman, Abramson, Brotman, Francois, and Femia exercised managerial and supervisory authority over Plaintiff on behalf of the NYU Defendants that directly affected the nature or conditions of Plaintiff's employment, and they actively participated in and aided and abetted the discriminatory conduct discussed herein and retaliated against Plaintiff for her protected activity.

25.     At all relevant times, including from 2017 through 2020, the Individual Defendants and the NYU Defendants stood in such relationship to each other and to Plaintiff so as to make the NYU Defendants liable for the acts and omissions of each Individual Defendant.

## FACTS

**A.     Dr. Carmody is an exceptional doctor, educator, and researcher.**

26.     Dr. Carmody is a licensed Doctor of Medicine and has been a practicing physician for more than 14 years.  She is an internationally published and recognized educator, and a leader in the field of emergency medicine.  She has held numerous national leadership positions and was lead editor and author of a treatise in emergency ultrasound, the *Handbook of Critical Care and Emergency Ultrasound*.  She has served as a reviewer for prestigious medical journals such as the *Annals of Emergency Medicine*, and was awarded a prestigious peer reviewer award in 2020 for that work.

27.     After graduating from the Stern School of Business at New York University, Dr. Carmody graduated from SUNY Downstate School of Medicine and went on to complete a residency in emergency medicine at Kings County Hospital/SUNY Downstate School of Medicine.  She then completed a fellowship in emergency ultrasound at Yale University School of Medicine.  After completing her fellowship at Yale, she served as an Assistant Professor and the Director of Emergency Ultrasound and the Director of Emergency Ultrasound Fellowship in

the Department of Emergency Medicine at Boston University (BU) School of Medicine.  Dr. Carmody served in this role at BU for five years before accepting an offer to join the NYU Department of Emergency Medicine as its Co-Director of Emergency Ultrasound and Co-Director of Emergency Ultrasound Fellowship in 2013.

28.     While working full time at NYU, Dr. Carmody enrolled in Maastricht University's Master of Health Professions Education (M.H.P.E.) program in 2015 and graduated with distinction (the highest honor) in 2017.  This M.H.P.E. degree is a joint initiative between Maastricht University and Defendant NYUGSOM.  Dr. Carmody obtained the M.H.P.E. degree to further her focus on higher level education, and because it is a prestigious degree that sets its holders apart from peer candidates for executive-level educational positions at major medical institutions, including Defendant NYUGSOM.

29.     In the 14 years prior to December 6, 2020 during which Dr. Carmody practiced medicine and was an academic at three top medical universities, Dr. Carmody did not receive a single negative review and was never the subject of any disciplinary action or any patient complaint.  Dr. Carmody had no cases involving bad patient outcomes, none of her patient care cases were selected for review or analysis, and her patient care reviews were consistently excellent.

30.     During her employment with the NYU Defendants, Dr. Carmody was involved in multiple initiatives dedicated to the mentoring, diversity, wellness, and the advancement of students, residents, fellows, and faculty, and she acted as a mentor to many (primarily) female and minority physicians and medical students.  In recognition of her proactive mentorship role as well as her established research, training, and educational history, Dr. Carmody was promoted to the title of Associate Professor (education/scholar track) in 2017.  Dr. Carmody was held in such

high regard by her NYU resident mentees that she won Mentor of the Year for 2020-2021, which

her resident mentees awarded her *in absentia* in June 2021.

31.     In 2017, Dr. Carmody applied for and, after an extensive interview process, was

offered the position of Vice Chair of Academic Affairs and Education Innovation for the

Department of Emergency Medicine at NYU.  The NYU Defendants had conducted a nationwide

search and considerable vetting process before selecting Dr. Carmody over a number of other

competitive candidates for the position.  NYU chose Dr. Carmody above all other candidates not

only because of her substantial experience as an educator, but also because she had recently

completed her M.H.P.E. degree, which NYU had identified as a qualification for the position.

32.     Dr. Carmody's Vice Chair role required her to engage deeply in the practical and

theoretical aspects of educational research and mentorship, and to take a further step in her

pursuit of scholarly work by expanding upon her research and devising educational curricula.

Dr. Carmody excelled in her Vice Chair role by creating numerous innovative educational

initiatives that were implemented institution-wide by Defendant NYUGSOM.  As recently as

November 2020—*one month* before Defendants unlawfully terminated Dr. Carmody—the NYU

Educator Community Committee recognized Dr. Carmody's exceptional performance by

awarding her with the "Excellence in Educational Innovation Award."

**B.     Dr. Carmody establishes herself as an advocate for equality and objects to Defendants' unlawful practices, leading to a "target on her back."**

33.     Long before the COVID-19 pandemic brought Defendants' illegal conduct into

the open, Dr. Carmody had advocated for equal rights at NYU.  As part of her role in the

executive position of Vice Chair, Dr. Carmody was required to enhance education curricula,

develop NYU ED's program leaders, and enrich opportunities for educational programs, as well

10

as to provide mentorship and leadership at all levels of the educational mission.

34.     Dr. Carmody took the requirements of this position seriously.  She mentored students and focused on enhancing the educational experience for residents and faculty of all backgrounds, genders, and races.  She encouraged initiatives that would help NYU become a better and more inclusive place for students, residents, and faculty.  After receiving feedback from a third-party consultant hired by NYU—who advised her to increase her advocacy efforts on behalf of residents and faculty to ensure that they receive equal treatment and education at NYU—Dr. Carmody focused on enhancing that part of her performance.

35.     As she performed the various educational design and mentorship aspects of her Vice Chair role, Dr. Carmody discovered that NYU was perpetuating unacceptable gender discrimination on various fronts that could affect the quality of NYU's educational experience. Dr. Carmody observed that Individual Defendants and others in NYU leadership positions repeatedly hired and promoted male candidates over better-performing female peers to faculty and other positions at NYU.  She repeatedly pushed for equal promotion, hiring, pay, and treatment of male and female NYU colleagues against steady pushback from Defendants.

        i.     Objections to failures to promote.

36.     Throughout her Vice Chair tenure, Dr. Carmody repeatedly approached Defendant Femia about NYU's failure to promote a particularly respected and accomplished female minority ED faculty member to various open educational positions for which she was a well-qualified applicant.   In response, Defendant Femia, who supervised hiring within the department, explained to Dr. Carmody that he would not be promoting this female candidate because "he didn't like her," and refused to engage in substantive discussion about the merits of her candidacy and her qualifications for the position.  Each time a position for which the

candidate was suitable opened, Defendant Femia ignored further requests from Dr. Carmody and filled those positions with lesser-qualified male candidates (with the approval of other Individual Defendants). These male candidates did not have the level of education-focused credentials and experience as the competing female candidate.

        ii.    <u>Objections to higher hours for lesser pay</u>.

37.      Another way in which Dr. Carmody became aware that male and female physicians were being treated differently was that numerous female physicians were systematically working longer clinical hours than male peers holding equivalent titles, while maintaining the same non-clinical academic workload and responsibilities. This amounted to significantly less net pay for the female physicians working higher hours than their male counterparts.[1]

38.      For example, when a male colleague was promoted to an Assistant Program Director (APD) position in 2017, Dr. Carmody reviewed his approval letter and compared it to the approval letters for female APDs at that time; his clinical hours as listed in that letter were significantly lower than those of his female counterparts (though, inexplicably, he *also* received $15,000 more per year under his contract for exactly the same work responsibilities). Dr. Carmody confronted Defendant Femia about this inequitable treatment of the three female APDs, but Defendant Femia responded that he would not be changing the status quo because he desired to "pay [the male APD] what he is worth" for less of his time.

39.      When Dr. Carmody continued to raise her concerns about this inequitable

---

[1] At academically-focused hospitals such as Defendant Langone, attending physicians' working hours are split between clinical shifts (those spent treating patients) and non-clinical administrative duties (*e.g.*, educational and other administrative responsibilities). The total number of clinical shifts (each 8 hours) that an attending physician works per week should enable the attending physician to perform both clinical and non-clinical functions within the workweek. If clinical shifts reduce the available hours for non-clinical duties, the non-clinical duties have to be performed regardless of the clinical hours worked. Higher clinical hours allocated means less time to perform non-clinical duties and more total hours worked, and therefore, less net pay for the work performed.

treatment of the female APDs, Defendant Femia raised the three female APDs to the same salary as the male APD, yet he kept the male APD's mandatory clinical hours substantially lower than the female APDs. Substantively, this still kept the male APD at a relatively higher salary than the female APDs because the women had to work much longer hours to perform the same job function as their male equivalent APD. However, Defendant Femia steadfastly refused to make appropriate adjustments either to the female APDs' clinical hours by reducing their mandatory clinical hours, or by increasing the male APD's clinical hours.

iii.   Objections to unequal salaries for equal work.

40.     In August 2020, a female faculty NYUGSOM leader approached Dr. Carmody about her inequitable salary. That faculty member had become aware that her salary in her high-level leadership position was substantially lower than her comparable male counterpart's salary, despite his having the same title and responsibilities as she had. Dr. Carmody confronted Defendant Femia about pay differentials between male versus female employees in equivalent roles, and requested that he raise the female leader's salary to that of male peers of equal title. Defendant Femia refused to change the woman's salary until Dr. Carmody made repeated requests, finally conceding that there had been no legitimate reason for the disparity.

41.     During her tenure as Vice Chair, Dr. Carmody also became aware of another male physician whom Defendant Femia had hired at a substantially higher base salary to comparable female physicians and who likewise maintained a lower number of mandatory clinical hours than those female counterparts. Dr. Carmody raised the issue numerous times to Defendant Femia throughout 2020, but Defendant Femia refused to make appropriate adjustments to that male's lighter clinical schedule and disproportionately high salary. In an effort to justify the male physician's higher salary than his female peers, Defendant Femia

claimed to Dr. Carmody that this male doctor was "working with Billy [Dr. William Goldberg] on financial stuff," an extra responsibility not undertaken by female peers in equivalent positions.  But when Dr. Carmody then asked Dr. Goldberg to describe the financial work that the male physician had undertaken with him, Dr. Goldberg responded that the two were "doing nothing" together.  Dr. Carmody challenged Defendant Femia by providing him with that contradictory information, yet Defendant Femia *still* refused to make any schedule or salary adjustments.

     iv. <u>Objections to her own lesser treatment.</u>

  42. By 2020, Individual Defendants' frustration with Dr. Carmody's many requests and inquiries became explicitly clear.

  43. During her time as Vice Chair, Dr. Carmody learned that male employees at her level and below received longer term contracts, higher rates of pay, and guaranteed raises, among other benefits.  When she was hired to the Vice Chair of Education role in 2017, she was assured by NYU leadership, particularly Defendant Femia, that her contract was identical to that of the NYU ED's Vice Chair for Operations (an equivalent position).  But the male physician occupying the Vice Chair for Operations supplied Dr. Carmody with his employment contract in 2018, and she discovered that NYU leadership's assurances had not been facts.  That Vice Chair had the same base salary as Plaintiff's Vice Chair contract, but many more financial benefits including an automatic raise of $10,000 every year (compared to Dr. Carmody's zero promise of raise) and a 10% bonus based on the increased annual compensation, *i.e.*, including the annual raises.  Furthermore, apart from substantially more pay, his contract terms included substantial non-financial benefits that Dr. Carmody did not get, such as a longer term (three years, compared to Dr. Carmody's one year), giving Dr. Carmody's male counterpart greater job security and

contractual legal protection than she had (and which she needed, as it turned out).  Dr. Carmody

raised the issue many times with Defendant Femia, who refused to take action again and again

throughout 2020.

44.     During her time as Vice Chair, Dr. Carmody also discovered that her male

colleague and fellow Vice Chair Dr. Goldberg had a very favorable clinical schedule and higher

salary with better contract terms than she and her female peers in equivalent positions had.  Dr.

Carmody raised this issue numerous times throughout 2017 through 2020 to Defendant Femia,

especially after she heard numerous complaints from her female colleagues regarding the

unfairness of Dr. Goldberg's situation and obviously preferential treatment.  Defendant Femia

initially responded that "Billy's my consigliere" but later lost patience with Dr. Carmody's

repeated objections, and threatened to fire Dr. Carmody (with the approval of other Individual

Defendants) if she challenged him further about such inequalities.

45.     As discussed below, upon information and belief, another male Vice-Chair, Dr.

Christopher Caspers, M.D. ("Dr. Caspers"), was both paid more for equivalent work as Dr.

Carmody, and had materially better contract conditions than she had.

46.     While praising her efforts at improving the educational program at NYU, many

of Dr. Carmody's colleagues (residents and faculty alike) cautioned her against risking

retaliation by Individual Defendants with her ongoing advocacy.  Several of her female

colleagues would later agree upon hearing about Dr. Carmody's unlawful termination that she

had long "had a target on her back."

**C.     Dr. Carmody supports her female mentees' advocacy efforts during the
        COVID-19 pandemic's heightened disparities.**

47.     Demands on medical institutions to respond to the COVID-19 pandemic

increased and highlighted preexisting inequities at NYU.  With the Defendants' failure to address

15

these increasingly discriminatory issues, NYU residents increased their involvement in social justice and equal rights initiatives with Dr. Carmody's mentorship support.  Beginning in March 2020, these frontline workers used their access to social media platforms such as Facebook, Twitter, and GoFundMe to increase awareness about disparities at NYU, and gained national attention when initiatives headed by residents were heavily publicized in news publications such as the *New Yorker*, *The New York Post*, *The Huffington Post*, and *The Washington Post*. Resident advocacy put NYU in the spotlight, for their disparate treatment of residents and patients as well as other inequities perpetuated by and within the institution.

48.     Once aware of these initiatives, Defendants reacted immediately: on March 27, 2020, an e-mail went out to all NYU employees.  This e-mail warned its recipients that speaking to media without the approval of NYU leadership would be "subject to disciplinary action, including termination," a deliberate effort to suppress legitimate and protected activities.

>     i.     Defendants begin pushback against increased resident advocacy.

49.     Around this time, when leadership at NYU (including Individual Defendants) refused to give frontline-working residents basic workers' benefits and safety protections afforded to residents at peer institutions, a group of residents led by primarily female and minority residents at NYU took action.  This group of residents wrote and sent a letter to NYU leadership on April 7, 2020 (the "April 2020 Letter"), describing concerns with their treatment of residents enrolled in Defendant NYUGSOM's educational program.

