UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                            :

KRISTIN A. CARMODY, M.D., M.H.P.E,    :

                :

        Plaintiff,         :

                :

      -against-         :

                :

                :   21-CV-08186 (LGS-VF)

NEW YORK UNIVERSITY; NYU GROSSMAN  :
SCHOOL OF MEDICINE; NYU LANGONE    :
HOSPITALS; ROBERT I. GROSSMAN, M.D.;  :
FRITZ FRANCOIS, M.D.; STEVEN B.     :
ABRAMSON, M.D.; ANDREW BROTMAN,  :
M.D.; and ROBERT J. FEMIA, M.D.,     :

                :

        Defendants.      :
---------------------------------------------------------------x


**DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**



October 25, 2022



CERASIA LAW LLC
Edward Cerasia II
Alison L. Tomasco
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
646.525.4231
ed@cdemploymentlaw.com
alison@cdemploymentlaw.com

Attorneys for Defendants

**Dr. Carmody's Employment With The School As Vice Chair of Education**

1.      Dr. Kristin Carmody began working at NYU in July 2013, in the Department of Emergency Medicine (the "ED"). (Dr. Carmody Dep. at 15-16, 18.)[1] She held the titles of Assistant Professor of Emergency Medicine (Clinical-not tenure), Co-Director of Emergency Ultrasound and of Emergency Ultrasound Fellowship, and attending physician. (*Id*. at 16.)

2.      In 2015, the ED Promotion Committee endorsed Carmody for promotion to Associate Professor, but the University Committee did not approve it. (*Id*. at 20-23.) Dr. Robert Femia, then-Vice Chair in the ED, was not involved in her promotion then. (*Id*. at 17, 21, 25.)

3.      On October 22, 2015, Carmody informed Femia she was not promoted because she lacked publications, and he responded she "was deserving" of promotion and he would "advocate on [her] behalf when needed." (*Id*. at 20, 22-24.) Thereafter, in October 2015, Femia became the Chair of the ED. (Dr. Femia Dep. at 20-21.)

4.      In March 2017, Femia promoted Carmody to Vice Chair, Academic Affairs and Education Innovation. (Carmody Dep. at 26; Femia Dep. at 135.) That decision was "favorable" to her and she remained in that role until the end of her employment. (Carmody Dep. at 26.)

5.      The March 2017 letter regarding her promotion (the "Employment Agreement") was for a one-year term and provided for total compensation of ████ for her clinical duties and serving as Co-Director of the Ultrasound Fellowship and Vice Chair of Education, with an academic appointment on the Clinical (Non-Tenured) Track. (Carmody Dep. Ex. 3 at p.5-6, 8.)

6.      Carmody was responsible for the educational activities in the ED for residents, medical students and various fellowships, the structure and administration of the educational mission and ensuring that the programs met compliance standards. (Carmody Dep. at 27-30.)

---

[1]      Copies of all deposition exhibits and other documents cited herein are annexed to the Declaration of Edward Cerasia II, Esq., submitted herewith.

**Treatment Of Patient On November 30, 2020 In The ED**

7.      On November 30, 2020, Carmody worked a shift in the Emergency Room ("ER") as an attending physician. (Carmody Dep. at 141.) Dr. Amber Ciardiello, a fourth-year resident, also worked that shift. (*Id*. at 145; Dr. Ciardiello Dep. at 64.)

8.      In the ED, physicians, residents and nurses use the EPIC computer medical record system to document patient care. (Dr. Jamin Dep. at 44-45.) Carmody received a message in EPIC from Dr. Jordan Swartz, an attending physician in the ED, stating that an NYU employee's wife (the "Patient") was going to the ED ████████████████████████████████████ ████ (Carmody Dep. at 147-48.)

9.      Neither Carmody nor Ciardiello prioritized seeing the Patient based on any "VIP" status versus her acuity level. (*Id*. at 151-52; *see also* Ciardiello Dep. at 64.)

10.     At triage, a nurse took the Patient's vital signs: ████████████████████ ████████████. (Carmody Dep. at 167-68 &Dep. Ex. 18 at p.10.) ████████████ ████████████████████████. (Carmody Dep. at 169.)

11.     Carmody never introduced herself to the Patient. (*Id*. at 146-47.) Ciardiello physically examined the Patient, and Carmody claims that she was approximately six feet away from the Patient at all times. (*Id*. at 146; Ciardiello Dep. at 75-76.)

12.     Ciardiello does not recall where Carmody was located while Ciardiello physically examined the Patient, but acknowledged that an individual standing at the nurse's station could have viewed the Patient. (Ciardiello Dep. at 74-76.)

13.     An attending physician is responsible for her ER patients. (Carmody Dep. at 187.)

14.     Carmody did not physically examine the Patient. (*Id.* at 158.)

15.  Attending physicians in the ED are expected to physically exam their patients. (Femia Dep. at 167-68; Dr. Grossman Dep. at 154, 167-68; Dr. Francois Dep. at 178; Dr. Jamin Declaration, ¶ 2 & Ex. A, p.5.)

16.  During Ciardiello's exam, the Patient reported ███████████████████ ██████████████████████████. (Ciardiello Dep. at 78, 83-84.) Ciardiello ordered a ███████████████████████, and presented findings to Carmody. (*Id*. at 85-88.)

17.  Ciardiello diagnosed the Patient with ██████████████████████ ███████████. (*Id*. at 88-89.) Ciardiello ordered ████████████████████, and discussed the results, diagnosis and ██████████ with Carmody. (*Id*. at 89.)

18.  Ciardiello consulted with Carmody regarding the Patient's discharge from the ED. (Carmody Dep. at 177.) Thereafter, a nurse took the Patient's vital signs again. (*Id*. at 179.)

19.  Around the time of discharge, ███████████████████████████ ██████████████████████████████████████████████████████████ (Ciardiello Dep. at 104; Carmody Dep at 180 & Dep. Ex. 19 at p.3 (Patient states her ██████████████).) The nurse who took the vital signs alerted Ciardiello and Carmody that ██████████████████ (Ciardiello Dep. at 115.) The Patient stated that the nurse said ██████████████ (Carmody Dep. Ex. 19 at p. 3.)

20.  Due to these vital signs, Ciardiello and Carmody discussed "████████ ████████████████████████" (Carmody Dep. at 180.)

21.  The Patient's chart states the final diagnosis was "██████████" (Carmody Dep. Ex. 18 at p.7.)

22.     Ciardiello testified this diagnosis is "inaccurate" because they treated the Patient for "███████████████" but neither she nor Carmody changed the diagnosis in the EPIC chart, even though they should have done so. (Ciardiello Dep. at 108-10; Cerasia Decl. Ex. I.)

23.     Based on the patient's vital signs at discharge, Ciardiello believes she and Carmody should have discussed the possibility the Patient ████████████████████████████ ██████████████████████████████████ (*Id*. at 111-12.)