50.     The April 2020 Letter requested fair treatment of residents as laborers in an emergency situation, and requested proper protective gear and streamlined safety procedures as well as life insurance, short- and long-term disability insurance, hazard pay, and covered COVID-19 treatment if they became ill working the frontlines.  Given the dire threats to their

safety from working with COVID-19-infected patients, the April 2020 Letter also requested a guarantee that there would be "no change in [residents'] standing in the program if [they] are out sick from COVID-19 related illnesses for a prolonged period," fearing the discretion afforded to NYU leadership if such safeguards were not in place to equalize decisions.

51.     In or around the time of the April 2020 Letter, Individual Defendants and others in the NYU's leadership began to intensify their retaliation against outspoken advocacy efforts at the institution.  Around this time, Individual Defendants (and particularly Defendant Femia) made it clear to Dr. Carmody that she would have to join them in their interference with resident activity or put herself at risk.

52.     On April 9, immediately after receiving the April 2020 Letter, Defendant Femia e-mailed Dr. Carmody to ask her to use her role to investigate which residents were involved in the letter.  He told Dr. Carmody in this e-mail that it was her responsibility to order the residents to withdraw their demands because they would not be met.  Dr. Carmody spoke with the residents and told them that Individual Defendants were refusing their requests, but did not discourage advocacy efforts.

53.     Resident advocacy continued to heighten as the pandemic raged on, and Individual Defendants engaged in increasingly targeted acts to specifically silence Dr. Carmody's female mentees involved in those initiatives.  In late April 2020, when a female resident spoke to the *Wall Street Journal* about pandemic working conditions and the April 2020 Letter, Defendant Femia ordered Dr. Carmody to contact the resident and warn her against giving information to the media because that "doesn't look good" for NYU.  Dr. Carmody declined to provide the resident with anything other than support, consistent with her mentorship and educational enhancement role as Vice Chair.

54.     In or around mid-April 2020, Defendant Francois met with then-President Trump to discuss healthcare inequities.  The meeting was called following numerous statistics showing that hospitals were experiencing racially disparate COVID-19 patient outcomes during the pandemic.  On April 17, 2020, Defendant Langone employees received an e-mail from Defendant Francois that confirmed he had told the then-President that there were no disparate outcomes at NYU, and that more resources were not needed at that time.  That denial by Defendant Francois upset the NYU residents, who had seen both disparate outcomes and severely under-resourced EDs during the pandemic.  On April 20, 2020, two of Dr. Carmody's female mentees mobilized other residents across the institution to sign off on an e-mail to Defendant Francois, which expressed their feeling that he had declined to "take this opportunity to advocate for the resources that all patients need" at their hospitals by failing to address severe inequities.

55.     Defendant Francois responded in a condescending and unprofessional manner geared at silencing the women speaking up.  He expressed personal insult and outrage, claiming they were not grateful for their positions with NYU, he refused to address their concerns, and signed off with a veiled threat by wishing them "[g]ood luck in [their] residency."  Although it was not apparent to Dr. Carmody at the time, it became subsequently clear to her that the Individual Defendants were conspiring to suppress the residents who were advocating for social justice issues.  Defendant Femia succinctly described to Dr. Carmody that Defendant Francois' reaction to the residents' complaints was to be "pissed," and directed Dr. Carmody to "fix this" with the residents immediately.

56.     Dr. Carmody's two female mentees e-mailed her on April 21, 2020 to express their concerns about Individual Defendants' pushback against their equal rights initiatives, and to

request her advice on how they should proceed.  Following Dr. Carmody's advice, they sent Defendant Francois a polite professional e-mail on May 9, 2020 in which they apologized if they had offended him but reiterated their request to have an "open and honest discussion" about the disparate patient treatment, safety, and care that they had witnessed at Defendant Langone's hospitals, and about which they had deep concerns.  Defendant Francois again responded with an offensive e-mail geared at silencing and shaming their efforts, demanded a further apology, and refused to engage in any further dialogue on the subject.

57.     On or around May 2, 2020, an NYU female resident posted on social media platforms about receiving threats from leadership about advocating publicly against and talking to the media about unequal patient care.  Upon being told about this social media post by the other Individual Defendants (who were by then surveilling resident activity), Defendant Femia texted Dr. Carmody angrily about the content of the post and asked to speak with her immediately.  At this time, Defendant Femia ordered Dr. Carmody to warn the posting resident about the negative impact of such actions on Defendants (and Individual Defendant Grossman in particular).  Dr. Carmody responded by expressing concern about the inappropriate monitoring of residents' private social media accounts.  Dr. Carmody declined to speak to this resident about her social media post, and told Defendant Femia instead that this retaliation by the Individual Defendants was highly inappropriate.

58.     Defendant Femia notified Dr. Carmody during this conversation that the "Dean" (meaning Defendant Grossman) was keeping track of all residents who signed any letter to NYU leadership during the pandemic and placed their names on a "no-hire list" (*i.e.*, a blacklist) to prevent them from getting jobs after finishing their residencies.

59.     During a meeting on May 18, 2020, Defendant Femia told Dr. Carmody that

Defendant Abramson, Defendant Grossman, and Defendant Francois were still angry about the residents' e-mails to hospital leadership, especially concerning equal rights initiatives. Defendant Femia stressed once again that Defendant Grossman was keeping track of the residents who had signed any advocacy letter and had placed them on a blacklist, or what he called the "Dean's[2] List" or "no-hire list."  At or around this time, Defendant Abramson sent around an e-mail to the residents of the Department of Internal Medicine at Defendant NYUGSOM in which he demanded they remove themselves from any letters to NYU leadership and related social media posts, and threatened them with adverse consequences if they took any further part in these types of initiatives.  Dr. Carmody objected again to Defendant Femia that tracking and monitoring these individuals was improper, but Defendant Femia again ignored her concerns.

60.     Also at the May 18, 2020 meeting, Defendant Femia asked Dr. Carmody to hunt down the names of her resident mentees involved with the April 2020 Letter.  Dr. Carmody told Defendant Femia that she did not know who signed the letter and posited that asking for this list seemed "completely inappropriate."  She reminded Defendant Femia at this time that tracking the residents was discriminatory because, among other things, the residents involved were primarily women and persons from other underrepresented groups in the medical field. Defendant Femia nonetheless ignored her concerns.

> ii.     <u>Defendants' retaliation and surveillance campaign intensifies, along with pressure on Dr. Carmody to assist.</u>

61.     In or around late May 2020, Defendant Femia called Dr. Carmody to check whether two senior residents from the NYU ED program had signed any letters to the Deans and/or Defendant Francois regarding workers' and human rights or other inequities at NYU.

---

[2] Defendant Femia referred to Defendant Grossman as "the Dean."

Defendant Femia told Dr. Carmody that he "need[ed] to know" because these two residents had been offered jobs at NYU as attending physicians after completing their residencies, and their employment contracts had reached Defendant Grossman's desk for signature.[3]  Defendant Femia told Dr. Carmody that "he [Defendant Grossman] is keeping track" of the residents who signed letters addressed to the hospital leadership "and will refuse to hire them" if these residents signed the letter objecting to  work conditions and discriminatory practices at NYU.  Dr. Carmody again did not provide any information to assist these efforts.

62.     On June 5, 2020, an article was published by *Medpage Today* (a medical news outlet/journal) regarding a Black Lives Matter rally involving NYU employees.  At or around this time, Defendant Abramson sent an internal e-mail around to a large group of NYU employees in which he referred to the residents quoted in the article as the "usual ones."  Dr. Carmody responded by telling Defendant Femia that Defendant Abramson's response was completely inappropriate because it indicated to her that NYU's leadership was focused on monitoring and retaliating against its residents, specifically those who were and had advocated for female and minority persons.  Defendant Femia ignored her concerns, and again did not address the issue.

63.     At or around the 2020 summer-through-autumn hiring season, Defendants prepared to interview the next group of graduating residents for attending physician positions in the NYU ED.  In multiple meetings related to recruitment efforts during that period, Defendant Femia repeatedly mentioned a "list" of residents that they should avoid hiring; referring to this list as the "Dean's List" or the "Dean's No-Hire List."  He also asked Dr. Carmody during the interview process whether particular interviewees—primarily female and minority candidates—

---

[3] Consistent with applicable policies and procedures at NYU, Defendant Grossman had to sign all employment-related contracts at NYUGSOM in his position as Dean after approval by Defendant Brotman.

had signed any of the April 2020 letters/e-mails or any other letter to leadership.  Dr. Carmody declined to answer or provide any particulars.

64.     At a meeting on September 21, 2020, Defendant Femia asked Dr. Carmody whether two senior residents, both female mentees of Dr. Carmody's, had signed any letters sent to Individual Defendants.  One of the residents is a woman of color quoted in numerous publications about equal rights initiatives such as racism in the health system and the medical profession ("Blacklisted Resident A"); the other resident is an outspoken gender equality proponent and author of numerous feminist pieces published online ("Blacklisted Resident B"). Dr. Carmody did not provide an answer, but Defendant Femia nonetheless discovered that both women had signed their names onto numerous e-mails and letters directed at NYU's leadership during the pandemic.  Upon finding this out, Defendant Femia stated that Blacklisted Resident B (who had stated her intention to work as an attending physician at NYU on numerous occasions), "won't be getting a job here" because "she is on the Dean's List and she will be in trouble for a job."  When Dr. Carmody pressed the issue of hiring Blacklisted Resident B because she was highly qualified, Defendant Femia expressed his heightening impatience with such efforts by warning Dr. Carmody to stop.

65.     Blacklisted Resident A interviewed at numerous institutions during the 2020 fall season.  In at least one interview at another New York City facility ("Facility A"), Blacklisted Resident A was asked if she had participated in any letters addressed to NYU leadership concerning hazard pay or equal rights initiatives during her residency.  The interviewer, who was part of Facility A leadership, texted Dr. Carmody to inquire whether Blacklisted Resident A was part of NYU's "hospital rebel group," having apparently heard a series of falsities about Blacklisted Resident A prior to the interview.  Blacklisted Resident A obtained the position at

Facility A only after Dr. Carmody vouched for her to the interviewer.  On information and belief, Individual Defendants warned Facility A and other outside medical institutions against hiring Blacklisted Resident A and other residents named on their blacklist.

66.     Similarly, Blacklisted Resident B did not secure a job position at NYU as she had wanted, nor was she even considered for one despite her excellent credentials and peer reviews.  She was not offered interviews for open positions at Facility A or other equivalent New York institutions for which she was highly qualified.  Dr. Carmody reached out on Blacklisted Resident B's behalf to senior faculty at Facility A, who told her that Facility A was only hiring for specific academic positions at that time and did not think they would have a spot for Blacklisted Resident B.  After the interview season concluded, Dr. Carmody spoke to another faculty member at Facility A about Blacklisted Resident B, who said that Facility A interviewees had heard from certain of the NYU Defendants' leadership that "[Blacklisted Resident B] is trouble," which Dr. Carmody refuted to no avail.

67.     On October 8, 2020, the *New Yorker* published an article about the backlash by NYU leadership against the residents who requested work benefits and protections during the initial weeks following the COVID-19 onset.  On the same day that this article was published, Defendant Femia called Dr. Carmody into a meeting and told Dr. Carmody to intervene and warn the residents of the consequences of their outspokenness.  Dr. Carmody ignored his request and did not intervene to limit any individual's decision to speak out with respect to these issues.

68.     Dr. Carmody inquired of Defendant Femia at that time whether someone from NYU's leadership was speaking to leadership at other medical institutions across New York City to block the hiring of certain residents at those institutions.  Dr. Carmody disclosed the details of her conversations with Facility A faculty to Defendant Femia at that time.  Dr. Carmody knew

that both Defendant Femia and Dr. Goldberg were speaking to other Chairs and outside

departmental leadership about blacklisted residents, and told Defendant Femia at this time that if

he or any of the Individual Defendants was in fact intervening to stop their residents from

obtaining positions at other medical institutions, that would be "very bad" and "very wrong."

69.     Later, Dr. Carmody learned that  Defendant Grossman had repeatedly disparaged

the residents who had signed the letters in a number of meetings, and had boasted that he had

blacklisted them from ever getting jobs with NYU.

> **D.     Defendants designed and mandated compliance with an improperly designed patient charting system.**

70.     Defendant NYUGSOM is a medical school that trains its residents, fellows, and

students at its hospital sites, including at the Defendant Langone ED and the Bellevue Hospital

ED.  Those two hospitals are teaching hospitals for NYU's residents and medical students,

meaning resident physicians (medical school graduates who have not yet completed their

residency program) and attending physicians (licensed doctors who have completed their

residencies, such as Dr. Carmody), work together as a team to treat patients in their different

departments.  Attending physicians train and teach residents as part of that treatment process.  As

part of that training and teaching process, attending physicians both supervise residents' patient

treatment and provide direct treatment themselves to patients, depending on the circumstances.

71.     Typically, a resident initially evaluates a patient, takes the patient's history, and

performs a "hands-on" physical examination.  An attending physician supervises the resident's

treatment and hands-on physical examination of the patient, and the resident then presents her

evaluation of the case to that attending physician, who assesses whether the treatment

necessitates a repeat examination of that patient by the attending physician herself. The attending

physician notes the patient care administered by the treatment team in the patient's medical

chart. As a matter of long-established Langone ED policy and procedure, custom and practice, on information and belief, all or nearly all, Langone ED attendings followed that exact same practice at the time of Dr. Carmody's termination.

72.     Defendants mandated that Dr. Carmody and all other attending physicians keep computerized patient charts in Epic, an electronic medical charting system for recording patient information. Attending physicians in the ED, including Dr. Carmody, would log the details of each patient visit to the ED using Epic to record patient diagnosis and treatment information.

73.     At the conclusion of treatment, attending physicians would sign off on the course of care for the patient using a tab called the "attending supervisory attestation," an auto-populated standard template that allowed attending physicians to record patient treatment administered using an "electronically sign" button at the bottom of the page. This section of the chart had to be filled out before the patient chart could be finalized and transmitted to NYU's billing department.