24.     In a patient's EPIC record, an attending physician must complete an attestation. (Carmody Dep. at 146; Jamin Dep. at 44-45.) In EPIC, a drop-down for this attestation states: "I performed a history and physical examination of [the patient] and discussed her management with the resident on the treatment team." (Carmody Dep. at 154-55 & Dep. Ex. 18 at p.7.)

25.     This language in the attestation can be edited, (Femia Dep. at 115; Jamin Dep. at 26), but Carmody claims she did not understand she could edit it, (Carmody Dep. at 155).

26.     Carmody was trained to ensure that her patient's medical chart reflects the care that she provided for that patient. (Carmody Dep. at 155.)

27.     Below the attestation language in an EPIC chart, the standard language reads: "I agree with the history, physical, assessment, and plan of care with the following exceptions and additions:" (*Id*. at 158-59.) After this language in the Patient's chart, Carmody manually typed in the following additions: ████████████████████████████████████████ ██████████ (*Id*. at 159-61 & Dep. Ex. 18 at p.7.) She received this information from Ciardiello; she did not hear the Patient say or confirm these symptoms. (Carmody Dep. at 160-61.)

28.     In the Patient's EPIC chart, Carmody also manually typed in the following: "PE: ████████████████████" meaning that she performed a "physical exam: ████████████████ ██████████" (*Id*. at 161-62 &Dep. Ex. 18 at p.7.) Ciardiello relayed this information to Carmody

– the Patient did not do so. (Carmody Dep. at 162.) These words and abbreviations that Carmody typed in the chart were "just a free text note that you're able to put in at the bottom" and are "not part of the attestation that you sign." (*Id*. at 163.)

**The Investigation Into The Patient's Complaint**

29.     On December 1, 2020, the Patient's husband, Dr. A, ███████████████████████, emailed Nader Mherabi, Chief Information Officer, and Dr. Leora Horwitz, a physician in the Department of Medicine, stating that, the day before, his wife (the Patient) was discharged from the ED "███████████████████████████████████████████████████████████████████████ ███████████████████" (Femia Dep. at 138; Jamin Dep. Ex. 12.) Mherabi sent the email to Dr. Fritz Francois, then-Chief Medical Officer, and Femia. (Jamin Dep. Ex. 12; Dr. Francois Dep. at 18.)

30.     Twenty minutes later, Dr. A emailed Dr. Catherine Jamin, Vice Chair of Clinical Operations in the ED and Carmody's friend since residency, and Dr. Benjamin Wertheimer, Patient Safety Officer, to "file an official report regarding [the Patient's] experience," stating: "███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████" (Jamin Dep. at 15, 17 & Ex. 10.) Jamin and Wertheimer informed Dr. A they would "initiate the review." (Jamin Dep. Ex. 10.)

31.     Jamin and Wertheimer then investigated the Patient's care in accordance with NYU's Adverse Events Procedure. (Jamin Decl., ¶ 3 & Ex. B.)

32.     Wertheimer and Jamin spoke with Dr. A, and Wertheimer emailed a summary to Jamin, Francois, Femia, Marcia Murphy (Senior Director, Patient Safety/Risk) and Regina Grinblat (Patient Experience). (Jamin Dep. at 152; Francois Dep. at 104-105 & Dep. Ex. 11.)

33.     Wertheimer wrote that the Patient "reported not being seen by an attending," that "[t]here is document in chart of attending exam and it is ED policy for all patients to be seen by attending." (Francois Dep. Ex. 11) He also wrote: "Marcia – this needs further investigation and likely requires RCA [Root Cause Analysis]." (*Id.*) Murphy agreed. (Jamin Decl., ¶ 4.)

34.     An RCA is a quality assurance review that is common, is "a broader institutional review of care delivered on a case" and is "initiated whenever there is a quality or safety concern." (Femia Dep. at 125; Francois Dep. at 95; Carmody Dep. at 205.)

35.     Carmody does not claim that Wertherimer discriminated or retaliated against her in this case. (Carmody Dep. at 267-68.)

36.     Jamin investigated, first reviewing the Patient's EPIC record. (Jamin Dep. at 154.)

37.     On December 1, 2020, Jamin emailed Carmody and Ciardiello to ask to speak with them "to review a patient" they saw the day prior. (*Id*. at 164-66, 170.)

38.      Jamin spoke with Carmody and asked her if she physically examined the Patient, but Carmody said she had not done so, stating: "I went by her a lot of times. I was sitting right behind her in the nursing station. She wasn't that far away from me, but I did not go over to her." (Jamin Dep. at 166, 168; Carmody Dep. at 196-97.) Carmody "expressed concern right way" about the attestation and notes she put in the Patient's record. (Jamin Dep. at 168.)

39.     Jamin also spoke by phone with Ciardiello about the Patient case, how the Patient "was admitted to another hospital ███████," and Jamin expressed "concerns about the care" given to the Patient. (Ciardiello Dep. at 130-31; Jamin Dep. at 171-72.)

40.     Thereafter, Jamin relayed the contents of those conversations to Femia, (Jamin Dep. at 167, 169, 184), spoke with Murphy about the Patient case, (*id.* at 180), and she also asked the nurse manager look into the Patient case from a "nursing perspective," (*id*. at 189-90).

41.     Jamin also spoke with Francois, who told her that the case warranted a Focused Professional Practice Evaluation ("FPPE") for Carmody. (*Id*. at 202.)

42.     If concerns are raised about the quality and safety of care that a physician is delivering, he or she can go on a FPPE for three months.  (Jamin Decl., ¶ 5.) An FPPE is "a nonpunitive process," and is not disciplinary in nature. (Francois Dep. at 138.)

43.     Francois opined that Carmody needed to be placed on a FPPE because she "was responsible for the care of a patient … where the patient was discharged, missed sepsis" and the "quality of care was extremely concerning." (Francois Dep. at 138-39.) Carmody was not placed on an FPPE before the end of her employment.  (Jamin Decl., ¶ 6.)

44.     December 2, 2020, Femia and Carmody spoke by phone about the Patient. (Carmody Dep. at 198.) Femia was not hostile or unprofessional during that call. (*Id.*) They did not discuss Carmody's lack of physical exam of the Patient or her EPIC documentation because Carmody believed "he had already spoken with Cat Jamin, and [Jamin] had already told him the whole story, and [Carmody] didn't feel the need to repeat the whole story." (*Id.* at 199-200.)

45.     On December 2, 2020, Dr. A emailed to Dr. Silas Smith, who runs the Safety Fellowship in the ED, Wertheimer and Jamin a six-page letter written by the Patient and Dr. A regarding the Patient's care in the ED (the "Patient Letter"), and a copy of the laboratory work that Northwell-Lenox Hill Hospital (the "Lab Work") performed about 90 minutes after the Patient's discharge from NYU. (Jamin Dep. at 198; Francois Dep. at 150 & Dep. Ex. 17; Femia Dep. at 160.) On December 3, Wertheimer forwarded the Patient Letter and Lab Work to Murphy, Grinblat and Francois. (Francois Dep. Ex. 17.)