74.     Every medical institution using Epic can choose how to set up their system, including how to standardize default attestation forms. Typically, teaching hospitals offer at least three standardized attestation template options for attending physicians to choose from to reflect the attending physician's role in patient care: broadly, one attestation template option reflects that the attending physician "personally, physically examined" the patient; one attestation template option reflects that the attending physician "supervised treatment of the patient by the resident;" and one attestation template option reflects that the attending physician "reviewed the resident's treatment plan, patient history etc. and agreed with it but did not supervise the resident in-person." This system of choices allows attending physicians to be compliant with the Accreditation Council for Graduate Medical Education's (ACGME)

standards while also preventing patient billing for unnecessary services (*i.e.*, billing for multiple unnecessary patient examinations by both the attending physician and the resident),

75.     Contrary to standard industry practice, Defendants designed Defendant Langone's ED attestation to provide a single option for when an attending physician was involved in a patient case: that the attending physician "personally did a full history and physical examination of" the patient.  The default attestation form for Defendant Langone's ED did not provide an attestation option for supervising a resident's examination despite that being the standard of patient care in the Defendant Langone ED.  Notably, other EDs (*e.g.*, Bellevue Hospital's ED) and other departments in NYU's hospital system (*e.g.*, the Department of Medicine) offer a number of attending attestation options to accurately reflect patient care directly provided by residents and supervised by attendings.  Unlike options that prevent overbilling in teaching hospitals as explained above, this one attestation option appearing in the ED's Epic template results in automatic billing for multiple examinations when selected.

76.     NYU's internal departmental review committee ("DRC") released a report on March 11, 2021 (the "DRCR") confirming that all attending physicians in Defendant Langone's ED, including, on information and belief, Defendant Femia, kept patient charts as instructed and mandated by the NYU Defendants' leadership (specifically by the Individual Defendants); that is, by choosing the "personally physically examined" attestation option in the standardized attending supervisory template even when they supervised a patient's treatment by the resident and did not (unnecessarily) repeat that resident's initial physical examination.  No other option appeared in the Epic template used by the attending physicians in the Defendant Langone ED, and Defendants *never* instructed attending physicians to edit or change that standard ED attestation form, nor show them how to do so.

77.     On information and belief, no attending physician from the Defendant Langone ED ever successfully edited the single attestation option appearing within the standard Epic template; at least two attending physicians who attempted to submit an edited attestation template were directed by the NYU Defendants' leadership and/or billing department to restore the attestation to the template option or risk losing their clinical privileges and salary.

78.     On information and belief, no attending physician was informed prior to Dr. Carmody's termination that he or she might be terminated and/or falsely accused of fraud for using as written or failing to edit the single attestation option that Defendants had mandated they all use without modification or alteration.

79.     The DRC found that the unique Langone ED attestation was "designed to prioritize financial reimbursement" rather than reflect patient care provided (*i.e.*, to defraud patients by overbilling them).  Unlike the Individual Defendants, attending physicians such as Dr. Carmody were not incentivized to overbill patients, as revenues generated from the NYU Defendants' billing practices did not impact any portion of their salary.  The DRCR indicated that there was no good reason from the patient care and safety perspective *not* to provide a choice of attestation template options like those available at Bellevue Hospital, other NYU departments, and virtually every other teaching hospital in the United States.  The DRCR recommended that the system be changed.

80.     At no time during Dr. Carmody's employment with Defendants did Defendants implement or refer to an institutional or departmental policy requiring all Langone ED attending physicians to depart from standard NYU ED (and ACGME) practice by personally conducting a physical examination of each patient treated by their team, nor to re-examine patients after a resident had conducted the initial examination.  Similarly, at no time during Dr. Carmody's

employment with Defendants did Defendants formally or informally communicate or announce

such requirements.

81.     On information and belief, Defendant Femia had installed the attestation

template with its solitary option at Defendant Grossman's and Defendant Brotman's direction.

Therefore, prior to the publication of the DRCR, the Individual Defendants were acutely aware

of the discrepancy between the singular attestation offered to attending physicians in the Epic

system at the Langone ED and the more varied reality of physical exams conducted on patients

in teaching hospitals such as Defendant Langone.  Also, prior to the publication of the DRCR,

the Individual Defendants were aware of the "significant legal risks" (the DRCR's description)

associated with the unique Epic patient charting system used in Defendant Langone's ED, which

they intentionally failed to disclose to attending physicians working in the department.

82.     Notably, there were no discussions concerning the Defendant Langone ED

attestation form, attestation options, or attestation editing capabilities at the weekly senior ED

management meetings attended by Dr. Carmody and one or more of the Individual Defendants

from 2017-2020, nor at any departmental faculty conference.  Nor did any of these meetings

include discussions about whether Defendant Langone ED attending physicians were themselves

required to substantially depart from ACGME standards to perform physical examinations of

each ED patient in all cases, rather than supervise a resident's examination of the patient where

appropriate.

83.     In sum, prior to the publication of the DRCR, Defendants were aware that all

Langone ED attending physicians, including Dr. Carmody, interpreted the singular Epic

attestation at Langone ED consistent with varied reality of physical exams conducted on patients

at NYU Langone hospitals, yet without notice or warning Defendants suddenly imposed their

new and unique interpretation to pretextually terminate Dr. Carmody, and solely Dr. Carmody.

**E.      Dr. Carmody treats a "VIP Patient" for a kidney infection in accordance with established protocols and procedures.**

84.      At NYU hospitals, certain patients are designated as "VIP" (very important person) patients.  The NYU leadership demands that their physicians prioritize VIP patients' care over that for other patients, regardless of the relative illness of patients that the physician is treating at the time.  When a VIP patient enters the Defendant Langone ED, the computer console of the assigned attending physician lights up in red to alert the attending physician to the VIP patient's special status over other "regular" patients.

85.      On November 30, 2020 (Monday), Dr. Carmody was working the day shift (7:45 A.M. to 4:00 P.M.) at Defendant Langone's ED.  A VIP patient (the "VIP Patient") came into the ED around 2 P.M.  This patient was designated "VIP" based on Defendant Francois' friendship with the VIP Patient's spouse.

86.      The VIP Patient complained of urinary tract infection (UTI)-like symptoms upon arrival to the ED and was thus placed on a UTI treatment pathway.  As is ordinary course in a teaching hospital like Defendant Langone, Dr. Carmody directed the senior, fourth-year resident on shift with her to examine and evaluate the VIP Patient and report the results back to her, which she did.  Dr. Carmody, as the attending physician, directly supervised the resident's physical examination and approved the treatment course presented by the resident for the VIP Patient while keeping the VIP Patient under constant observation for the entire time from an observation point less than six feet away (as the later RCA Report confirmed).  As is also routine practice between attending and resident physicians, Dr. Carmody discussed the patient's condition and treatment options with the senior resident at repeated intervals throughout the VIP Patient's visit.

87.     Dr. Carmody recorded the examination and treatment administered to the VIP Patient in the Langone ED's Epic charting system by noting it in the patient's chart.  Dr. Carmody's record included the VIP Patient's history, the senior resident's physical examination, the interactions Dr. Carmody had observed between the VIP Patient and the senior resident, as well as everything Dr. Carmody directly observed about the VIP Patient during her supervised treatment.

88.     Carmody and the senior resident initially understood that the VIP Patient's symptoms and examination suggested a UTI, and decided on an oral antibiotic for that condition (Macrobid).  Based on their close monitoring of VIP Patient's condition, Dr. Carmody and her supervised resident subsequently adjusted the VIP Patient's antibiotic to treat a possible kidney infection ("pyleonephritis"), prescribing a stronger oral antibiotic, Cefpodoxime (the treatment for kidney infection) to reflect their reassessment.

89.     Because VIP Patient was stable, appeared non-toxic, and was tolerating fluids and medicines by mouth—and because no Epic systemic alerts went off to indicate a more serious condition (the Rory Staunton alerts discussed below—the VIP Patient was discharged consistent with ED practice at approximately 4:15 P.M., during a shift change between Dr. Carmody and the other attending physician coming on duty for the next shift.

90.     At discharge, Dr. Carmody confirmed VIP Patient's condition and the prescription for the oral antibiotic (Cefpodoxime) for VIP Patient's kidney infection, and instructed the VIP Patient to return immediately to the Defendant Langone ED should symptoms reappear or worsen.

91.     As is ordinary course for Defendant Langone's ED attendings, Dr. Carmody opened the attestation page in Epic and allowed the only standard template option to auto-

populate the VIP Patient's chart (that is, the attestation that Dr. Carmody had "performed a history and physical examination" of the patient).  Dr. Carmody left the attestation in its standard format before auto-closing and submitting it in the Epic system, as she (and every other Langone ED attending physician) had done many times before and understood to be correct.

92.     At approximately 8:00 A.M. on the following day, December 1, 2020 (Tuesday), VIP Patient's spouse emailed a suspicious six-page, single-spaced, detailed letter to his friend, Defendant Francois.  This letter (the "VIP Letter") complained about the treatment received by the VIP Patient.  The VIP Letter identified Dr. Carmody as the attending physician for VIP Patient's case, and requested a "Root Cause Analysis" (RCA, described below) in the subject line.  On information and belief, Defendant Francois shared the VIP Letter with the other Individual Defendants immediately upon receipt.

93.     The VIP Letter was ostensibly written by the VIP Patient, who identified as a qualified but non-practicing nurse practitioner.  Part of the narrative in the VIP Letter asserted that the VIP Patient's condition had worsened post-discharge from the Defendant Langone, and instead of returning to Defendant Langone's ED as instructed, the VIP Letter claimed the VIP Patient instead visited and stayed overnight at Lenox Hill Hospital (in its Observation Unit).  The author of the VIP Letter further asserted that the VIP Patient's condition at Lenox Hill Hospital indicated sepsis from a kidney infection and that Lenox Hill Hospital had activated its sepsis protocols. The VIP Letter did not include medical records or any other evidence that the VIP Patient had been diagnosed or treated for sepsis, nor even that a visit to Lenox Hill had indeed occurred.

94.     The claims that the VIP Patient 1) had sepsis and 2) spent the night in an Observation Unit are mutually inconsistent on their face to any practicing ED physician.  This is

because it is uniform standard of care and directed protocol across all New York hospitals *not* to admit any patient showing symptoms indicative of sepsis to a hospital Observation Unit; Observation Units provide only low-level, unmonitored care that is inadequate for sepsis. Patients exhibiting symptoms of sepsis would either be admitted to a monitored inpatient unit or, if the condition is deemed life-threatening, to an intensive care unit (ICU), because these types of hospital units offer the higher levels of requisite care by which to treat the illness.

95.    The VIP Letter submitted by Defendant Francois' friend also asserted that Lenox Hill Hospital released the VIP Patient early on December 1, 2020 from its Observation Unit after observation and treatment with an antibiotic (Ceftriaxone/Rocephin).  This presented another inconsistency ostensibly noticeable to most practicing ED physicians.  The medicine identified in the VIP Letter as the VIP Patient's treatment is not prescribed as treatment for sepsis; rather, it is a medically equivalent antibiotic to that which Dr. Carmody had prescribed for the VIP Patient's suspected kidney infection (*i.e.*, Cefpodoxime).  According to the VIP Letter submitted by Defendant Francois' friend, Lenox Hill Hospital prescribed oral antibiotic Levaquin upon the VIP Patient's release.  That antibiotic has similar efficacy to the Cefpodoxime initially prescribed by Dr. Carmody in treating a kidney infection and is also not a treatment for sepsis.

96.    According to the treatment plan outlined in the VIP Letter, Lenox Hill Hospital did not treat the VIP Patient for sepsis.  If it had done so, the Lenox Hill Hospital doctors would have admitted the VIP Patient into a monitored inpatient unit or the ICU and would have administered two potent antibiotics via IV rather than those administered as reported.

**F.     Defendants use suspicious allegations submitted by Defendant Francois'**
**        friend as pretext to unlawfully terminate Dr. Carmody's employment.**

97.    On information and belief, Defendant Francois directed the VIP Patient's spouse to draft and e-mail him the VIP Letter for the case and to request a "root cause analysis" (RCA)

as a scheme which he and the other Individual Defendants developed as a pretext to unlawfully terminate Dr. Carmody's employment.

98.     Despite the contradictory information contained in the VIP Letter submitted by Defendant Francois' friend, Defendant Femia eagerly distributed it to the entire Defendant Langone ED via e-mail blast upon receipt.  Many of Dr. Carmody's ED colleagues immediately flagged information contained in the VIP Letter as highly suspicious to Defendant Femia and, upon information and belief, to the other Individual Defendants as well.  At least two practicing ED physicians noted to Defendant Femia (who passed along the information to one or more of the Individual Defendants) that the VIP Patient was discharged from the Lenox Hill Hospital's Observation Unit with prescriptions for a kidney infection, which contradicted the assertion that Dr. Carmody and her team had misdiagnosed a septic condition; on information and belief, these physicians also pointed out to Defendant Femia that those inaccuracies and inconsistencies were obvious to any competent practicing medical professional.

99.     Despite these red flags as to the veracity of the claims in the VIP Letter—and before any effort to determine the facts and circumstances was undertaken—Dr. Cat Jamin called Dr. Carmody at 9 A.M. on December 1, 2020 (Tuesday) to tell her that Defendant Francois had flagged Dr. Carmody's handling of the VIP Patient for departmental "Morbidity & Mortality Case" (MMI)[4] review.  This phone call took place less than an hour after the VIP Letter had been received by Defendant Francois from his friend.

100.     Dr. Carmody was shocked, not only because this case had not yet undergone *any*

---

[4] MMI reviews are department-wide meetings (including attending physicians, fellows, and residents from the relevant department), held to review cases where patient outcomes were less than optimal and determine how the quality of patient care delivered could be improved.  The setting for these meetings is intentionally confidential, non-confrontational, and safe, and there is no disclosure of the identity of the physicians involved in the cases unless the physicians choose to self-disclose his or her identity in order to better explain the exact facts and circumstances concerning the case.

internal case review (as would typically happen prior to an MMI), but also because this was the first review of any case in Dr. Carmody's career.  During this two-minute phone call, Dr. Carmody informed Dr. Jamin of all details surrounding the VIP Patient's treatment and her supervision of the resident for that treatment (which Dr. Jamin later relayed to the entire faculty at one of the Zoom Meetings).  Dr. Jamin told Dr. Carmody that nobody had spoken to the VIP Patient, which puzzled Dr. Carmody at the time.