46.     The Patient wrote: "███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████” (Carmody Dep. Ex. 19, at p.5.)

47.    Francois did not discuss the Patient Letter with Dr. A. (Francois Dep. at 103.)

48.    On December 3, 2020, Jamin spoke with Carmody again, and she told Carmody that the Patient case was going to an RCA and Morbidity and Mortality Review ("M&M"), and that Francois wanted to place her on a FPPE. (Carmody Dep. at 200-02; Jamin Dep. at 203.)

49.    An M&M is "an educational conference [for residents] where [they] talk about ways to make the systems better, what could have been done better for the patient." (Carmody Dep. at 200-201.) M&Ms occur monthly, are "educational" and conducted at the "department[] level." (*Id.* at 205; Ciardiello Dep. at 174.)

50.    On December 4, 2020, Dr. Andrew Brotman, EVP & Vice Dean, Clinical Affairs and Strategy at the School, emailed Femia, stating that Dr. Robert Grossman, Dean of the School and CEO of NYU Langone, "was told that in the [Dr. A] wife case, the attending signed of[f] without seeing the patient," "he wants to fire her" and "[y]ou're going to need to talk to him about this one." (Femia Dep. at 144 & Dep. Ex. 14; Answer, ¶¶ 19, 22.)

51.    As of December 4, 2020, Femia did not believe that Carmody should be fired and responded to Brotman's email, stating: "It's not that cut and dry and she should not be fired. She made an error. She's sick and embarrassed about it. She was sitting within 5 feet of the patient and walked past her many times and said hello. She admits she did not do an independent exam and knows that was wrong." (Femia Dep. Ex. 14; Femia Dep. at 142.)

52.    Femia then spoke with Grossman, who said it is "inexcusable for an attending physician not to see and examine a patient, and to attest that they had examined the patient." (Grossman Dep. at 113; Femia Dep at 143.) Grossman "voiced that this was a serious incident

that rose to the level of termination," but he "ultimately" told Femia that it was Femia's decision and to consult with Human Resources and Legal. (Femia Dep. at 173; Grossman Dep. at 112, 134.) Grossman's belief and statements to Femia had absolutely nothing to do with Carmody's gender or her alleged protected activity. (Declaration of Dr. Grossman, ¶¶ 9-10.)

53.     Femia did not feel pressure from Grossman to fire Carmody. (Femia Dep at. 171.)

54.     Femia then spoke with Carmody again, and she admitted she did not examine the Patient and "she documented a physical exam that she didn't do." (*Id.* at 143-44.)

55.     Then, on a conference call with Nancy Sanchez, Executive Vice President and Vice Dean for Human Resources; Francois, the CMO; Lynn Lowy, Esq., Senior Counsel in NYU Legal Department; and Maxine Simon, Chief Regulatory Officer, Femia sought their advice about Carmody's employment and conduct. (Femia Dep. at 144, 174; Francois Dep. at 163-64.)

56.     During this conference call, there was no discussion of Carmody's gender or any alleged complaints she claims to have made to Femia. (Declaration of Dr. Femia, ¶ 2; Declaration of Nancy Sanchez, ¶¶ 2, 4-5; Declaration of Maxine Simon, ¶¶ 2, 5-6; Declaration of Dr. Francois, ¶¶ 2, 4.) Sanchez, Simon and Francois gave Femia advice regarding their beliefs as to the serious nature of Carmody's misconduct and that falsification of a patient record warrants termination, which had nothing to do with gender or protected activity. (Sanchez Decl., ¶¶ 3-6; Simon Decl., ¶¶ 3, 5-6; Francois Decl., ¶¶ 2, 4; Femia Dep. at 144, 174.) Femia was reluctant at first to fire Carmody. (Sanchez Decl., ¶ 3; Simon Decl., ¶ 3.)

57.     Based on Femia's call with these individuals, his review of the Patient's medical record, time to reflect on the seriousness of the situation and, "most weighty" being Carmody telling him that she did not "perform a history and physical, speak with the patient, and that she documented a physical exam that she didn't do," Femia changed his mind and he made the

decision to offer her the option to resign in lieu of terminating her employment. (Femia Dep. at 155, 174, 179, 250; *see* Grossman Dep. at 111; Francois Dep. at 164; Sanchez Decl., ¶ 3.)

58.     Femia believed that decision was justified because Carmody "put a patient in harm's way, she didn't supervise a trainee, she documented in the medical record an exam that she didn't perform" and in his "30 years in emergency medicine, [he has] had this happen once" – *i.e.*, with Dr. Carmody. (Femia Dep. at 191-92.) Femia "was aware that regardless of the attestation template, … the attestation … in no way forces or handcuffs any doctor to say that they performed a physical exam that they didn't do." (*Id.* at 193-94.)

59.     No one ever brought to Femia's attention that any attending physician was not seeing patients and "documenting physical exams they didn't do." (*Id.* at 168; Simon Decl., ¶ 4 (Carmody was first such falsification of physical exam that Simon had heard of).)

60.     On December 6, 2020, Femia called Carmody and gave her the option to resign in lieu of the termination of her employment. (Carmody Dep. at 206-07.) She said Femia stated to her that "it's not about your medical care, it's about what you wrote in the chart." (*Id.* at 207.)

61.     Shortly after her call from Femia, Carmody texted her colleague, Dr. Kar-mun Woo, to say Femia fired her. (Carmody Dep. at 214 & Dep. Ex. 21.) In her texts, Carmody stated that Femia fired her "[b]ased on the fact that I wrote PE: though probably killed myself on this one … If I had just signed the note I would have been better off." (Carmody Dep. Ex. 21.) Carmody's statements in her texts refer to her typing in "physical examination: ███████████ ███" in the Patient's EPIC record. (Carmody Dep. at 215-16.)

62.     Before resigning, Carmody spoke with an employment lawyer, who advised her she ████████████████████████████████████████████████████████ ████████████████████████████████ (Carmody Dep. a 212-13 & Ex. 21-KC 002156.)

63.    In the afternoon on December 6, 2020, Carmody emailed Femia, stating "I hereby resign my position at NYU." (Carmody Dep. at 212.)

64.    NYU was required to report to the NYS Department of Health-Office of Professional Medical Conduct ("DOH") that Carmody falsified the Patient's EPIC record by documenting a physically examination that she did not perform. (Simon Decl., ¶ 7.) Simon is the person who sends such reports to the DOH. (*Id.*, ¶¶ 8 & 9 (reporting delayed because it "fell through the cracks," not because lawsuit filed); Femia Dep. at 242-43; Grossman Dep. at 115.)

65.    Brotman did not participate in the decision to end Carmody's employment and he did not even know Carmody's name at that time. (Dr. Brotman Dep. at 65-66.)

66.    Dr. Steven Abramson, Executive Vice Dean for Education, Faculty and Academic Affairs at the School, did not participate in the decision to end Carmody's employment and became aware of her termination after the fact. (Abramson Dep. at 13, 137.)