101.     At no time during this phone call did Dr. Jamin request information from Dr. Carmody about her patient charting, nor did Dr. Jamin flag any irregularity about Dr. Carmody's charting during that call or at any time afterwards.  Dr. Jamin *did* tell Dr. Carmody that the VIP Patient was "fine," that the VIP Patient had been discharged home without any follow-up issues, and that there was nothing for Dr. Carmody to worry about.

102.     On information and belief, at no time prior to Dr. Carmody's termination did any NYU employee conduct any review of facts of the VIP Patient's case to determine whether it was appropriately selected for MMI review.  At no time prior to Dr. Carmody's termination did anyone even take such basic preliminary steps as interviewing the senior resident on the case, reviewing the patient's medical records, interviewing the VIP Patient, or otherwise independently verifying the facts contained in VIP Letter—which are standard, routine precautions taken for cases before they are selected for ED MMI review.  Moreover, all information came from a letter submitted by Defendant Francois' friend, VIP Patient's spouse, with Defendant Francois acting as the information filter.

103.     On December 2, 2020 (Wednesday), Defendant Femia called Dr. Carmody's cell phone.  Defendant Femia asked Dr. Carmody to provide him with all details about the VIP Patient's treatment.  Dr. Carmody relayed to Defendant Femia the same information she had

relayed to Dr. Jamin the day before.  Like Dr. Jamin, Defendant Femia then confirmed that the VIP Patient was "doing fine," and told Dr. Carmody "not to worry about this case," because it would "blow over" and "was nothing," and that "[the VIP Patient] had already gone home" safely and in good health.  Notably, like Dr. Jamin, Defendant Femia did not ask Dr. Carmody about her patient charting during this call, nor did he indicate that there was any irregularity about Dr. Carmody's charting or related patient care.

104.    On December 3, 2020 (Thursday), Dr. Jamin called Dr. Carmody again to inform her that Defendant Francois had ordered further discipline for Dr. Carmody in connection with the VIP Patient's case.  Dr. Jamin informed Dr. Carmody that Defendant Francois had ordered Dr. Carmody to be placed on a Focused Professional Practice Evaluation (FPPE) for the VIP Patient's case.  The FPPE would consist of a thorough three-month review of all of Dr. Carmody's work, by a committee headed by Defendant Francois.

105.    FPPEs are not commonly ordered, and are usually limited to cases where a physician is involved with a serious adverse patient outcome (or where a case is one of many adverse outcomes in which a particular physician has been involved).  The results of an FPPE review affect the hospital privileges of the physician involved in the reviewed case and become part of the physician's disciplinary record.

106.    Dr. Jamin later admitted to the Defendant Langone ED faculty that Individual Defendants had inappropriately selected the case for FPPE review (stating, "this was barely an [MMI]").  Defendant Francois nonetheless pressed forward with this heightened disciplinary action, with himself at the supervisory helm.

107.    In addition to MMI and FPPE selection, Dr. Jamin told Dr. Carmody on this December 3, 2020 phone call that the VIP Patient's case would also be undergoing an RCA (as

requested in the VIP Letter) by the hospital RCA review committee, a group headed by

Defendant Francois in his role as Defendant Langone's Chief Medical Officer.

108.     Unlike departmental MMIs, RCAs are *hospital*-wide reviews of cases and

therefore include all other hospital departments.  Such reviews are substantial and atypical, and

they are reserved for cases involving significant adverse outcomes for a patient, such as an

avoidable death or a life-threatening injury.   At an RCA review, hospital leadership (generally

including one or more of Individual Defendants), would review medical care administered in a

particular case and discuss systemic issues that need to be improved upon to prevent future bad

patient outcomes akin to those resulting in the case.  The purpose of RCA review for serious

adverse patient outcomes is to carefully review the underlying facts and patient treatment

involved in the case to prevent recurrence of those adverse outcomes.  While departmental MMIs

are common and function partly as general education and teaching mechanisms for attending

physicians and residents, few MMIs satisfy the objective criteria for RCA review.

109.     Defendant Francois took the extraordinary step of ordering RCA review of Dr.

Carmody's case even though no independent investigation into the allegations contained in the

VIP Letter had been conducted, and even though he (like the other Individual Defendants)

*actually knew* that the case did not involve any bad outcome for the patient—the VIP Patient had

gone home from an Observation Unit on a course of oral antibiotics for a kidney infection.  Dr.

Jamin revealed that Defendant Francois had selected the case for RCA review consistent with his

friend's request in the subject line of the e-mail transmitting the VIP Letter: "RCA

REQUESTED."

110.     At approximately 11:30 A.M. on December 5, 2020 (Saturday), Defendant

Femia called Dr. Carmody and informed her that her case was undergoing *further* examination—

specifically, that Defendant Francois was examining it with a "fine-tooth comb," an atypical approach under the circumstances (especially given that discipline had already been administered in the form of FPPE, and an MMI and an RCA had been ordered). Defendant Femia again told Dr. Carmody to "stay positive" and "not to worry about it."

111.    During this phone call, Defendant Femia did not inform Dr. Carmody of any possibility that she would face further disciplinary action other than that of which she had already been made aware, nor did he indicate that there would be any need or opportunity for Dr. Carmody to defend or prepare herself in any way. At no time during this or any previous communication did Defendant Femia mention that Dr. Carmody's medical charting for VIP Patient was being discussed by the Individual Defendants.

112.    At 11:06 A.M. on the following day, December 6, 2020 (Sunday), Defendant Femia called Dr. Carmody again and terminated her employment, announcing that he was "going to have to let [her] go." Defendant Femia told Dr. Carmody that the termination was based on her chart-keeping for VIP Patient, drawing this topic to Dr. Carmody's attention for the first time. Defendant Femia said that the termination was "not about your medical management," but about "what you wrote in the chart" recording the VIP Patient's treatment. He accused Dr. Carmody of "committing fraud" that was "reportable to the State" for prosecution; he said this was because the "chart said" Dr. Carmody had examined the patient herself rather than she had supervised the resident's examination of the VIP Patient (the latter of which Defendant Femia knew *was not an available option for the attestation because he had set the system up*). No one had previously raised any question about what Dr. Carmody had recorded in the VIP Patient's medical chart or whether Dr. Carmody had any other options available to describe her treatment of the VIP Patient.

113.    On information and belief, it was only after realizing that none of the litany of accusations Defendants had begun to set in motion based on the VIP Letter would support or justify any disciplinary action against Dr. Carmody that Defendants abruptly shifted to threats and false accusations of criminal fraud against Dr. Carmody as the basis to terminate her employment.  At no point did Defendants provide Dr. Carmody with any documentation outlining any allegation or provide any factual support for their claim against her.

114.    Despite Dr. Carmody's many questions during her phone call with him, Defendant Femia refused to provide any explanation as how Dr. Carmody had done anything outside of ordinary course or in violation of standard practice at any time that would substantiate Defendants' decision to terminate her employment.  To the contrary, when Dr. Carmody attempted to explain to Defendant Femia that what she had written in the VIP Patient's chart was based on her own observation and direct supervision of the senior resident (which Defendant Femia knew was consistent with standard ED practice), Defendant Femia spoke over her explanations by repeating the statement she was refuting ("you lied in the chart! You lied in the chart!").

115.    Defendant Femia was aware at the time that he told Dr. Carmody she "lied in the chart" that there had been no dishonesty or malintent behind Dr. Carmody's actions.  Defendant Femia knew this because he himself had kept charts precisely the same way (the DRC later concluded it was standard enforced Langone ED practice, described below).  He also knew at this time that, as part of the responsibilities of his role as Chair of the Langone ED, ***Defendant Femia had himself set up, maintained, and enforced the Defendant Langone ED singular attestation scheme to "prioritize" the generation of ED revenues over accurate record-keeping to benefit himself and the other Individual Defendants, whose salary bonuses are tied to***

***hospital revenues.*** As Defendant Langone ED Chair, Defendant Femia knew Dr. Carmody had done nothing differently from what all other ED attending physicians had done and been instructed to do by himself and others on every clinical shift since at least 2013 (discussed below).

116.    Following Defendant Femia's termination of Dr. Carmody's employment and his refusal to acknowledge its improper basis, despite having already terminated her, he then demanded that Dr. Carmody "resign in writing by the end of the day" or "[he would] have to terminate [Dr. Carmody] tomorrow morning" for fraud "which would be reportable to the State." He also warned Dr. Carmody that if she did not send in her "resignation" as he demanded, a termination on her record for fraud would cause her to be ineligible for any other benefits (including COBRA, Dr. Carmody's concern—a misstatement of the law under the circumstances).

117.    Defendant Femia concluded the six-minute phone call by notifying Dr. Carmody that he would be promptly calling the other Defendant Langone ED Vice Chairs (Drs. Jamin, Goldberg, Caspers, and Grudzen) to advise them that Dr. Carmody had been terminated for committing criminal fraud that compromised patient care.  Dr. Carmody was shocked and terrified by this phone call and panicked about Defendant Femia's threats to her career, benefits (and ability to qualify for those benefits), and livelihood.  She adhered to Defendant Femia's command and sent in her forced "resignation" via e-mail to him immediately after their call.  The severe anxiety Dr. Carmody experienced from that sequence of events traumatizes Dr. Carmody to this day.

118.    Dr. Carmody's access to all Defendant facilities was abruptly cut off by 1:00 P.M. on December 7, 2020 (Monday).  Dr. Carmody had not been told to expect this sudden

timing, and never had an opportunity to retrieve her personal items from her offices (which she hopes remain there to this day). Dr. Carmody's e-mail address with Defendants was deactivated at or around the same time that her access to facilities was cut off, at which time Dr. Carmody lost all of her stored professional contacts and correspondences before she could save them. Defendant Femia refused to provide to Dr. Carmody with those contacts when she later requested them from him, and she has been unable to acquire them to this day.

119.    At no time prior to the termination of her employment (nor to to this day) did Defendants provide Dr. Carmody with a copy of any paperwork relevant to her termination, any report reviewing the facts and circumstances related to her termination, or any documentary or other evidence supporting Defendants' actions against her.

120.    At no time prior to the termination of her employment did Defendants provide Dr. Carmody with an opportunity to discuss the matter with anyone employed at NYU, to present her side of the case in any format (including to rebut Individual Defendants' version of the events leading to her termination).

121.    At no time prior to the termination of her employment was Dr. Carmody permitted to submit evidence on her own behalf, to interview witnesses or present witness testimony, to hire a lawyer to salvage her job, or to create a report or have one presented to her on the case for which her employment was terminated.

122.    To this day, it appears that no person or entity (including any person or entity affiliated with Defendants) ever filed any report with a state or other authority regarding Dr. Carmody or her casework, nor has any person or entity filed any report concerning Dr. Carmody with the National Practitioner Data Bank or the New York State Department of Health. Those failures indicate Defendants' acute awareness that such filings would have been false and

actionable against the filer(s), actions which Dr. Carmody fully intended (and intends) to pursue. To this day, Dr. Carmody has never been investigated for or charged with any crime or misconduct whatsoever.

### G.   Individual Defendants launch a smear campaign against Dr. Carmody in the wake of her termination to destroy her reputation and send a warning.

#### i.   The Zoom presentations.

123.   At 7:45 P.M. on December 8, 2020 (Tuesday), Defendant Femia invited and convened the entire Defendant Langone ED for a Zoom Meeting (the "December 8, 2020 Zoom Meeting") under the guise of discussing three MMIs (Dr. Carmody's VIP Patient case, and two unrelated cases resulting in very serious adverse patient outcomes).

124.   The December 8, 2020 Zoom Meeting was highly irregular comparative to other MMIs.  First, Defendant Femia scheduled this meeting on a Tuesday night even though MMI meetings were uniformly held on Wednesday mornings from 8 A.M. until 12 P.M.  Second, MMIs are medical lessons, and are therefore typically confined to medical practitioners (attending physicians, residents, and physician assistants), a set of personnel amounting to about 70-75 participants; yet for this putative MMI meeting, Defendant Femia invited the *entire* department including faculty, fellows, residents, nurses and administrative staff, resulting in 172 attendees.  And third, this MMI lasted for over *three and half hours*, during which time Individual Defendants (primarily through Defendant Femia, who reported back discussions from his meetings with other Individual Defendants), doubled down on their attacks on Dr. Carmody and her work in front of their audience.

125.   At Defendant Femia's direction, a physician presented Dr. Carmody's VIP Patient case on her behalf.  He presented the facts exactly as Dr. Carmody had described them to Defendant Femia, and the presentation thus evidenced that there had been no care-related

deficiencies in the case (and that to the extent treatment was administered at Lenox Hill, the treatment was consistent with the kidney infection diagnosis and treatment administered at the Langone ED).  The presenter then returned the "Zoom floor" to Defendant Femia, whom the audience expected to introduce the other two scheduled MMIs as planned (each of which involved an actual case of serious sepsis infection in patients who had been treated by male ED attending physicians, described below).  However, Defendant Femia did not introduce or discuss either of the other scheduled MMI cases.

126.    Rather, Defendant Femia went on to inappropriately disclose Dr. Carmody's identity and announce that she had been "fired" for "fraud" because she had recorded the results of a patient examination that she had supervised a resident conduct and "wrote down that she had done it herself."  He also said that the NYU Defendants were "considering" reporting Dr. Carmody "to the state" for prosecution for this "fraud," implying that Dr. Carmody had engaged in criminal conduct that should be prosecuted.  At this meeting, Defendant Femia confined the reasons for Dr. Carmody's termination to Dr. Carmody's having committed "fraud" through her charting for the VIP Patient, and at no time linked Dr. Carmody's termination to any mishandling of the VIP Patient's treatment (for there was none).

127.    Defendant Femia was challenged by numerous attendees at the December 8, 2020 Zoom Meeting about his disingenuous characterizations of "fraud," and with the fact that Dr. Carmody had chosen the only available attestation for the Defendant Langone ED (the attendees made clear numerous times that they all uniformly used the solitary attestation as instructed in ordinary course).

128.    In response to being challenged and confronted by certain members of his audience, Defendant Femia pivoted to say he did not actually believe the allegations against Dr.