67.    Jamin did not participate in any discussions involving or mentioning the possible termination of Carmody's employment. (Jamin Dep. at 231.) Carmody does not allege that Jamin discriminated or retaliated against her. (Carmody Dep. at 223.)

**<u>Medical Opinions Regarding The Patient's Condition And Standard Of Care</u>**



68.    NYU is "well attuned to" ██████████████████████████████ ████████████████████████████████████████. (Francois Dep. at 112-13.) Since then, "[a] lot of effort was put in place to ensure that … patients are not discharged from [the ED] with signs ████████████████████████████████████████" (*Id.* at 113.)

69.    In Francois' medical opinion, ████████████████████ when she left the ED, based on "objective evidence" in the EPIC chart noting the Patient's "████████████████

██████████████████████████████████████████████

██████ " (*Id.* at 109, 117, 120-21.)

70.     In Francois' medical opinion, the Lenox Hill Lab Work was more evidence that

the Patient ██████ . (*Id.* at 131-32.) ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ ( *Id.* at 132.)

71.     Francois shared his medical opinion with Grossman, who relied upon it.

(Grossman Decl., ¶ 4; Grossman Dep. at 127, 153; Francois Dep. at 165-66.)

**Dr. Femia's Favorable Treatment Of Dr. Carmody Over The Years**

72.     Femia approved paying Carmody's full tuition for a Master's degree she

completed in 2017. (Carmody Dep. at 87-90.)

73.     In August 2017, Femia submitted a "very favorable" letter to support Carmody's

promotion to Associate Professor (Clinical), which she received, effective September 1, 2017.

(*Id.* at 49-51; Cerasia Decl., Ex. E.) This was the same promotion she sought prior to Femia

becoming the Chair of the ED in 2015. (Carmody Dep. at 50.) He was "enthusiastic" about her

promotion and "true to his word" in 2015 that he would support her promotion. (*Id.* at 50-51.)

74.     In September 2018, Femia submitted a letter to the Educator Community Awards

Committee to support Carmody for an Excellence in Educational Innovation Award. (Carmody

Dep. at 52-53.) Carmody did not receive that award in 2018. (*Id.* at 53.)

75. In January 2019, Femia increased Carmody's salary to ▮▮▮▮▮, retroactive to September 2018. (Carmody Dep. at 71; Femia Decl., ¶ 10 & Ex. B.)

76. Around the Fall of 2020, Femia submitted another letter to support Carmody receiving an Excellence in Educational Innovation Award, and she received that Award. (Carmody Dep. at 53-54.) Femia's decision to nominate her was "favorable." (*Id.* at 55-56.)

77. On October 14, 2020, Abramson emailed Carmody congratulating her for receiving the Excellence in Educational Innovation Award. (Carmody Dep. at 54-55.)

78. On November 20, 2020 – 16 days before her resignation in lieu of termination – Carmody thanked Femia "for [his] support" after he stated he was "impressed" with a presentation she gave – it was "so well thought out, innovative and exciting." (Carmody Dep. at 139-40 & Dep. Ex. 16.) This was "favorable praise from Dr. Femia." (Carmody Dep. at 141.)

79. After Carmody's resignation, Femia donated $1,000 to a GoFundMe account set up by Carmody's colleague to help her financially, and Femia offered to help her find a job. (Carmody Dep. at 219-20, 246-48 & Dep. Ex. 21 at KC002167.)

80. Femia did not make any comment to Carmody that she found to be disparaging or derogatory because she is a woman. (Carmody Dep. at 277.) Femia liked Carmody and always supported her. (Femia Decl., ¶ 30.)

81. Francois, Abramson, Brotman and Grossman did not make any comment to Carmody that was disparaging or derogatory about her gender. (*Id.* at 279.)

82. For months after her employment, Carmody stated in writing that NYU terminated her because of the residents' complaints, with no mention of her gender. (Carmody Dep. at 225-26, 232-34, 256, 301-303, 305.)

## Dr. Femia's Strong Record of Supporting Women In the ED

83.     As of December 2020, 25 of the 40 leaders in the ED under Femia were female. (Carmody Dep. Ex. 49; Answer, p. 3.)

84.     Femia selected a woman, Dr. Selin Sagalowsky, to replace Carmody as the Vice Chair of Education. (Carmody Dep. at 354-55; Cerasia Decl. Ex. H – Response to Interrog. 19.)

85.     Before selecting Sagalowsky, Dr. Chris Caspers filled the Vice Chair, Education role in an interim capacity only. (Femia Dep. at 223; *see* Carmody Dep. at 353-56.)

86.     Over a period of 6 years, Femia selected 4 Vice Chairs, with 3 of those 4 being female, including Carmody. (Carmody Dep. at 46-47 & Dep. Ex. 49; Femia Decl., ¶ 4.)

87.     In June 2021, Femia hired Dr. Annalee Baker, a woman, as the Resident Program Director.  (Femia Decl., ¶ 5.)

88.     Femia approved of a budget for a women's group and initiative for female physicians in the ED. (Carmody Dep. at 69.)

89.     Jamin has worked in the ED since 2012 and Femia selected her as a Vice Chair. (Jamin Decl., ¶ 8.) She has not experienced or observed conduct by Femia toward her or females that she would construe as gender discrimination or based on gender, and she "consistently observed him promoting and supporting his female colleagues and subordinates." (*Id.*)

90.     Between 2020 and 2021, Femia also relieved at last three male leaders of their roles in the ED and did not renew their agreements, thus ending their employment at NYU. (Carmody Dep. at 74-75; Femia Dep. at 92-93, 236-37.)

## Dr. Carmody's Compensation Was Not Discriminatory or Retaliatory

91.     When Carmody was promoted to Vice Chair in 2017, she did not seek to negotiate her salary. (Carmody Dep. at 46.) Those salaries are negotiable. (Femia Dep. at 136.)

92.     As Chair of the ED, Femia made recommendations regarding compensation for Vice Chairs, and Brotman approved them in his role as Vice Dean. (Femia Decl., ¶ 6; Brotman Dep. at 22.)

93.     The ED Vice Chairs did not have the same responsibilities for clinical work, research and/or leadership roles. (Femia Decl., ¶ 6.) Their compensation is based on a variety of factors, including their specific responsibilities, scope and reach of their positions, the degree to which work is across multiple NYU campuses, revenue generated, impact on patients and years of experience. (*Id.*) Total annual compensation varied due to the fact that, as attending physicians, they voluntarily took additional clinical shifts, for which they were paid an hourly rate that did not vary based on seniority. (*Id.*, ¶ 7.)

94.     For 2017, Carmody and ████████████, Vice Chair ████████████████, had the same annual compensation of ██████, effective for Carmody as of the time of her appointment to Vice Chair on February 1, 2017. (*Id.*, ¶ 9.)