42

Carmody, indicating instead that the accusations came from the other Individual Defendants. He issued statements such as, for example: "I'm using the word to describe how hospital administration [*i.e*, the other Individual Defendants] uses it, [fraud] is not my word." After pushback from numerous attendees for the arbitrary and outrageously severe punishment inflicted upon Dr. Carmody for keeping patient charts as instructed/mandated when (in one attendee's words), "we all do the same thing," Defendant Femia conceded that Dr. Carmody's treatment was unjust and inexplicable. He announced that he would revisit Dr. Carmody's termination the next day with the other Individual Defendants to try to get it reversed.

129.   On or around December 8 or 9, 2020, a senior resident met with Defendant Brotman to discuss post-graduation employment opportunities. During this meeting, Defendant Brotman raised the unrelated issue of Dr. Carmody's termination to the senior resident and inquired as to what had been said about it at the December 8, 2020 Zoom Meeting. When the senior resident related what had occurred, Defendant Brotman became frustrated and disparaged Dr. Carmody to that resident before throwing the VIP Letter in front of the senior resident to read.

130.   On information and belief, including this interaction between the senior resident and Defendant Brotman, Defendant Brotman was closely involved in Defendants' discriminatory and retaliatory practices concerning Dr. Carmody. Notably, Defendant Brotman inappropriately presented the senior resident with the VIP Letter (which, unsurprisingly, did not mention Dr. Carmody's chart-keeping) as the reason for her termination.

131.   Defendant Brotman disparaged Dr. Carmody by his words and the inferences that senior resident reasonably drew from them by falsely asserting or implying that Dr. Carmody had mismanaged the VIP Patient's medical care. When Defendant Brotman

43

disparaged Dr. Carmody's medical treatment of the VIP Patient, he knew or recklessly

disregarded the fact that Dr. Carmody had correctly treated VIP Patient for the condition she had

presented at Langone ED: a kidney infection.  Moreover, Defendant Brotman's comments

regarding Dr. Carmody were unsolicited, false, and designed to malign Dr. Carmody and her

reputation.

132.     Defendants Francois and Abramson convened another Zoom meeting on

December 9, 2020 (Wednesday) (the "December 9, 2020 Zoom Meeting"), attended by

Defendants Abramson, Femia, Francois and others in the department.  The meeting was held in

order to introduce the attendees to the DRC.  Despite its stated purpose, Dr. Carmody's

termination inappropriately became the immediate discussion topic at the meeting and remained

so for nearly its entirety.

133.     During the December 9, 2020 Zoom Meeting, Defendants Abramson and

Francois spoke about Dr. Carmody in a highly charged and negative manner, defaming and

disparaging her for about two full hours.  Both Defendant Abramson and Defendant Francois

repeatedly and fervently demeaned Dr. Carmody's work and alleged she had committed

"criminal fraud" and an "egregious case of fraud," and also asserted incongruously that "the

patient almost died" as a result of what Dr. Carmody had written.

134.     Attendees were shocked when Defendant Abramson became increasingly

frustrated by questioning from attendees at the December 9, 2020 Zoom Meeting and banged his

fist on the table when asked to explain why Dr. Carmody's conduct constituted fraud meriting

termination when nobody else was terminated for engaging in the same chart-keeping practices.

Almost shouting, Defendant Abramson responded that "this is the worst patient letter we have

ever received in history" and that it "was egregious fraud and the patient almost died." He also

44

inexplicably maintained that while other, diametrically inconsistent practices at NYU were "oversights, this is fraud," along with numerous other nonresponsive statements to the questions asked.

135.     As the December 9, 2020 Zoom Meeting progressed, Defendants Abramson and Francois continued to inflate their false narrative as they were questioned, adding that this is "just like the Rory Staunton case."  This false equation compared the VIP Patient case with that of Rory Staunton, a tragic case involving the death of a 12-year-old due to sepsis that was not timely diagnosed at the Defendant Langone ED.  Ironically, the Rory Staunton case had been the reason behind an installation of sepsis alerts in the Epic program used to guide patient treatment. Those sepsis alerts were programmed to go off as a result of certain patient triggers such as abnormal vital signs, and to warn the treating physician to check the patient for sepsis.  .

136.     As discussed above, the later-issued RCA Report confirmed that the Rory Staunton Epic alerts did not go off during the course of Dr. Carmody's supervisory treatment of the VIP Patient, indicating that the VIP Patient did not have symptoms consistent with sepsis when in the Defendant Langone ED.  Despite knowing the cases were not equivalent in any way, primarily because the VIP Patient never had sepsis, Individual Defendants directly and repeatedly compared these distinct cases multiple times to disparage Dr. Carmody.

137.     When Defendants Abramson and Francois said that Dr. Carmody had "committed fraud," both knew or should have known that their statements were false, for both knew the actual facts: Dr. Carmody had accurately recorded the results of a directly supervised resident examination during which she had followed standard, routine ED practices.  She used the *only* available Defendant Langone ED attestation that she was aware of to record that information in the VIP Patient's chart.  Both Defendant Abramson and Defendant Francois knew

that the Langone ED had only one available attestation for patient care, and Defendant Femia confirmed repeatedly at the December 8, 2020 Zoom Meeting and the later December 10, 2020 Zoom Meeting that he had enforced the department-wide use of that attestation option.

138.    Both Defendants Abramson and Francois also knew that Dr. Carmody had an unblemished patient care record, and was a superb doctor and educator (Defendant Abramson specifically noted at one of the meetings that Dr. Carmody had recently won an institution-wide award).  They knew Dr. Carmody had no motive whatsoever to inaccurately record any patient care information, because she had nothing to personally gain from following or not following the billing practices they had instructed her to use.  They knew very well that her life's work has been about patient care, medical education, and equal rights—not financial operations or departmental revenue schemes.

139.    Both Defendants Abramson and Francois knew that the VIP Patient had suffered no adverse outcome from Dr. Carmody's treatment, that the VIP Patient did not have sepsis, that the VIP Patient did not die or suffer any near-death experience, and that the Rory Staunton sepsis alerts had not gone off in Epic during the course of treatment in that case; they knew, therefore, that the Rory Staunton comparison was entirely false.  The VIP Letter submitted by Defendant Francois' friend had informed them that the VIP Patient had been treated and released home from Lenox Hill Hospital's Observation Unit with treatment for a suspected kidney infection— ***not sepsis***—and that this was the same treatment that Dr. Carmody had prescribed.  Both knew also that the Lenox Hill Hospital Observation Unit treatment the VIP Letter had described was inconsistent with sepsis, which would have demanded double coverage with two highly potent IV antibiotics, not the same kidney infection medication as Dr. Carmody and Lenox Hill Hospital had both prescribed.

140.     In short, Individuals Defendants knew that the VIP Patient had a kidney infection and that this is what Dr. Carmody treated the patient for, just as Lenox Hill Hospital had done.  Individual Defendants turned to allegations of "fraud" as a stand-in for the basis to terminate Dr. Carmody's employment they realized too late would not work, and added threats of criminal repercussions to repel any challenges to their actions.

141.     At the direction of the other Individual Defendants, Defendant Femia convened and held yet another Zoom meeting on Thursday, December 10, 2020 (the "December 10, 2020 Zoom Meeting") to further denigrate Dr. Carmody and quell dissent and resistance to their decision.  This was the explicit purpose of the meeting—no other reasons for holding it were provided.  Defendant Femia again invited more than 180 members of Defendant Langone's ED so that Individual Defendants through Defendant Femia could continue to defame and disparage Dr. Carmody *for over three and a half hours*.  The attendees did not have any interest in knowing and discussing the details, as many attendees expressly remarked to Defendant Femia when they objected to what was occurring.  Departmental terminations had never previously been discussed in such a public setting, and none since.

142.     Recordings from the December 10, 2020 Zoom Meeting reveal Defendant Femia's repeated defamation and disparagement of Dr. Carmody.  Increasing his attacks on Dr. Carmody in response to further pushback from certain attendees, Defendant Femia stated numerous times that Dr. Carmody had committed "fraud," that she "had lied in the chart, that the "patient almost died," and that the case was "just like Staunton."  Defendant Femia also said that Dr. Carmody "would be reported to the State" for prosecution and that Dr. Carmody "could lose her license" for fraud (a materially enhanced threat from his prior statement just days before that "it might" be reportable and that reporting was "being considered").  Defendant Femia's

comparison of the VIP Patient case to the Rory Staunton case and his other disparaging statements mirrored the false and misleading words of Defendants Abramson and Francois at the December 9, 2020 Zoom Meeting the day before, which Defendant Femia adopted as his own.

143.    Recordings from the December 8, 2020 and December 10, 2020 Zoom Meetings reveal that Defendant Femia convened those meetings in non-privileged settings.  Defendant Femia, Dr. Jamin, Dr. Caspers (then the Vice Chair of Operations) and Dr. Goldberg reiterated at one or both of these meetings that they had already discussed the case repeatedly with one or more of the Individual Defendants at other meetings with them.  Each admitted his or her awareness that Defendant Femia did not believe that Dr. Carmody had committed any fraud or engaged in any wrongdoing whatsoever, which Defendant Femia did not dispute in any instance.

144.    A number of attendees at one or more of these meetings reminded Defendant Femia that Dr. Carmody's "intent" would be a necessary element of any fraud charge against her.  Dr. Jamin agreed with attendees that Dr. Carmody had no "intent," stating unequivocally that: "[i]t's not fair, there was no intent.  She was right there near the patient … which is exactly what she said….", later confirmed by the RCA Report.  Defendant Femia did not contradict or otherwise oppose any of the numerous remarks from attendees at one or both meetings that Dr. Carmody could not have committed fraud for she obviously lacked the requisite intent.  Despite his prior assertions, when challenged, Defendant Femia conceded repeatedly that Dr. Carmody had no intent to commit fraud, and at various points deflected the accusation (saying that "fraud was their word, not mine," and that he "was not using the term fraud").  He did not explain why, given this position, he had previously used criminal fraud to describe Dr. Carmody's conduct.

145.    Defendant Femia also did not explain why, given his concessions, he continued with his allegations that Dr. Carmody had committed "fraud" and stated at the December 10,

2020 Zoom Meeting that her conduct had to be reported to the State as a "soft reporting." When pressed, he could not justify these determinations (nor explain what they even mean). He also did not provide a satisfying answer to remarks by attendees that attending physicians, including Defendant Femia *himself*, had followed precisely the same chart-keeping practice followed by Dr. Carmody for VIP Patient. Defendant Femia notably declared in response to questioning that repeating a resident examination was "not necessary or required" and that the "attestation language would be looked at."

146. At the December 10, 2020 Zoom Meeting in particular, several resident and attending physicians questioned the highly suspicious circumstances and inconsistent reasons presented by the Individual Defendants for their decision to terminate Dr. Carmody's employment. Those residents and attending physicians voiced that the Individual Defendants, and Defendant Femia in particular, were engaging in retaliation against a doctor who had advocated for the equitable treatment of NYU employees because the reasons presented to support Dr. Carmody's termination did not make coherent sense. As one attending physician remarked: "This was a calculated decision to fire her and there was a public beheading called in a vague meeting to have this done in front of everybody."

147. A number of attendees at the December 10, 2020 Zoom Meeting also expressed outrage over the ongoing campaign to destroy Dr. Carmody's reputation and pretextual basis to justify the termination of her employment conveyed through inappropriately convened Zoom meetings (one "in the guise of patient safety," referring to the December 8, 2020 Zoom Meeting) to discuss Dr. Carmody without her having the ability to defend herself. In the words of one attending physician: "If the person who's most respected in our department is taken down in front of everybody, the clear message is anybody can be taken down." During the December 10,

2020 Zoom Meeting, several female physicians remarked that Dr. Carmody had "a target on her back" long before she was terminated.  At no point did Defendant Femia disagree.

148.     A number of attendings questioned Defendant Femia about this "paradigm shift" regarding patient care (*i.e.*, "what happens tomorrow morning for me?"), what attendings needed to do regarding resident supervision (*i.e.*, "Kristin did the same as we all do!") and whether staffing levels would be increased in order to allow them to comply with the attestation wording or whether the attestation would be changed.  In response, Defendant Femia unequivocally declared that it "*won't end up being that you [attendings] have to repeat everything the resident did*," clarifying that a resident examination was "*not necessary or required*," and promising that "*we'll get clarification on how the attestation reads*."

149.     Dr. Caspers reinforced and promoted Defendant Femia's statements in his then-role as Vice Chair for Operations.  Yet he also stated that ED leadership had expressed certain of the Individual Defendants (Defendants Grossman, Abramson and Francois) that "the type of change in culture and safety and quality that they expect to see from us is near impossible without Kristin's presence and that we need her back on our team to help us lead this," and in a December 14, 2020, email to the Langone ED, he confirmed that the policy as enforced against Dr. Carmody was an entirely new policy that ED leadership was still trying to come to terms with so they could advise ED medical personnel how to comply.

ii.     The Root Cause Analysis Meeting and Report.

150.     Approximately a week later on December 16, 2020, Defendants convened the RCA (Root Cause Analysis) meeting for the VIP Patient's case (the "RCA").  Attending physicians, residents and fellows from across the institution logged into the RCA which was conducted via Zoom.  Again, there had been no bad patient outcome in the VIP Patient's case

and, therefore, the case did not fit the objective criteria for RCA selection, but Defendant

Francois had selected the case for RCA review anyway in collusion with his friend, the VIP

Patient's spouse.

151.    Although RCAs do not typically disclose the treating physician's identity,

substantially all the attendees at this RCA knew that Dr. Carmody was the attending physician

involved in the case under review.  They knew this because by this time, the case had achieved

institutional notoriety across NYU (due to the inappropriate revelation of the termination by

Defendants Abramson, Francois, and Femia at the December 8, 2020, December 9, 2020 and

December 10, 2020 Zoom Meetings).  This knowledge was confirmed to RCA attendees (many

of whom promptly texted confirmation to Dr. Carmody's cell phone) when the senior resident

who had worked with Dr. Carmody on VIP Patient's case revealed herself at the RCA.