95.     In 2018, Carmody received total annual compensation of ████████ which was slightly less than ██████ total annual compensation of ████████ for a difference of ████████ ( *Id.*, ¶ 10.) Femia made up for this small differential by approving an increase of Carmody's salary by ██████ in January 2019, retroactive to September 2018, when he requested that her annual salary be increased to ██████. (*Id.*) This increase was designed to pay Carmody comparably to ████. (*Id.*; *see* Femia Decl., Ex. B; Carmody Dep. at 71-72.)

96.     In August 2019, Femia promoted ████████████, a male, to be the Vice Chair, ████████████████, while he also maintained his leadership responsibilities as System Chief of Observation Medicine, the Medical Director of the Tisch Hospital Observation Unit, the Medical Director of the Physician Assistant Program, and a leadership role in Observation Medicine at

the Long Island campus. (Femia Decl., ¶ 12.) The Observation Unit is short-stay care for patients who need 12-48 hours more of care before being discharged from the ER. (*Id*.) ███ created this Unit at Tisch Hospital and developed best practices for various medical diagnoses treated in the Unit. (*Id.*) ███ then started Observation Units at other NYU campuses in Brooklyn and on Long Island. (*Id.*) He was responsible for developing processes and procedures for excellent patient care and revenue generation at all three Observational Units. (*Id.*)

97.     In 2019, ███ received total annual compensation of ███. (*Id*., ¶ 13.) He held five administrative leadership roles and performed clinical work at NYU Winthrop and his roles spanned all of NYU's clinical sites in Manhattan, Brooklyn and Long Island. (*Id*.)

98.     In 2019, Carmody received total annual compensation of ███, which was higher than ███ total compensation that year. (*Id*., ¶ 14.) She held two leadership roles, Vice Chair of Education and Co-Director, Emergency Medicine Ultrasound Fellowship, and she performed clinical work at Tisch and Bellevue Hospitals in Manhattan. (*Id*.)

99.     In 2020, due to ███ much broader scope of responsibilities, he received total annual compensation of ███ and Dr. Carmody received total annual compensation of ███. (*Id*., ¶ 15.)

100.     In 2019 and 2020, ███ leadership responsibilities were much greater than Carmody's. (*Id*., ¶ 16.) His 5 leadership roles required him to travel to 3 campuses and oversee the clinical operations at those locations, while Carmody's leadership roles were performed in Manhattan, with some responsibility for a resident/student presence in Brooklyn. (*Id*.)

101.     ███, a full tenured Professor, Vice Chair of ███ in the ED and Assistant Dean, Clinical Sciences, Office of Science and Research, and ███, the two other

female Vice Chairs in the ED who had a larger scope of responsibilities at the time, were paid more than Carmody. (*Id.*, ¶ 17.)

102.    In 2018, ██████ was paid more than ███. (*Id.*, ¶ 18.) In 2019, ██████ was paid more than █████. (*Id.*) In 2020, ███████ was paid more than Vice Chair ██████████ ██████, a male. (*Id.*) ███████ was consistently paid more than Carmody and others because, in addition to her administrative leadership role, as Assistant Dean, she was responsible across all clinical departments, and not just in the ED, and she spent 50% of her employment efforts on research and brought in millions of dollars in research revenue. (*Id.*)

103.    Femia promoted █████ (female) to Vice Chair, ██████████████ in 2019. (*Id.*, ¶ 19.) There were two Vice Chairs, █████████████ in the ED and, together, ██████████ ██████ were responsible for 500,000 patient visits a year, as well as setting up quality programs, workflow, best practices, safety and community engagement. (*Id.*) Femia set █████████████ annual compensation the same (████████), which was approved. (*Id.*) █████ held 3 leadership positions and performed clinical duties. (*Id.*)

104.    In 2019, █████ was paid more than █████. (*Id.*, ¶ 20.) In 2020, ██████ received only █████████ more in annual compensation than █████, with that differential mainly due to ██████ picking up additional clinical shifts. (*Id.*)

105.    In 2020, █████ was paid more than ████████ (male). (*Id.*, ¶ 21.) She does not believe she was discriminated against due to her gender regarding her pay. (████ Decl., ¶ █.)

106.    ████████ was the Vice Chair for █████████████████████████████████ in the ED before Femia became the Chair, and had 24 years of experience as a physician as of 2020. (*Id.*, ¶ 22.) Femia was involved with one renewal of his employment and leadership role, effective September 1, 2016, but did not renew his Vice Chair role in 2021. (*Id.*)

107.    ████████ was paid more compensation than Carmody, but he had 11 more years of experience as a physician and he also had 3½ more years as a Vice Chair than her. (*Id.*, ¶ 23.)

108.    Brotman was not involved in setting compensation terms and has never rejected Femia's recommendation for an individual's compensation. (Brotman Dep. at 22, 25-26.)

109.    In his role as Dean and CEO, Grossman signed agreements, but did not make compensation decisions. (Grossman Decl., ¶ 12.) He signed Carmody's 2017 Agreement, but he did not make any decision on her compensation then or at any time thereafter. (*Id.*)

**The Quality Assurance Medical Reviews: The M&M and RCA**

110.    M&Ms were held monthly in the ED, (Ciardiello Dep. at 174), to "review care and see if there [are] opportunities for improvement," (Femia Dep. at 124).

111.    On December 8, 2022, the ED held an M&M relating to the Patient's case. (Femia Dep. at 150; Jamin Dep. at 240-41.) The Patient Letter was discussed. (Ciardiello Dep. at 132.)

112.    At this M&M, Carmody's name was mentioned, but many residents and attending physicians were raising questions about Carmody's departure and already knew her identity. (Ciardiello Dep. at 156, 158, 179; Femia Decl., ¶ 25.)

113.    On December 16, 2020, an RCA was held regarding the Patient's case, and Carmody's name was not mentioned. (Carmody Dep. Ex. 30; Ciardiello Dep. at 160-61, 163.)

114.    Wertheimer chaired the RCA and Francois attended. (Francois Dep. at 167.)

115.    In connection with the RCA, a summary of the Patient RCA was created (the "RCA Summary"). (Francois Dep. at 171; Carmody Dep. Ex. 30.)

116.    The following in the RCA Summary is accurate: "████████████████
████████████████████████████████████████



" (Carmody Dep. at 264 & Dep. Ex. 30 at p.2.)

117.    Carmody admits that the following statement in the RCA Summary is accurate, except she claims that the Patient was discharged with "▮▮▮▮▮▮▮▮▮▮▮▮▮": "▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Carmody Dep. at 264-65 & Dep. Ex. 30 at p.2.) Neither Ciardiello nor Carmody changed the discharge note in the EPIC record to reflect any diagnosis other than ▮▮▮. (Ciardiello Dep. at 109-10; Carmody Dep. Ex. 18 at p.7.)

118.    The RCA Summary states that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮" (Carmody Dep Ex. 30 at p.3.) Carmody agrees that the standard of care was not met with respect to the Patient. (Carmody Dep. at 269.)