152.    A number of RCA attendees later related to Dr. Carmody that Defendant

Francois appeared to base the review of the VIP Patient's medical care at Lenox Hill Hospital

entirely on the content of the VIP Letter and not on actual Lenox Hill Hospital records, because

Lenox Hill hospital records were neither distributed to attendees nor referenced in the later-

produced RCA Report.  Notwithstanding the absence of actual medical records for the VIP

Patient, Defendant Francois not only relied on the unverified narrative in the VIP Letter in his

RCA presentation but also  distorted the facts that the letter itself contained in order to disparage

Dr. Carmody.[5]

153.    For example, Defendant Francois misrepresented that the patient was "septic"

when she was at the Defendant Langone ED, and stated that this condition should have been

obvious to Dr. Carmody because the VIP Patient "could not tolerate any oral liquid" and "was

---

[5] At least two RCA attendees surmised to Dr. Carmody that Defendant Francois may not have known that Defendant
Femia had distributed VIP Letter to the entire Defendant Langone ED when he engaged in distortions.

shaking" and "dropping pills."  Even after the senior resident who had treated the VIP Patient interjected and said this was not so (and that she had seen VIP Patient drinking fluids and interacting with nurses in a lively fashion in the ED), Defendant Francois acknowledged the discrepancy but was not dissuaded from further reliance on the unconfirmed claims in the VIP Letter during his presentation.  The RCA Report, provided after the RCA meeting, records the correct statement of events in that regard.

154.     Defendant Francois also falsely asserted several times during the RCA that "the patient almost died" as a result of the Defendant Langone ED care she had received.  When challenged by an attending physician (and certain residents) that those statements were directly contradicted by the treatment plan described in the VIP Letter itself, Defendant Francois admitted that the VIP Patient had been discharged home from the Lenox Hill Hospital Observation Unit on a course of oral antibiotics.

155.     Frustrated that his false narrative was being challenged and directly contradicted by the actual facts of the case, Defendant Francois turned to aggressively target one of the female attending physicians at the RCA who had continued to question him, barking "how did you get invited to this."  When she persisted with further questioning, Defendant Francois ended the RCA prematurely as he did again for least one other meeting where he was challenged concerning Dr. Carmody, as the recording of that meeting reveals.

156.     On information and belief, NYU physicians approached Defendant Francois in the weeks after Dr. Carmody was terminated to request a reversal of the termination decision, explaining that Dr. Carmody had done nothing wrong and had followed standard ED practice. Without explanation, Defendant Francois abruptly responded each time that "she committed fraud."

157.     Defendant Francois' statements directly and by implication injured Dr. Carmody in her profession as a doctor because they suggested she had disregarded symptoms and failed to treat a serious illness, and as a result the patient had "almost died" a false narrative that Defendant Grossman promoted as recently as July 2021.  Defendant Francois knew his statements were false when he made them (for the multiple reasons described above), yet he maliciously continued to make them to support Defendants' pretextual reasons for terminating Dr. Carmody.

158.     On February 2, 2021, the RCA committee distributed the RCA Report for the case to RCA attendees and institutionally across NYU.  The RCA Report recorded that the VIP Patient had originally been treated for a suspected UTI, which Dr. Carmody and the senior resident on the case upgraded after consultation and review to treatment for a suspected kidney infection attributable to a change in VIP Patient's condition.  Remarkably, the RCA Report contains no record of how the VIP Patient was treated, if at all, at Lenox Hill Hospital, nor did it detail any adverse outcome suffered by the VIP Patient that would have justified holding the RCA.

159.     Defendant Francois, as the person in charge of the RCA, caused the following unnecessary and defamatory statement to be inserted in the RCA Report:

> Investigation confirmed that despite the ED Attending's attestation, the Attending did not examine the patient.

Yet on information and belief there had been no "investigation," and Dr. Carmody had never maintained she had herself had physically examined or re-examined VIP Patient after senior resident had already examined her under Dr. Carmody's direct supervision.  Nor had been any need for Dr. Carmody to personally re-examine VIP Patient because she and senior resident already had diagnosed VIP Patient with a kidney infection, which is what she had.  Dr. Carmody

had been truthful and accurate in her medical charting and told both Defendant Femia and Dr.

Jamin so, as they admitted to the faculty at the December 10, 2020 Zoom Meeting.

160.    The RCA Report's use of the words "despite the ED Attending's Attestation" to

describe how Dr. Carmody had documented the VIP Patient's visit fails to acknowledge that Dr.

Carmody chose the *only* attestation available to her, despite Defendant Francois' actual

knowledge of this fact.  The omission of this material fact falsely implied that Dr. Carmody had

other attestation choices and deliberately chose one that was incorrect.  Therefore, RCA

attendees and others to whom the RCA Report was distributed drew the false and misleading

impression that Dr. Carmody had deliberately charted the VIP Patient's care incorrectly, which

had been discovered only after an "investigation."

161.    Defendant Francois' deliberate, intentional defamation of Dr. Carmody

disparaged Dr. Carmody in her profession as a doctor by implying she had engaged in serious

misconduct impacting patient care, which he actually knew had not happened.  Moreover, in the

context of an RCA involving a discussion of patient care, Defendant Francois (in his role as

Chief Medical Officer) had an affirmative obligation to disclose that complete information to

attendees, yet he failed to do so.

162.    The RCA Report also contains the following defamatory statement:

> Lastly, the RCA Committee reinforced the institution's expectation
> that, although the patient was in constant view of the ED team and
> Attending, the documentation and physician attestation must be
> based upon interventions undertaken.

This statement further defames Dr. Carmody in her profession because, in the context of the

RCA as a whole and the complete RCA Report, it conveys the false impression that Dr. Carmody

chose to inaccurately chart patient care when, in fact, she had no choice as to how she recorded

that information because the unique Langone ED attestation offered her no choice (as the later

54

DRCR found, and Defendant Francois knew when he caused it to be inserted in the RCA Report).

163.    Because Defendant Francois was in charge of both the RCA and DRC, he knew or recklessly disregarded that those incomplete statements were misleading and false when he caused them to be included in the RCA Report, a widely distributed document.  Nevertheless, he himself inserted the false statements or caused them to be inserted into the RCA Report anyway, and failed to correct the defamatory misimpression they created that Dr. Carmody had engaged in some form of professional misconduct.

        iii.    The Departmental Review Committee Report (DRCR).

164.     Defendant Femia presented a summary of the DRCR on March 23, 2021  to NYU ED faculty and residents, and distributed the summary PowerPoint presentation to the entire Defendant Langone ED shortly thereafter.  The DRCR supported Dr. Carmody's account of events.

165.    The DRCR revealed problematic, systemic issues both with Defendant Langone's Epic system's charting, as well as with the NYU Defendants' serious mismanagement of attending physicians and patient care from operational perspectives.

166.    The DRCR confirmed that Dr. Carmody had followed the same practices and procedures as every other attending physician in the Defendant Langone ED, including the way in which she entered the patient information and signed the Epic attestation for VIP Patient's medical chart.  The DRCR recorded that "Residents, Attending physicians, and PAs stated recent disciplinary actions inequitable to what they witness from other clinical services."  This is a reference to the fact that Dr. Carmody was terminated for following precisely the same charting practice as other medical faculty across the department and hospital.

167.     The DRCR identified that, unlike other EDs in the NYU Defendants' hospital system (*e.g.*, Bellevue Hospital) and institution-wide (*e.g.*, NYU's Department of Medicine), attending physicians at the Defendant Langone ED were in the unique position of having no choice of attestation template for patient care, because Defendants had secretly "designed [the Langone ED attestation] to prioritize financial reimbursement" rather than to reflect patient care provided (*i.e.*, to defraud patients by overbilling them), and required attending physicians to use it.

168.     The DRCR also found that the chart-keeping practices that the Individual Defendants claimed was a basis for Dr. Carmody's termination had been a department-wide standard practice.  *Even after they knew that Dr. Carmody had been terminated for using the ED attestation system,* attendings reported to the DRCR that they continued to record information from resident examinations in patient charts, and that attendings continued to sign charts without changing the template just as Dr. Carmody had done.

169.     The DRCR also found that Defendant Langone ED attending physicians experienced a "palpable" "fear of retaliation" for engaging in legitimate activities regarding patient care, confirming the existence of the pervasive discriminatory and retaliatory environment that Dr. Carmody experienced.

170.     On information and belief, Dr. Carmody is the only physician to date whose employment was terminated by Defendants for using the Defendant Langone ED patient charting system that *all* attending physicians in the ED used in the same way without alteration up to Dr. Carmody's termination.  By way of examples, neither of the two male attending physicians that Defendants flagged for MMI review at the same time as Dr. Carmody were terminated for this reason, despite using the exact same attestation in far worse circumstances.  Nor was any person

in the NYU Defendants' leadership—such as the Individual Defendants— who secretly designed the fraudulent attestation system terminated

171.    In the wake of Dr. Carmody's unlawful termination in December 2020, Defendant Femia set up an "attestation review committee" to review the attending supervisory attestation language in response to Langone ED faculty demands.  This committee consisted of a number of Langone ED physicians responsible for operations, with representatives of NYU's patient billing department also attending these meetings.  The NYU billing representatives in attendance at these meetings confirmed that the attending supervisory attestation language was driven by billing rather than intended to reflect patient care, and that changes that allowed for an alternative attestation would reduce ED revenues.

####    iv.    Defendant Grossman's presentation to new residents.

172.    Incredibly, to the first year class of new NYU residents, the Dean of NYU medical school deliberately and demonstrably lied about Dr. Carmody's medical care of VIP Patient in a presentation about professionalism in the medical profession.

173.    On July 7, 2021, at the intern orientation for new ED residents enrolled at NYU (the "Intern Orientation"), Defendant Grossman continued Defendants' attacks on Dr. Carmody to an audience comprised of the new ED intern class of 18 resident physicians, their program directors, Defendant Femia, Defendant Francois, Dr. Caspers, and then-COO of NYU Robert Cerfolio, M.D., as well as possibly others.  During this presentation, Defendant Grossman stated that the VIP Patient situation was a "classic case[]" of "un-professionalism" in the Langone ED, and announced a new story about Dr. Carmody's termination: that a female attending physician

had mismanaged a patient[6] with "pyelonephritis" (a kidney infection) as well as sepsis.

174.    While conceding that the VIP Patient "presented with what looked for all the world like a UTI," Defendant Grossman nonetheless proceeded state that in treating VIP Patient, Dr. Carmody "missed the sepsis," "missed the pyelonephritis [kidney infection]," and "missed everything."  He attributed this solely to "the attitudes, literally hubris on the part of the attending as well."

175.    Defendant Grossman knew or should have known that such statements were false, because at the time he issued them the RCA Report had already been shared with him.  The RCA Report confirmed that the VIP Patient had in fact been treated for a possible kidney infection with corresponding antibiotic Cefpodoxime, and stated:

> The ED team including the ED attending were made aware of the patient's low grade fever and the plan was for Tylenol and due to concern for possible pyelonephritis her antibiotics were changed to Cefpodoxime. *** The patient was subsequently ordered for and received Tylenol and one dose of Cefpodoxime.  The patient was now to be discharged on Cefpodoxime [for her "pyelonephritis"/kidney infection]

while also confirming that Epic sepsis alerts had not been triggered by the VIP Patient's symptoms.

176.    Also during his presentation at the Intern Orientation, Defendant Grossman used the VIP Patient's case to disparage Dr. Carmody's educational work and reputation.  After attributing his false allegations of mishandling to "hubris on the part of the attending," he went on to call this "classic case from the ED" a "cautionary note" for the residents entering school to learn, stating: "You're here for an education, and you don't want to be shortchanged."

---

[6] Due to the notoriety that the VIP Patient case had attained at the Defendant Langone ED, substantially all the attendees at the Intern Orientation knew that Defendant Grossman was referring to the VIP Patient case and that Dr. Carmody was the attending physician fired in connection with it.  On information and belief, any attendee who did not initially understand the reference was quickly informed by those who did.

177.     Both Defendant Femia and Defendant Francois participated in Defendant Grossman's continuation of the retaliatory defamation campaign against Dr. Carmody by not correcting Defendant Grossman's false statements concerning her work, despite having actual knowledge that such statements were false and malicious when issued.

178.     Defendant Grossman, like Defendants Abramson, Francois, and Femia, had access to information contradicting his statements regarding Dr. Carmody at the time that he made them, demonstrating that he either knew such statements to be false or recklessly disregarded the truth when he made such statements to harm Dr. Carmody's professional reputation.

179.     Defendants Grossman, Abramson, Francois, and Femia made conclusive, authoritative statements about Dr. Carmody's character and her work that were contradicted by both the RCA Report and the DRCR, including their many accusations that Dr. Carmody engaged in fraud, that she had intentionally and deliberately engaged in criminal misconduct, and that her patient care had resulted in a near-death experience for a patient.  In fact, Defendant Grossman's, Abramson's, Francois,' and Femia's statements at the December 8, 2020 Zoom Meeting, the December 9, 2020 Zoom Meeting, the December 10, 2020 Zoom Meeting, the RCA meeting and at the Intern Orientation,[7] were, at the very least, reckless, malicious, and designed to send a message to other NYU physicians who might otherwise object to Individual Defendants' unlawful actions.

180.     At all the identified meetings (and potentially others yet undiscovered), Defendants' extensive and continuing defamation and disparagement of Dr. Carmody and her work reached doctors around NYU, New York City, other states, and even other countries in a

---

[7] Most recently, Dr. Carmody has been informed by other practicing doctors in New York City that false narratives regarding Dr. Carmody's termination have also reached medical recruiters through NYU leadership.

widespread destruction of Dr. Carmody's reputation that has caused irreparable harm to her career and health.  Dr. Carmody has been and reasonably believes that she will continue to be unable to obtain an equivalent position to the one from which Defendants terminated her or a promotion beyond that position.  Defendants destroyed the career that Dr. Carmody had steadfastly built with professional dedication at great personal sacrifice.

181.    Defendants' real reasons for terminating Dr. Carmody lie nowhere near her treatment of the VIP Patient or her signing NYU's mandatory, unique attestation.  Rather, they lie in her advocacy for the equal treatment of women, her opposition to Defendants' retaliatory treatment of legitimate advocacy at the institution, and her opposition to and undermining of Defendants' blacklist of hard-working and talented residents for pursuing their legitimate, statutorily protected rights.  Defendants' pretextual termination of Dr. Carmody's employment and other conduct constitutes discrimination and retaliation.

### H.    Defendants consistently favor male physicians by rewarding subpar performance, discipline-worthy behavior, and even criminal conduct.