119.    The RCA Summary was not discriminatory or retaliatory. (*Id*. at 268.)

**Dr. Carmody's Allegations Regarding Alleged Male Comparators**

120.    Dr. Carmody alleges that two male physicians (Dr. W and Dr. C) committed wrongdoing, but did not lose their employment. (Am. Compl., ¶¶ 193-203.)

121.    Dr. W was employed in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and never reported to Femia – he only "kn[e]w of" Dr. W. (Femia Dep. at 254-55; Femia Decl., ¶ 26.)

122.    In June 2020, Murphy reviewed a progress note made by Dr. W in his grandson's EPIC record, and that note provided an "objective timeline of sorts" relating to the patient. (Cerasia Decl., Ex. H - Response to Interrog. No. 26.)

123. At some point thereafter, Brotman spoke with Dr. W about the progress note entry to let him know that he could not make any such entry in the patient record of a family member. (*Id*., Response to Interrog. No. 26.) Under the circumstances, there was no need to consider disciplinary action for Dr. W for his note. (*Id*., Response to Interrog. No. 30.)

124. Femia, Grossman and Abramson have no personal knowledge regarding Dr. W and the progress note. (*Id*., Response to Interrog. Nos. 26-30.)

125. Dr. C was the ██████████████████████████████; he reported to Grossman, and did not report to Femia. (Femia Decl., ¶ 27.)

126. NYU received complaints about alleged ████████████████████████ ██████████████. (Grossman Dep. at 146-47.)

127. After an investigation by a female attorney at an outside law firm in the Fall of 2021, ████████████████████████████████████████████████████████ ████████████████████████. (*Id*. at 146, 148-50.) Femia was not involved in any way with Grossman's decision and is unaware of the basis for it. (Femia Decl., ¶ 27.)

**Dr. Carmody's Claims Regarding The Residents' Concerns**

128. In April 2020, residents from several departments sent a letter to NYU's Graduate Medical Education office requesting hazard pay and benefits for residents and fellows who were working during COVID (the "Hazard Pay Letter"). (Carmody Dep. at 97-101 & Dep. Ex. 9.)

129. Carmody had no involvement in writing the Hazard Pay Letter and did not see a draft of it before it was sent. (Carmody Dep. at 97.)

130. In the Hazard Pay Letter, the residents did not allege discrimination based on gender, race or otherwise. (*Id*. at 101-02 & Dep. Ex. 9.)

131.     Carmody allegedly discussed the Hazard Pay Letter with Femia, but never gave him or other NYU leaders the names of those residents who signed that Letter. (*Id*. at 102-03.)

132.     Femia never discussed the residents' request for hazard pay with anyone in NYU administrative leadership. (Femia Dep. at 49.)

133.     Despite "financial pressures" on NYU and its hospital system during the COVID-19 pandemic, NYU eventually increased residents' salaries. (Carmody Dep. at 104-05.)

134.     In April 2020, Francois and other healthcare professionals met with then-President Trump to discuss the healthcare associated with COVID-19, including NYU's participation in a ventilator sharing program. (Francois Dep. at 50-52.) On April 17, 2020, an email was sent on behalf of Francois to NYU employees concerning the meeting with then-President Trump and NYU's response to the pandemic. (*Id*. at 54-55; Carmody Dep. Ex. 10.)

135.     On April 20, 2020, medical residents from various departments emailed Francois about their beliefs as to purported inequities in the treatment of patients during the pandemic (the "Residents' April 20 Email"). (Francois Dep. at 56-57.) Carmody was unaware that residents were sending the Residents' April 20 Email to Francois. (Carmody Dep. at 109.)

136.     The Residents' April 20 Email did not mention gender or race discrimination toward them concerning their residency or employment; rather, it was about "patients" at NYU and Bellevue.  (Carmody Dep. at 111-12 & Dep. Ex. 10.)

137.     On April 20, 2020, Francois responded to the Residents' April 20 Email, noting it contained factual inaccuracies. (Francois Dep. at 57-60; Carmody Dep. Ex. 10.) On May 9, 2020, the residents responded to Francois with an "apology" ("Residents' May 9 Email"). (Carmody Dep. at 115-16.) Carmody was "involved" in the Residents' May 9 Email; she "helped them and edited it" after residents "Dr. O'Callahan and Dr. Doobay reached out to [her]."  (*Id*. at 116.)

138.    Carmody alleges "Femia was aware of the fact that [she] was meeting with the residents and that [she] was involved with counseling them on [the Residents' May 9 Email]." (*Id*. at 116-117.) She did not show Femia a draft of that Email.  (*Id*. at 117.)

139.    Like Carmody, Jamin also assisted the residents in reviewing and commenting on the Residents' May 9 Email. (Jamin Decl., ¶ 7.) Jamin informed Femia that she was speaking with the residents about a response to Francois, but Femia never treated her negatively or adversely because of her involvement in that process. (*Id*.)

140.    On May 9, 2020, Francois responded to the Resident May 9 Email. (Francois Dep. at 77-78.) At that point, he felt that "it [was] not worth continuing a conversation in this manner, during a time when [his] job [was] to keep patients safe, as much as possible, and keep them alive during a historic pandemic, and also to keep [NYU's] staff safe." (*Id*. at 80.)

141.    Abramson asked Francois if he objected to sharing the email exchanges with chairs of the residents who signed onto the emails to Francois. (*Id*. at 81.) Francois did not object because, given the focus was on saving lives and the facts showed equitable treatment of patients, there was "the teachable moment … that we need to operate from facts." (*Id*. at 81-82.)

142.    Abramson felt the residents who wrote the emails to Francois were "uninformed and unprofessional," but not that they were "disloyal." (Abramson Dep. at 27.)

143.    Francois did not ask Department Chairs to speak with residents who emailed him. (Francois Dep. at 71.) Femia never spoke with Francois regarding the emails. (Femia Dep at 50-51.) Femia never placed any documentation in the files of those ED residents who wrote or signed onto the emails to Francois. (*Id*. at 54-55.)

144.     Carmody alleges that Femia gave Grossman the names of those residents who signed the emails to Francois, (Carmody Dep. at 139) – which Femia did not do, (Femia Dep. at 52) – and those names were already shown on the emails, (Carmody Dep. Ex. 10).

145.     Francois, Abramson, Brotman and Grossman had no knowledge or belief that Carmody was involved in the Hazard Pay Email or the residents' emails to Francois. (Grossman Decl., ¶ 11; Francois Decl., ¶ 11; Brotman Decl., ¶ 9; Declaration of Dr. Abramson Decl., ¶ 9.)

146.     Abramson was not bothered if Carmody supported residents who may have acted in an "unprofessional way"; "[it] was not something that to [him] Dr. Carmody was responsible for, nor did [he] hold her accountable for it." (Abramson Dep. at 220.)