### i.    Defendants rewarded subpar performance and discipline-worthy behavior.

182.     At the time that Defendants terminated Dr. Carmody's employment, they flagged two "similar" MMIs both involving male physicians (but notably did not personally identify the physicians involved in either case).  These other two cases *actually* involved serious patient complications resulting from sepsis (unlike Dr. Carmody's, which did not actually involve sepsis at all).  In connection with one of those two MMIs, a male physician missed a septic leg abscess because he had not ordered a standard procedure for such a case.  Neither male physician was subjected to an FPPE, and no other discipline was issued against either physician, despite the substantial adverse patient outcomes that had ultimately required urgent, surgical intervention.  According to a medical professional directly involved in one of the cases, the

attending physician in question did not himself physically examine or re-examine the septic patient in question and signed the same unique Defendant Langone ED attestation as Dr. Carmody had because it was the only available, mandated choice.  On information and belief, Individual Defendants were aware of those facts after they reviewed the patient charts for those other two cases; yet they terminated only Dr. Carmody's employment.

183.    Defendants continued to assign special treatment to male physicians when, after terminating Dr. Carmody from a position for which she was highly qualified, they immediately replaced her with a less qualified man, Dr. Caspers.  Dr. Carmody's male replacement did not satisfy the position description requirements for her former role, including the requirements set out in the original national advertisement for the position in 2016-17.

184.    Specifically, Dr. Caspers' previous roles had been strictly operational and non-educational.  Dr. Caspers does not possess a M.H.P.E. degree (or any equivalent or similar degree), even though the NYU Defendants had specifically identified this degree as a qualification for the position when Dr. Carmody applied in 2017 and even though this degree is a generally accepted prerequisite (or at least highly desirable asset) for a Vice Chair of Education position.  Dr. Caspers does not have any academic publications focused on education and does not have an Associate Professor degree on the appropriate educational track for the position (he is a "Clinical Associate Professor" and not on the education/scholar track as would be required for an educational leadership position).  Nor has Dr. Caspers ever involved himself with professional mentorship of anybody at NYU, another basic requirement for the position of Vice Chair of Education at a major educational institution.  Neither did he attend educational meetings or express interest in educational events held by NYU, and therefore failed to gain the experience with faculty and resident education that is critical to an educational leadership role.  Dr. Caspers

also did not work clinical shifts at Defendant Langone's ED or Bellevue Hospital's ED and, therefore, did not frequently work with residents on his clinical shifts and has no experience teaching them clinically—a basic requirement for any person occupying a senior educational role.

185.    Notably, Dr. Carmody's less qualified male replacement had never involved himself with objecting to the improper treatment of female and minority residents and employees.  Rather, on information and belief he maintains a close personal relationship with Individual Defendants and protects their interests over those of the institution.

186.    Individual Defendants awarded Dr. Caspers with Dr. Carmody's executive position without any interview or any competitive application process.  Defendants did not publicly post this senior, important educational position at the time he took it over, notwithstanding institutional policies requiring that executive-level positions be posted to prevent exactly the type of discrimination that occurred here.  Rather than being forced to undergo additional, substantial interviews by institution-wide educational leadership for the role as Dr. Carmody had been, Individual Defendants simply selected Dr. Caspers via a tap on the shoulder.  Each of Defendants Grossman, Abramson, Brotman, and Femia approved Dr. Caspers' elevation to this position under NYU's internal policies and procedures.

187.    When Dr. Caspers was appointed to the position of Vice Chair of Education, the NYU Residents filed a formal complaint with the ACGME stating: "The residents believe that the current VCE, Dr. Chris Caspers, is not qualified for the role."  They went on to cite their reasons (same as above).  ACGME subsequently commenced an investigation of the NYU EM department, placing significant focus on its education of residents and Dr. Casper's competency in an educational role.

188.     On information and belief, when the Individual Defendants gave Dr. Caspers Dr. Carmody's Vice Chair of Education position, they gave him a more favorable contract with a larger salary and bonus than Dr. Carmody had received in the same role.

189.     Dr. Carmody is also aware of certain male colleagues who received severe and repeated negative feedback from their colleagues over the course of several years during her employment, yet were never subjected to disciplinary action or further investigation.  One particular male physician was reported on multiple occasions to the NYU Defendants' Human Resources Department for abusive, misogynistic, and racist behavior towards physicians, staff and patients, yet he kept his position and continued his abusive behavior without repercussion. When Dr. Carmody pressed Defendant Femia in November 2020 to discipline this colleague due to the many reports of his deplorable conduct towards multiple female mentees of hers, Defendant Femia insisted to Dr. Carmody that this male physician *must* be allowed to "gracefully retire" rather than have his reputation destroyed by an ugly termination for his misconduct.

190.     Defendant Femia's academic promotion in 2016 to the title of "Associate Professor (scholar track)" from "Assistant Professor" in connection with his appointment as Chair of Langone ED further evidences Defendants' long-standing, pervasive, and ongoing gender discrimination.  Normally, the promotion from "Assistant Professor" to "Associate Professor" represents a prestigious distinction in academic medicine, especially for those pursuing a career in high-level educational positions.  To qualify for this promotion, the applicant typically must possess and present a substantial amount of peer-reviewed publications, innovative research, national awards, and recommendations from higher-ranked academic peers from outside the reviewing institution.  That material is then thoroughly reviewed and vetted by a

institutional "promotion review committee," which also engages in a substantial review of the candidate's work and curriculum vitae in a process that can take many months.

191.    Defendant Femia's promotion did not follow that standard process.  In 2016, Defendant Femia was promoted from Assistant Professor to Associate Professor despite his lacking the qualifications for the promotion under applicable institutional guidelines, which qualifications (or lack thereof) were not vetted like other promotion candidates.  On information and belief, Defendants Grossman, Abramson, and Brotman leapfrogged Defendant Femia over the normal promotion process knowing he would not have satisfied the promotion criteria (particularly external peer review) had he been vetted, and would not have passed the promotion review committee.

192.    At or around the same time that Defendants were promoting Defendant Femia, Dr. Carmody likewise applied for academic promotion from Assistant Professor to Associate Professor.  Defendants denied Dr. Carmody's promotion, even though she was highly qualified for promotion under applicable institutional guidelines and possessed all the necessary qualifications.  Defendants did not provide her with an explanation as to why she did not receive the promotion, sending her instead a rejection letter describing lack of grant funding that had nothing to do with her promotion application.  At the time when Dr. Carmody was eventually promoted to Associate Professor on the education/scholar track on her re-application, she was the only female Associate Professor in the NYU ED on that track.  Defendant Femia, as a male, with the assistance of Defendants Grossman, Abramson and Brotman, encountered no difficulty whatsoever.

ii.    <u>Defendants have a history of covering up the real fraud and other criminal misconduct of male doctors, and discriminating against women.</u>

193.    In stark contrast to Defendants' demonstrably false accusations of "fraud"

against Dr. Carmody for keeping patient charts as enforced, Defendants have a history of covering up egregious cases of actual fraud and other potentially criminal conduct to protect male doctors.

194.     Based on the facts presented at an August 12, 2020 MMI review (and confirmed by a number of physicians directly involved in the case), a child VIP patient related to two different male physicians employed at NYU was admitted to the Defendant Langone ED on June 11, 2020.  This child patient was exhibiting symptoms of benzodiazepine overdose after being injected with the drug at home.  The physicians who treated the child patient at the ED called New York City Child Protective Services (NYCCPS) to alert social workers to potential child abuse, as the treating physicians are legally required to do.  Shortly thereafter, the treating physicians received a call from Defendant Femia (at the direction of one or more of the other Individual Defendants), berating them for calling the authorities on this case.

195.     The MMI of the case revealed that on June 13 or 14, 2020, a male physician employed at NYU and related to the VIP child patient illegally accessed the child patient's ED medical chart and made a false entry.  The entry indicated that this physician had overseen the child patient's care prior to patient admission to the Defendant Langone ED, and identified an alternative cause for the child's symptoms separate from what treating doctors had determined. The MMI review revealed that the entry was false because this physician had not been involved in the child patient's treatment at all, and had no authority or right to access the patient's chart. Doing so was a direct, unequivocal violation of protocols and procedures and an example of real criminal fraud.

196.     Multiple persons in the NYU Defendants' leadership (including specifically Defendants Grossman, Abramson, Francois and Femia) were actually aware of and actively

involved in what had occurred in the child patient's case.  Each (but especially Defendant Francois in his role as Chief Medical Officer) had clear legal obligations to report the case to multiple authorities.  Nevertheless, the male physician who had altered the patient chart and the male physician that had brought the child in for treatment remain employed at NYU with unblemished records, treating patients today.

197.    Individual Defendants assisted with the cover-up of the misconduct involved with this case.  This was clear, for example, when at the MMI Dr. Jamin instructed physicians in the Defendant Langone ED at Defendant Femia's direction to consult with "ED management" (Defendant Femia) before reporting a VIP patient directly to NYCCPS in the future.

198.    In addition, on information and belief there is at least one male attending physician who, during his January 12, 2020 clinical shift, signed Epic attestations that he himself actually treated and physically examined three different patients that he had not even observed treatment for at all.  This male physician occupied a comparable executive and clinical position to Dr. Carmody at the time of Dr. Carmody's termination.  But that male physician was not warned, disciplined, or terminated by Defendants even though, on information and belief, Defendant Femia knew about the attestations by this male physician and may have passed that information along to the other Individual Defendants.

199.    More recently, in October 2021, Defendants demonstrated their favoritism toward another executive-level male physician who had been reported on numerous separate occasions to Defendant's Human Resources Department ("HR") for acts of sexual harassment and other misogynistic conduct in breach of NYU policies and procedures over the course of many years.

200.    Upon information and belief, one example of this physician's misconduct occurred just before he was to commence chest surgery upon a female patient.  Upon entering

the operating room and observing the patient laying nude on the operating table, this physician made a crude and obscenely sexual comment about the woman's breasts. This incident was reported to NYU's HR by one or more of the members of the surgery team present for the comment.

201.    Upon information and belief, another example of this physician's misconduct occurred when he stated to a large NYU meeting concerning staffing in mid-2019 that "as a manager, you have to be mindful of the people you are hiring" and went on to sincerely propose that women of childbearing age no longer be hired at Defendant NYUGSOM due to their tendency to get pregnant and cause staffing problems; he later stated at the same meeting that NYU should also decline to hire "older women." At least one female physician present at that meeting reported the incident to NYU's HR.

202.    Upon information and belief, this physician's routine criminal discriminatory misconduct was reported to Defendant Grossman on numerous occasions over the years during which it occurred, during which time Defendant Grossman took no action in response—the physician was not terminated, disciplined, or even investigated.

203.    In October 2021, Defendant Grossman announced that this physician was voluntarily "stepping away" from his managerial role to concentrate on his other professional responsibilities. Defendant Grossman gave a glowing presentation of this physician's achievements, praising his accomplishments and affectionately referring to him by nickname. Defendant Grossman made no mention during this time of the real reasons removing this physician from his administrative position.

### FIRST CAUSE OF ACTION
**(Violation of Title VII—Gender Discrimination)**
**AGAINST NYU DEFENDANTS**

204.     Plaintiff repeats Paragraphs 1 through 203 of this Amended Complaint with the same force and effect as if more fully set forth herein.

205.     By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

206.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

207.     Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

## SECOND CAUSE OF ACTION
### (Violation of Title VII—Retaliation)
### AGAINST NYU DEFENDANTS

208.     Plaintiff repeats Paragraphs 1 through 207 of this Amended Complaint with the same force and effect as if more fully set forth herein.

209.     By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff for her opposition to gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  As a result of Defendants' discriminatory illegal actions, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits,

termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

210.    Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights

## THIRD CAUSE OF ACTION
### (Violation of NYSHRL—Gender Discrimination)
### AGAINST ALL DEFENDANTS

211.    Plaintiff repeats Paragraphs 1 through 210 of this Amended Complaint with the same force and effect as if more fully set forth herein.

212.    By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff on the basis of her sex in violation of NYSHRL § 296(1).

213.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

214.    Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

215.    Each Individual Defendant actually and intentionally aided and abetted the NYU Defendants in discriminating against Plaintiff on the basis of her sex in violation of NYSHRL § 296(6), by personally leading and participating in discriminatory acts as alleged.

## FOURTH CAUSE OF ACTION
### (Violation of NYSHRL—Retaliation)

**AGAINST ALL DEFENDANTS**

216.     Plaintiff repeats Paragraphs 1 through 215 of this Amended Complaint with the same force and effect as if more fully set forth herein.

217.     By the above acts, practices and described misconduct, Defendants discriminated against Plaintiff for her opposition to gender discrimination in violation of NYSHRL § 296(7).

218.     As a result of Defendants' discriminatory illegal actions, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

219.     Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

220.     Each Individual Defendant actually and intentionally aided and abetted the NYU Defendants by personally participating in retaliation against Plaintiff in violation of NYSHRL § 296(6) for her participation in protected activity.

**FIFTH CAUSE OF ACTION**
**(Violation of the NYCHRL—Gender Discrimination)**
**AGAINST ALL DEFENDANTS**

221.     Plaintiff repeats Paragraphs 1 through 221 of this Amended Complaint with the same force and effect as if more fully set forth herein.

222.     By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff on the basis of her sex in violation of NYCHRL § 8-107(1).

223.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

224.     Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

225.     Each Individual Defendant actually and intentionally aided and abetted the NYU Defendants in discriminating against Plaintiff on the basis of her sex in violation of NYCHRL § 8-107(6), by personally leading and participating in discriminatory acts as alleged.

**SIXTH CAUSE OF ACTION**
**(Violation of the NYCHRL—Retaliation)**
**AGAINST ALL DEFENDANTS**

226.     Plaintiff repeats Paragraphs 1 through 225 of this Amended Complaint with the same force and effect as if more fully set forth herein.

227.     By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff for her opposition to gender discrimination in violation of NYCHRL § 8-107(7).

228.     As a result of Defendants' discriminatory illegal actions, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

229. Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

230. Each Individual Defendant actually and intentionally aided and abetted the NYU Defendants by personally participating in retaliation against Plaintiff in violation of NYCHRL § 8-107(6) for her participation in protected activity.