### Dr. Carmody's Purported Complaints of Gender Discrimination

147.     Carmody claims she had "multiple conversations [with Femia] about inequities in the [ED] when it came to compensation." (Carmody Dep. at 61-62.)

148.     Carmody did not complain to Grossman, Francois, Brotman and Abramson, and only alleges that she made complaints of discrimination to Femia. (Carmody Dep. at 87; Grossman Decl., ¶ 10; Francois Decl., ¶ 9; Brotman Decl., ¶ 8; Abramson Decl., ¶ 7.)

149.     Carmody alleges that she first raised issues of gender disparity in pay with Femia in 2016, regarding ▮▮▮▮▮▮▮▮. (Carmody Dep. at 62-63.) She alleges that Femia then changed the salaries of three female physicians to match ▮▮▮▮ salary. (*Id.* at 329-30.)

150.     Carmody claims that the "last time" she raised a pay discrimination issue with Femia was on behalf of ▮▮▮▮▮▮, who was in a fellowship director position. (*Id.* at 63-64.) Carmody claims ▮▮▮ was paid less than ▮▮▮▮▮▮▮▮ and that she told Femia that "if it was a man, it probably wouldn't be happening." (*Id.* at 64.)

151.    Carmody alleges that Femia was resistant to raising ████ pay, but that he eventually did so "within a few months after the discussion," and while Carmody was still employed at NYU. (*Id.* at 65-66.) ████ received an increase to her compensation in September 2020, but that increase was not in response to any alleged complaint by Carmody, (Femia Decl., ¶ 28.) Given that ████ pay was increased in September 2020, then Carmody's alleged complaint about pay discrimination toward ████ must have been in or about July 2020. (*See id.*; Carmody Dep. at 63-66 (she claims Femia changed ████ pay within "a few months" after she allegedly complained to him about that topic).)

**The Alleged "Blacklisted" Residents**

152.    Grossman did not keep a "blacklist" or "no-hire list" of residents who signed the Hazard Pay Letter or the emails to Francois. (Grossman Dep. at 63.) Femia was unaware of any list. (Femia Dep. at 58-60.)

153.    Abramson kept a list of residents who made misstatements to the media and who acted unprofessionally, as "professionalism is [an] essential piece of physicians' training," but there were no consequences at NYU for these residents. (Abramson Dep. at 22-24, 78-81.) Residents on his "list" were hired by NYU and he "did nothing to block them."  (*Id.* at 44, 87.)

154.    In 2021, Dr. Dana Gossett, Chair of the OB-GYN, wanted to hire a resident who had signed onto the residents' emails to Francois. (Grossman Dep. at 179-80.) Grossman told Gossett she could do "whatever [she] want[ed]" and she hired this resident. (*Id.* at 180.)

155.    In 2020, there were only 2 open jobs for attending physicians in the ED in Manhattan due to the decrease in volume in the ER during COVID. (Femia Dep. at 81.) One open job was for an ultrasound-trained physician and, at Carmody and others' recommendations,

NYU hired ███████████. (*Id.*; Jamin Dep. at 139-40.) Carmody did not even rank █████████████ in her top three candidates to hire for that role. (Jamin Dep. at 141.)

156.    For the second position, the ED needed someone with a background in telehealth, and hired ██████████, who had this experience. (Femia Dep. at 81-82.)

157.    Carmody alleges Femia contacted Columbia and warned it against hiring ███████, (Carmody Dep. at 334-36), but Femia did not do so, (Femia Decl., ¶ 29.)

**Alleged Retaliatory and Defamatory Statements**

158.    Carmody alleges that, after her employment, Francois retaliated against her by stating (to unnamed people) that she "almost killed a patient" and "[t]he patient almost died," (Carmody Dep. at 291-92), which he did not state, (Francois Decl., ¶ 3). In Francois' medical opinion, the Patient was ██████████████████████████████. (Francois Dep. at 109, 117, 120-21, 202; *see supra* ¶¶ 69-70.) Carmody also alleges that Francois told unnamed physicians that she "committed fraud," but he did not make that statement. (Francois Decl., ¶ 5.)

159.    On December 8, 2020, the ED held a video meeting for an M&M to discuss the Patient case and treatment. (Answer, ¶ 125.) Femia truthfully mentioned during the video meeting that Carmody had made a false entry in the Patient's medical record. (Answer, ¶ 126.) Femia did not accuse Carmody of "fraud." (Femia Decl., ¶ 24.) Femia stated that "fraud" was not his word choice, but he does not recall the exact words he used. (Answer, ¶ 128.) [2]

160.    The Patient case "and the fact that an attending did not examine a patient and falsified the record" came up at a December 9 video meeting with ED leadership. (Francois Dep. at 192-93.) Abramson made his medical opinion "very clear that if [the Patient] were older that

---

[2]    Despite Defendants' requests, Carmody has not produced any evidence during discovery to support these statements, identify any recipient of these alleged statements in paragraphs 158-164, or the names of the individuals who allegedly provided her with audio recordings (or their authenticity), as addressed with the Court and in the August 3, 2022 Order. (Dkt. No. 46.)

she would be dead." (*Id.* at 201-02.) That was and is Abramson's good-faith opinion, which was based on information in the Patient Letter, including her symptoms and treatment, and ████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████. (Abramson Decl., ¶ 4; Abramson Dep. at 130-33, 140-41.) Since the Patient is a nurse, he found the history and information she provided to be credible. (Abramson Dep. at 130-33.)

161.    During the December 9 video meeting with ED leadership to discuss a Department Review Committee formed by Grossman, Abramson made his opinion known that Carmody's misrepresentation in the Patient's chart was a serious error. (Abramson Decl., ¶ 3.) He did not "slam" his fist or state that this was "an egregious case of fraud." (*Id.*) He did not make any comments about Carmody, the medical care delivered to the patient or his opinion as to the Patient's medical condition to retaliate against Carmody or because he had any type of ill will, spite or hatred toward her. (*Id.*, ¶ 6.)

162.    In July 2021, Grossman met with new residents in the ED as part of their orientation. (Grossman Decl., ¶ 3.) Carmody was not present. (Carmody Dep. at 298-99.) His purpose was to impress upon residents the importance of their education, ensuring that they get the most out of their education, and delivering one standard of care to all patients. (Grossman Decl., ¶ 3.) This included Grossman telling them to ensure that an attending physician properly supervised them at all times and that NYU expects that its residents and attending physicians will provide the same, high-level of care to every patient. (*Id.*) He told the residents that there is one standard of care in the Tisch and Bellevue Emergency Rooms, which involves an attending physician physically examining every patient, taking a history and conferring with residents

about their observations. (*Id.*) He stressed that, if an attending physician does not take those steps, residents should go right to Femia, as this could create liability for the residents. (*Id.*)

163. To highlight his advice to the residents, Grossman mentioned a classic case in the ED involving a young, healthy woman who came in for what looked to be ▮▮▮. (*Id.*, ¶ 4.) He mentioned the attending physician and the resident missed ▮▮▮ and missed ▮▮▮▮. (*Id.*) Grossman received this information from Francois and Dr. Brian Bosworth, and from the Patient Letter. (*Id.*; Francois Dep. at 165-66.) Francois and Bosworth were familiar with the Patient's case. (Grossman Decl., ¶ 4.) Grossman reasonably believed these facts to be true. (*Id.*)

164. Grossman also mentioned to the residents that the misses may have been the result of a little hubris on the part of the attending physician, as that was his honestly-held opinion and impression based on the information that he had as of July 2021. (*Id.*, ¶ 5.)