**SEVENTH CAUSE OF ACTION**
**(Violation of NYLL—Retaliation)**
**AGAINST ALL DEFENDANTS**

231. Plaintiff repeats Paragraphs 1 through 230 of this Amended Complaint with the same force and effect as if more fully set forth herein.

232. By the above acts and practices and described misconduct, Defendants retaliated against Plaintiff in violation of NYLL § 215 for her opposition to Defendants' illegal activity under the NYLL, including Defendants' restraint, suppression, coercion, and interference with legitimate protected activities , and for their surveillance and monitoring of the protected activities of persons who Defendants ultimately blacklisted in order to prevent them from obtaining or retaining employment, in retaliation for exercising their rights and in violation of NYLL § 704.

233. Individual Defendants' subsequent actions to disparage and defame Plaintiff after Defendants had terminated her were intended to further retaliate against Plaintiff for her opposition to Defendants' illegal conduct under the NYLL and to chill others from opposing or complaining about Defendants' illegal conduct under the NYLL.

234. As a result of Defendants' retaliation, Plaintiff has suffered and will continue to suffer severe and irreparable injury, including monetary damage for deprivation of income and

benefits, termination of employment, loss of opportunity for professional advancement and promotion, and damages for physical injury and related severe emotional distress.

235.    Defendants intentionally and maliciously engaged in those unlawful discriminatory practices with reckless and wanton indifference to, and conscious disregard of, Plaintiff's statutorily protected rights.

**EIGHTH CAUSE OF ACTION**
**(Sex-Based Pay Discrimination in Violation of the EPA)**
**AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN,**
**BROTMAN, AND FEMIA**

236.    Plaintiff repeats Paragraphs 1 through 235 of this Amended Complaint with the same force and effect as if more fully set forth herein.

237.    By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff in violation of the EPA, 29 U.S.C. § 206(d), by paying their male employees higher wages and providing them with more material, valuable benefits than offered or given to Plaintiff for equal work in a position which required at least equal skill, effort, and responsibility and which was performed under similar working conditions.

238.    The differential in pay between Plaintiff and other women and their male colleagues at the NYU Defendants was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor were disparities in pay and benefits the result of a factor other than sex.

239.    Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in the NYU Defendants' EDs.  All three of these Individual Defendants were signatories to Plaintiff's

employment contract with the NYU Defendants, and retained the authority to sign and approve employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

240.    As a consequence of Defendants' unlawful acts, Plaintiff has been deprived of compensation and is entitled to recovery of such amounts plus liquidated damages for all willful violations, as well as pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation under the EPA.

**NINTH CAUSE OF ACTION**
**(Sex Based Retaliation in Violation of the EPA)**
**AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN,**
**BROTMAN, AND FEMIA**

241.    Plaintiff repeats Paragraphs 1 through 240 of this Amended Complaint with the same force and effect as if more fully set forth herein.

242.    By the above acts and practices and described misconduct, Defendants, in violation of the EPA, 29 U.S.C. § 206(d), retaliated against Plaintiff for opposing the lesser payment offered to her and her female colleagues than was offered to her similarly situated male colleagues, for doing equal work in a job which required at least equal skill, effort and responsibility, and which was performed under similar working conditions.

243.    Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in Defendant Langone's ED.  All three of these Individual Defendants were signatories to Plaintiff's employment contract with the NYU Defendants, and retained the authority to sign and approve

employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

244.    As a consequence of Defendants' unlawful acts, Plaintiff has been deprived of compensation and is entitled to recovery of such amounts plus liquidated damages for all willful violations, as well as pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation under the EPA.

### TENTH CAUSE OF ACTION
**(Sex-Based Pay Discrimination in Violation of the NYSHRL)**
**AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN,**
**BROTMAN, AND FEMIA**

245.    Plaintiff repeats Paragraphs 1 through 244 of this Amended Complaint with the same force and effect as if more fully set forth herein.

246.    By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff in violation of NYSHRL § 296(1) by paying their male employees higher wages and providing them with more material, valuable benefits than offered or given to Plaintiff for equal work in a position which required at least equal skill, effort, and responsibility and which was performed under similar working conditions.

247.    The differential in pay between Plaintiff and other women and their male colleagues at the NYU Defendants was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor were disparities in pay and benefits the result of a factor other than sex.

248.    Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in the Defendant

Langone ED.  All three of these Individual Defendants were signatories to Plaintiff's employment contract with the NYU Defendants, and retained the authority to sign and approve employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

249.     As a consequence of Defendants' unlawful acts, Plaintiff has been deprived of compensation and is entitled to recovery of such amounts plus liquidated damages for all willful violations, as well as pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation pursuant to the extent permitted under NYSHRL § 297.

## ELEVENTH CAUSE OF ACTION
### (Sex-Based Pay Discrimination in Violation of the NYCHRL)
### AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN, BROTMAN, AND FEMIA

250.     Plaintiff repeats Paragraphs 1 through 249 of this Amended Complaint with the same force and effect as if more fully set forth herein.

251.     By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff in violation of NYCHRL § 8-107(1) by paying their male employees higher wages and providing them with more material, valuable benefits than offered or given to Plaintiff for equal work in a position which required at least equal skill, effort, and responsibility and which was performed under similar working conditions.

252.     The differential in pay between Plaintiff and other women and their male colleagues at the NYU Defendants was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor were disparities in pay and benefits the result of a factor other than sex.

253.     Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU

Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in the Defendant Langone ED.  All three of these Individual Defendants were signatories to Plaintiff's employment contract with the NYU Defendants, and retained the authority to sign and approve employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

254.    As a consequence of Defendants' unlawful acts, Plaintiff has been deprived of compensation and is entitled to recovery of such amounts plus liquidated damages for all willful violations, as well as pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation pursuant to the extent permitted under the NYCHRL.

**TWELFTH CAUSE OF ACTION**
**(Sex-Based Pay Discrimination in Violation of NYLL)**
**AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN, BROTMAN, AND FEMIA**

255.    Plaintiff repeats Paragraphs 1 through 254 of this Amended Complaint with the same force and effect as if more fully set forth herein.

256.    By the above acts and practices and described misconduct, Defendants discriminated against Plaintiff in violation of NYLL § 194 by paying their male employees higher wages and providing them with more material, valuable benefits than offered or given to Plaintiff for equal work in a position which required at least equal skill, effort, and responsibility and which was performed under similar working conditions.

257.    Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in the Defendant

Langone ED.  All three of these Individual Defendants were signatories to Plaintiff's employment contract with the NYU Defendants, and retained the authority to sign and approve employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

258.   Defendants' violation was willful and intentional, and Defendants did not make a good faith effort to comply with the NYLL with respect to its compensation of Plaintiff.

259.   As a consequence of Defendants' unlawful acts, Plaintiff has been deprived of compensation and is entitled to recovery of such amounts plus liquidated damages for all willful violations, as well as pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation pursuant to the extent permitted by NYLL § 198.

**THIRTEENTH CAUSE OF ACTION**
**(New York State Law—Defamation Per Se)**
**AGAINST ALL DEFENDANTS**

260.   Plaintiff repeats Paragraphs 1 through 259 of this Amended Complaint with the same force and effect as if more fully set forth herein.

261.   On the dates specified, each of Defendant Grossman, Brotman, Abramson, Francois, and Femia in different contexts and through various media deliberately defamed and disparaged Plaintiff in oral and written form to various groups of identified people.

262.   Each of those Individual Defendants authoritatively, definitively and variously stated that Plaintiff had committed the serious crime of fraud, disparaged Plaintiff as a medical practitioner, stated and implied she had engaged in other serious misconduct or made other defamatory comments and disparaging remarks regarding Plaintiff's character, emotional, and mental health (together the "defamatory statements," and each a "defamatory statement") that

were highly injurious to Plaintiff's profession as a doctor.  Each of the defamatory statements was *per se* defamatory of Plaintiff.

263.    The specified (often unnecessarily large) groups of people, or individual persons, to which each of the Individual Defendants made each described defamatory statement did not request information about, and had no interest in knowing or right to know any of the circumstances surrounding Defendants' termination of Plaintiff's employment, and therefore such defamatory statements were made without privilege or contextual justification.

264.    Individual Defendants (and other employees of the NYU Defendants) may also have made these same or similar statements in internal meetings and phone calls, formal or informal, of which Plaintiff is not yet aware.  The Individual Defendants (and other NYU personnel) may also have made these same or similar statements in writings of which Plaintiff is not yet aware, including, without limitation, other versions or drafts of the RCA Report and DRCR and related documents.

265.    At the time that each Individual Defendant made the applicable described defamatory statement, he either knew it was false or recklessly disregarded the truth.

266.    Plaintiff is aware that those Individual Defendants' defamatory statements spread far and wide within and beyond the NYU Defendants, and reached doctors and medical institutions within New York and outside New York as well as countries outside of the United States, causing Plaintiff substantial loss and damage.

267.    As a direct and proximate cause of Defendants' defamatory statements and writings, Plaintiff has been irreparably damaged and continues to suffer severe and irreparable harm, damage and loss, including damage and loss sustained for deprivation of income and benefits, lost compensation, damage to personal and professional reputation, loss of opportunity

for professional advancement and promotion, damages for costs and expenses incurred to

mitigate some of the cost of the harm caused to Plaintiff by Defendants (including attorneys'

fees), and damages for physical injury and related severe emotional distress.

268.   Defendants intentionally and maliciously engaged in those unlawful

discriminatory practices with reckless and wanton indifference to, and conscious disregard of,

Plaintiff's rights.

**FOURTEENTH CAUSE OF ACTION**
**(New York State Law—Breach of Contract)**
**AGAINST NYU DEFENDANTS AND INDIVIDUAL DEFENDANTS GROSSMAN,**
**BROTMAN, AND FEMIA**

269.   Plaintiff repeats Paragraphs 1 through 268 of this Amended Complaint with the

same force and effect as if more fully set forth herein.

270.   In or around 2017 when Plaintiff was promoted to her Vice Chair role, she met on

numerous occasions with her assigned supervisor, Defendant Femia, in connection with her

revised employment contract.  Defendant Femia verbally reiterated on at least two of these

occasions that this revised contract was set for a one-year term, after which it would

automatically renew for another one-year term without expiring.  Defendant Femia explained

(and based on this explanation, Plaintiff understood) that the contract's annual renewal would not

require reissue or re-execution.  Plaintiff conferred with at least two other of the NYU

Defendants' Vice Chairs at or around the time of executing this contract, who confirmed that

their understanding of their own respective contracts was the same as hers.

271.   Defendant Femia also reiterated each year that Plaintiff's contract would

automatically renew at the expiry of her one-year duration, confirming Plaintiff's understanding

that he had given official notice pursuant to the NYU Faculty Handbook ("Faculty Handbook")

(available at https://www.nyu.edu/faculty/governance-policies-and-procedures/faculty-

handbook.html) as incorporated into the terms of Plaintiff's employment contract with Defendants.  By providing this official notice on numerous occasions, Defendant Femia confirmed Plaintiff's status as a "Full-Time Continuing Contract Faculty" member under her employment contract each time he renewed that written contract with the notice.

272.    The Faculty Handbook also incorporates Selected University Policies into its text, including but not limited to the "Code of Ethical Conduct" and the "NYU Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees."  These selected policies and guidelines are incorporated into Plaintiff's renewed contract by its terms incorporating the Faculty Handbook.

273.    Defendants breached their contract with Plaintiff when they engaged in discriminatory and retaliatory misconduct in violation of selected policies incorporated into the Faculty Handbook, including but not limited to the Code of Ethical Conduct and the NYU Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees.

274.    Additionally, even if Plaintiff were an at-will employee at the time that she was unlawfully terminated by Defendants, Defendant NYUGSOM's Faculty Handbook provides that the NYU Defendants' employees, such as Plaintiff, are entitled to six-months' notice in advance of their termination.

275.    Defendants did not provide Plaintiff with any notice of termination when they summarily terminated her on December 6, 2020 in violation of the terms of the Handbook.

276.    Individual Defendants Grossman and Brotman oversee and control the process of drafting, negotiating, and executing physician contracts such as Plaintiff's at the NYU Defendants.  Defendant Femia, in his authority as Chair of the Department of Emergency Medicine, oversees the terms of employment contracts for physicians employed in Defendant

Langone's ED.  All three of these Individual Defendants were signatories to Plaintiff's employment contract with the NYU Defendants, and retained the authority to sign and approve employment contracts (and terminations thereof) during Plaintiff's tenure at and through her termination from the NYU Defendants.

277.    Plaintiff has suffered damage and loss attributable to the NYU Defendants' failure to pay Plaintiff pay her salary and benefits for the mandatory six-month notice period provided under the Handbook.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment and grant the following relief:

a.    Declare the acts and practices complained of herein to be violations of Title VII, EPA, NYSHRL, NYCHRL, NYLL, and the common law of New York;

b.    Enjoin and permanently restrain these statutory violations by Defendants;

c.    Declare that, under the relevant law, Defendants' termination of Plaintiff was invalid and void;

d.    Direct Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

e.    Award Plaintiff damages to make her whole for all earnings and benefits she would have received but for Defendants' unlawful treatment, including but not limited to wages, bonuses, equity awards, pension and retirement benefits, health care and other insurance coverage, tuition remission, and other lost benefits, including future lost wages and benefits;

      f.      Award Plaintiff compensatory damages under applicable statutes and common law, in an amount to be determined at trial;

      g.      Award Plaintiff damages for breach of contract, in an amount to be determined at trial;

      h.      Direct Defendants to pay liquidated damages of one hundred percent under the EPA and three hundred percent under the New York State law equivalents;

      i.      Direct Defendants to pay punitive damages under applicable statutes and common law in an amount to be determined at trial;

      j.      Award Plaintiff pre-judgment and post-judgment interest;

      k.      Award Plaintiff the costs of this action, including attorneys' fees, costs, and disbursements pursuant to applicable law; and

      l.      Award such other legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.


New York, New York
December 22, 2021

                        **HOGUET NEWMAN REGAL & KENNEY, LLP**


By: _____
          Damian R. Cavaleri
          Fiona M.  Carmody
          One Grand Central Place
          60 East 42nd Street, 48th Floor

New York, NY 10165
Phone: 212-689-8808

*Attorneys for Plaintiff Dr. Kristin A. Carmody*