165. Grossman generically referred to an "attending physician;" he did not mention Carmody's name, job title or even the gender of the physician. (*Id.*, ¶ 6; Carmody Dep. at 299.) Nor did he ever state that the attending physician's employment was terminated or was no longer employed at NYU. (Grossman Decl., ¶ 6.)

166. Grossman did not make his comments to the residents to retaliate against Carmody or because he had any type of ill will, spite or hatred toward her. (*Id*, ¶ 7.)

167. It was and is Grossman's medical opinion that, by not examining and speaking directly with the Patient, Carmody did not recognize the signs that the Patient's symptoms were worsening, and that the Patient should not have been discharged. (*Id.*, ¶ 8.) His opinion is that, after a thorough evaluation of the Patient by an experienced attending physician, the Patient ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in accordance with established clinical standards for the

management of possible ███. (*Id.*) The Patient Letter stated ███████████
██████████████████████████████████████████████████████. (*Id.*)

168.    Other than the alleged comments to residents in July 2021, Grossman did not make any statement or engage in conduct that Carmody alleges to be retaliatory, and Carmody claims his alleged retaliation against her was "for the residency," meaning "the letters to Francois" and "the hazard [pay] letter." (Carmody Dep. at 300.)

169.    Any retaliation claim Carmody has against Francois relates to the letters and emails he had with residents in April and May 2020. (*Id.* at 300-301.)

170.    With respect to Brotman, Carmody claims, without any first-hand knowledge, that he retaliated against her by making defamatory comments to a resident, Dr. Arnab Sarker, about the Patient Letter. (Carmody Dep. at 293-94; Am. Compl., ¶¶ 129-31.) Brotman "had not met [Carmody] or known her prior" to the lawsuit. (Brotman Dep. at 24.)

171.    Because Sarker was interested in hospital leadership and administration, Femia connected him with Brotman, so that Sarker could be mentored. (Declaration of Dr. Sarker, ¶ 2.) Sarker started meeting with Brotman for mentoring sessions. (*Id.*, ¶ 3.)

172.    At one meeting in December 2020, they discussed that an issue was raised with respect to patient care in the ED on November 30, 2020. (*Id.*; Declaration of Dr. Brotman, ¶ 3.)

173.    Brotman handed Sarker the Patient Letter and Sarker read it. (Sarker Decl., ¶ 4.) As part of the mentorship, they generally discussed the Patient Letter in the context of how leadership deals with such issues. (*Id.*; Brotman Decl., ¶ 4.)

174.    They spoke in general terms about quality of care and safety issues in the ED, including, for example, whether the Patient should have been discharged from the ER and what

the ED and institution could do going-forward to consistently deliver a high standard of care to patients. (Sarker Decl., ¶ 5.)

175.    After reading and discussing the Patient Letter, Sarker stated he would be happy to share his perspective about quality and safety issues with his ED colleagues, as he understood they may not have had the complete picture surrounding the Patient. (*Id*., ¶ 6.) Subsequently, Sarker mentioned this issue during a video conference with his colleagues in the ED. (*Id.*)

176.    At no time, did Sarker hear or view Brotman make any disparaging statements about Carmody. (*Id*., ¶ 7; Brotman Decl., ¶ 5.)

177.    Any statements made by the Individual Defendants regarding the facts surrounding the Patient Letter, Carmody's falsification of the EPIC record or her resignation were made in the context of quality assurance medical reviews, for educational or learning purposes for medical residents and physicians, and/or communications with NYU employees about her departure as the Vice Chair. (Femia Decl., ¶ 30; Grossman Decl., ¶ 7; Francois Decl., ¶ 6; Abramson Decl., ¶¶ 3-4, 6; Brotman Decl., ¶¶ 6-7.) These statements were made without any ill will, spite or hatred toward Carmody, and were based on their good-faith understanding of the facts, which they believed were true.  (*Id.*)

178.    The statements and opinions about the Patient's condition and treatment were medical opinions made for educational purposes and teaching moments. (Femia Decl., ¶ 31; Grossman Decl., ¶¶ 7-8; Francois Decl., ¶ 6; Abramson Decl., ¶¶ 3-4; Brotman Decl., ¶ 7.)

**Employment Agreement, Code of Conduct, Non-Discrimination Policy and Handbook**

179.    Carmody's 2017 Employment Agreement with NYU was never renewed in writing. (Carmody Dep. at 309 & Dep. Ex. 3, ¶ VI.b at p.8.) She was an at-will employee after one year, given that the Agreement was not "explicitly renewed in writing." (Carmody Dep. Ex.

3, ¶ VI.b p. 8.) Carmody knew "that [Dr. Femia]" did not "renew[] [her] contract" and that she was an "employee[] at will." (Carmody Dep. at 309 & Dep. Ex. 21 at KC 002156.)

180. The 2017 Agreement could "not be modified except by a written instrument duly executed by [Carmody] and [NYU]." (Carmody Dep. Ex. 3 at Section IV(b) at p.3.)

181. The 2017 Agreement provides that Carmody did not have any contractual right for advanced notice of her termination under the Faculty Handbook, as her Academic Appointment was "Co-terminus" with her NYU employment under Section II.2 of her Agreement. (Carmody Dep. Ex. 3, Section II.2 at p.2.)

182. The NYU Code of Conduct states on the cover page that "This Code is not a contract of employment" and that "[a]ll employment is deemed at-will (*i.e.*, can be terminated by the employee or NYU Langone at any time, with or without cause) unless a written contract of employment exists setting forth a specific duration and executed by an authorized NYU Langone signatory." (Cerasia Decl., Ex. F; Carmody Dep. at 308-09 & Dep. Ex. 46 ("This Code does not form a contract" and NYU reserves right to amend or modify).)

183. NYU's Non-Discrimination & Anti-Harassment Policy ("ND Policy") does not contain language limiting NYU's right to terminate employees. (Carmody Dep. Ex. 48.) Carmody did not file any complaint under the ND Policy at the time of her resignation or at any other point during her employment at NYU. (Carmody Dep. at 87.)

184. NYU's Faculty Handbook does not provide for advanced notice of termination to non-tenured faculty, like Carmody. (Cerasia Decl., Ex. G; Carmody Dep. Ex. 3, at p. 6.)

Respectfully submitted,

CERASIA LAW LLC

By  /s Edward Cerasia II
    Edward Cerasia II
    Alison L. Tomasco