UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

KRISTIN A. CARMODY, M.D, M.H.P.E.

    *Plaintiff*,

       - against -

NEW YORK UNIVERSITY; NYU
GROSSMAN SCHOOL OF MEDICINE; NYU
LANGONE HOSPITALS; ROBERT I.
GROSSMAN, M.D.; FRITZ FRANCOIS,
M.D.; STEVEN B. ABRAMSON, M.D.;
ANDREW W. BROTMAN, M.D.; and
ROBERT J. FEMIA, M.D.

    *Defendants*.

--------------------------------------------------------

Case No.: 1:21-cv-08186-LGS

Hon. Lorna G. Schofield

## **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii-vii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 2

    A.   Dr. Carmody is a Well-Respected Doctor and Educator with a Previously Flawless
          Professional Record ......................................................................................................... 2

    B.   Dr. Carmody Advocated and Supported Others' Advocacy Against Defendants' Gender
          Discrimination and Retaliation ....................................................................................... 3

    C.   Defendants Terminated Dr. Carmody Following Receipt of the VIP Patient Letter and
          Without a Meaningful Investigation ............................................................................... 4

    D.   Similarly Situated Male Physicians Accused of Similar, If Not, More Serious Violations
          Received Better Treatment Than Dr. Carmody ............................................................... 8

    E.   Defendants Continued to Disparage Dr. Carmody After Her Termination ......................... 9

    F.   Defendants' Investigation After They Terminated Dr. Carmody Confirms That Dr.
          Carmody Followed Standard Practice and Provided The VIP Patient with Proper Care .. 10

ARGUMENT ............................................................................................................................ 11

I.     LEGAL STANDARD ....................................................................................................... 11

II.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S
       DISCRIMINATION CLAIMS UNDER TITLE VII, NYSHRL, AND NYCHRL .............. 12

    A.   Plaintiff Established a *Prima Facie* Case of Gender Discrimination ................................. 13

       1.   Dr. Carmody was qualified for her position.................................................................. 14

       2.   Dr. Carmody was terminated under circumstances giving rise to an inference of
          discriminatory intent.................................................................................................... 14

    B.   Genuine Issues of Material Fact Exist as to Whether Defendants' Reason for Dr.
          Carmody's Termination Was Pretextual........................................................................ 18

III.   SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S RETALIATION
       CLAIMS .......................................................................................................................... 21

    A.   Plaintiff Has Established a *Prima Facie* Case of Retaliation ........................................... 22

    B.   Genuine Issues of Material Fact Exist as to Whether Defendants' Reason for Dr.
          Carmody's Termination Was Pretextual........................................................................ 24

IV.   SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S DEFAMATION
       CLAIMS .......................................................................................................................... 25

V.   SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S PAY
     DISCRIMINATION CLAIMS............................................................................................ 27

VI.   SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S BREACH OF
     CONTRACT CLAIMS.................................................................................................... 29

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abrams v. Dep't of Public Safety*,
  764 F.3d 244 (2d Cir. 2014)........................................................................ 12-13

*Albert v. Loksen*,
  239 F.3d 256 (2d Cir. 2001)........................................................................ 25, 27

*Alianza Dominicana, Inc. v. Luna*,
  229 A.D.2d 328 (1st Dep't 1996).................................................................. 25-26

*Alvarado v. GC Dealer Ser. Inc.*,
  511 F. Supp. 3d 321 (S.D.N.Y. 2021)............................................................ 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................... 11

*Belfi v. Prendergast,*
  191 F.3d 129 (2d Cir. 1999).......................................................................... 28

*Brown v. City of Syracuse*,
  673 F.3d 141 (2d Cir. 2012).......................................................................... 12

*Campbell v. Home Depot U.S.A., Inc.*,
  2006 WL 839001 (S.D.N.Y. Mar. 30, 2006) .................................................. 23

*Carlton v. Mystic Transportation, Inc.*,
  202 F.3d 129 (2d Cir. 2000).......................................................................... 19

*Chambers v. TRM Copy Centers Corp.*,
  43 F.3d 29 (2d Cir. 1994).............................................................................. 14-15

*Chiavarelli v. Williams*,
  256 A.D.2d 111 (1st Dep't. 1998).................................................................. 26

*Ciarrochi v. Provident National Bank*,
  83 F.R.D. 357 (E.D. Pa. 1979)...................................................................... 28-29

*Cox v. Onondaga County Sheriff's Departmentt*,
  760 F.3d 139 (2d Cir. 2014).......................................................................... 21

*Cronin v. Aetna Life Insurance Co.*,
  46 F.3d 196 (2d Cir. 1995)............................................................................ 18

*Cruz v. Coach Stores, Inc.*,
   202 F.3d 560 (2d Cir. 2000) ............................................................................ 22

*Curry v. City of Syracuse*,
   316 F.3d 324 (2d Cir. 2003) ......................................................................... 11-12

*D'Amico v. Zingaro*,
   135 A.D.3d 805 (2d Dep't. 2016) ..................................................................... 26

*Davis-Garett v. Urban Outfitters, Inc.*,
   921 F.3d 30 (2d Cir. 2019) ............................................................................. 12

*DeBlasio v. North Shore University Hospital*,
   213 A.D.2d 584 (2d Dep't 1995) ...................................................................... 27

*DeCintio v. Westchester County Medical Center*,
   821 F.2d 111 (2d Cir.1987) ............................................................................. 21

*Dillon v. City of New York*,
   261 A.D.2d 34 (1st Dep't 1999) ....................................................................... 25

*EEOC v. Ethan Allen, Inc.*,
   44 F.3d 116 (2d Cir. 1994) ............................................................................. 20

*Egelston v. State University College at Geneseo*,
   535 F.2d 752 (2d Cir. 1976) ............................................................................ 11

*Ellis v. Century 21 Department Stores*,
   975 F. Supp. 2d 244 (E.D.N.Y. 2013) .............................................................. 23

*Espinal v. Goord*,
   558 F.3d 119 (2d Cir. 2009) ........................................................................... 23

*Feingold v. New York*,
   366 F.3d 138 (2d. Cir. 2004) .......................................................................... 23

*Fincher v. Depository Trust & Clearing Corp.*,
   604 F.3d 712 (2d Cir. 2010) ........................................................................... 21

*Graham v. Long Island Railroad*,
   230 F.3d 34 (2d Cir. 2000) ......................................................................... 16-17

*Grant v. Bethlehem Steel Corp.*,
   622 F.2d 43 (2d Cir. 1980) .......................................................................... 23-24

*Hagan v. City of New York*,
   39 F. Supp. 3d 481 (S.D.N.Y. 2014) ................................................................ 15

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ........................................................................ 21, 27

*Holcomb v. Iona College*,
    521 F.3d 130 (2d Cir. 2008) ............................................................................. 12

*Howard v. MTA Metro-North Commuter Railroad*,
    866 F. Supp. 2d 196 (S.D.N.Y. 2011) ............................................................. 14

*Ibok v. Securities Industry Automation Corp.*,
    369 F. App'x. 210 (2d Cir. 2010) ..................................................................... 20

*Joshi v. Trustees of Columbia University in City of New York*,
    2018 WL 2417846 (S.D.N.Y. May 29, 2018) ................................................... 29

*Kessler v. Westchester County Department of Social Services*,
    461 F.3d 199 (2d Cir. 2006) ............................................................................. 21

*Knutt v. Metro International, S.A.*,
    91 A.D.3d 915 (2d Dep't 2012) ....................................................................... 25

*Kwan v. Andalex Group LLC*,
    737 F.3d 834 (2d Cir. 2013) ...................................................................... 18, 21

*La Grande v. DeCrescente Distribution Co.*,
    370 F. App'x 206 (2d Cir.2010) ...................................................................... 22

*Lambert v. Genesee Hospital*,
    10 F.3d 46 (2d Cir. 1993) ................................................................................ 28

*Lavin-McEleney v. Marist College*,
    239 F.3d 476 (2d Cir. 2001) ............................................................................ 28

*Lewis v. New York City Transit Authority*,
    12 F. Supp. 3d 418 (E.D.N.Y. 2014) ............................................................... 18

*Lindner v. International Business Machines Corp.*,
    2008 WL 2461934 (S.D.N.Y. June 18, 2008) .............................................. 23-24

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015) ............................................................................ 13

*Martin v. State University of N.Y.*,
    704 F. Supp. 2d 202 (E.D.N.Y. 2010) ............................................................. 22

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .................................................................................. 12, 14

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
    715 F.3d 102 (2d Cir. 2013) ................................................................................. 13, 21

*Moore v. Kingsbrook Jewish Medical Center*,
    2013 WL 3968748 (E.D.N.Y. July 30, 2013) ...................................................... 14

*Mulder v. Donaldson, Lufkin & Jenrette*,
    208 A.D.2d 301 (1st Dep't 1995) ......................................................................... 30

*O'Neill v. New York University*,
    97 A.D.3d 199 (1st Dep't 2012) ....................................................................... 29-30

*Pinkard v. N.Y.C. Departmentt of Education*,
    2012 WL 1592520 (S.D.N.Y. May 2, 2012) ....................................................... 23

*Richardson v. New York State Department of Correctional Service*,
    180 F.3d 426 (2d Cir. 1999) ................................................................................. 11

*Rosen v. Thornburgh*,
    928 F.2d 538 (2d Cir. 1991) ........................................................................... 14, 15

*Rule v. Brine, Inc.*,
    85 F.3d 1002 (2d Cir. 1996) ................................................................................. 26

*Schiano v. Quality Payroll Systems Inc.*,
    445 F.3d 597 (2d Cir. 2006) ................................................................................. 12

*Senno v. Elmsford Union Free School District*,
    812 F. Supp. 2d 454 (S.D.N.Y. 2011) .............................................................. 17-18

*Slattery v. Swiss Reinsurance America Corp.*,
    248 F.3d 87 (2d Cir. 2001) ................................................................................... 14

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 502 (1993) ............................................................................................. 18

*Stern v. Trustees of Columbia University*,
    131 F.3d 305 (2d Cir. 1997) ................................................................................. 20

*Syeed v. Bloomberg L.P.*,
    2022 WL 3447987 (S.D.N.Y. Aug. 17, 2022) ..................................................... 21

*United States v. City of New York*,
    717 F.3d 72 (2d Cir. 2013) ................................................................................... 27

*Virgona v. Tufenkian Import-Exportr Ventures, Inc.*,
    2008 WL 4356219 (S.D.N.Y. Sep. 23, 2008) ...................................................... 28

*Vivenzio v. City of Syracuse*,
    611 F.3d 98 (2d Cir. 2010) .................................................................................. 12

*Weiss v. JPMorgan Chase & Co.*,
    332 F. App'x. 659 (2d Cir. 2009) ....................................................................... 20

*Wellner g. Montefiore Medical Center*,
    2019 WL 4081898 n.4 (S.D.N.Y. Aug. 29, 2019) .............................................. 13

*Williams v. N.Y.C. Housing Authority*,
    61 A.D.3d 62 (1st Dep't 2009) ............................................................................ 13

*Zimmerman v. Associates First Capital Corp.*,
    251 F.3d 376 (2d Cir. 2001) ............................................................................... 15

**Statutes**

29 U.S.C. § 206(d)(1) .................................................................................................. 27

N.Y. Exec. Law § 300 .................................................................................................. 13

N.Y. Labor Law § 215 .................................................................................................. 22

**Rules**

Fed. R. Civ. P. 56 (a) .................................................................................................. 11

Plaintiff Dr. Kristin Carmody, M.D. M.H.P.E. respectfully submits this memorandum of law in opposition to Defendants' Motion for Summary Judgment.

## PRELIMINARY STATEMENT

On December 6, 2020, Defendants summarily terminated Plaintiff Dr. Carmody from her hard-earned executive, clinical, and professorial positions with NYU in an abrupt decision that destroyed her reputation and career, and severely impacted her personal life. Dr. Carmody's termination came shortly after her continued objections to Defendants' unfair treatment of women and her refusal to align with Defendants in their campaign to monitor and "blacklist" residents who sought to speak up about the racial and economic injustice with respect to the treatments afforded to NYU's patients during the COVID-19 pandemic.

Evidence has confirmed that Defendants' termination of Dr. Carmody's employment followed neither investigation nor applicable protocol, which were afforded to similarly situated male doctors including those that were alleged to have sexual relations with patients, made ███ ████████████████████████████████ provided subpar patient care where ████████████, and improperly documented a patient's chart that he did not treat. Rather, Defendants terminated Dr. Carmody within one week of Defendants' receipt of a single letter from a patient designated as "VIP" (the "VIP Patient") complaining about the care that the patient received at NYU (the "VIP Patient Letter" or the "Letter"), where the patient did not experience an adverse impact. During the short period of time between receipt of the Letter and Defendants' decision to termination Dr. Carmody's employment, Defendants never questioned the substance of the VIP Patient Letter, and never afforded Dr. Carmody the chance to rebut anything stated in the Letter. This among other evidence adduced to date shows that Defendants' reason to terminate Dr. Carmody was pretextual, which Dr. Carmody's expert, Dr. Robert M. McNamara confirms. In

1

fact, in Defendants' attempt to establish the contrary, Defendants are forced to heavily rely on their own self-serving testimony and declarations, which are refuted and inconsistent with contemporaneous documents.

Further harming Dr. Carmody, after their discriminatory and retaliatory termination of her employment, recognized by several of Dr. Carmody's colleagues, Defendants engaged in a defamatory campaign to "justify" their actions, during which they knowingly made false statements. The Individual Defendants derided Dr. Carmody's patient care and accused her of fraud with respect to her treatment of the VIP Patient. Evidence shows that there are at least issues of material facts as to whether Defendants engaged in discriminatory, retaliatory and defamatory actions, while at the same time failing to pay Dr. Carmody and other women the same rates as male doctors. Defendants' motion for summary judgment should be denied.

## STATEMENT OF FACTS

### A.    Dr. Carmody is a Well-Respected Doctor and Educator with a Previously Flawless Professional Record

Dr. Carmody is an award-winning female Emergency Medicine physician and educator, a renowned researcher, and an internationally published author. 56.1(b)[1] ¶ 1. Throughout the entirety of her fourteen years of medical practice prior to her termination from NYU on December 6, 2020, Dr. Carmody maintained a spotless professional record and reputation, and had not received a single negative review or disciplinary action. *Id.* ¶ 2. Dr. Carmody was hired by NYU in 2013 as a faculty and clinical physician. *Id.* ¶ 3. In 2015, Dr. Carmody applied for, but was denied a promotion from Assistant Professor to Associate Professor for a requirement that was not listed as necessary for such a promotion. *Id.* ¶ 4. Finally, in 2017, in recognition of her proactive mentorship

---

[1] "56.1(b)" refers to Plaintiff's Local Rule 56.1(b) Statement of Additional Material Facts, submitted herewith.

role as well as her established research, training, and educational history, Dr. Carmody was promoted from Assistant Professor to Associate Professor and offered the position of Vice Chair of Academic Affairs and Education Innovation for the Department of Emergency Medicine at NYU (the "ED"). *Id.* ¶¶ 5-7. To achieve this promotion and position of Vice Chair, Dr. Carmody had to go through an extensive review process and write a letter in support of her promotion on behalf of Dr. Femia for his signature. *Id.* ¶ 5.

Dr. Carmody is also widely respected by physicians and students in the medical field for her mentorship and for her dedication to patients and the medical profession. *Id.* ¶¶ 10-11. She has also remained particularly beloved by colleagues and mentees for her fearless approach in opposition to discrimination at NYU. *Id.* ¶¶ 10-11. In fact, Dr. Carmody's achievements and expertise have been recognized on numerous occasions, including receiving the Excellence in Educational Innovation Award from NYU in November 2020, one month prior to her termination. *Id.* ¶ 12. To receive the award, Dr. Carmody explicitly asked Dr. Femia to nominate her for the award and, again, drafted the letter in support of herself for his signature. *Id.* ¶ 13.

**B.    Dr. Carmody Advocated and Supported Others' Advocacy Against Defendants' Gender Discrimination and Retaliation**

Throughout her tenure with Defendants, Dr. Carmody objected to disparities and inequities within NYU. Dr. Carmody discovered that NYU was perpetuating unacceptable gender discrimination, including Defendants' hiring and promoting male candidates over better-performing female peers, treating of male and female physicians differently, and pay and hours disparities between male and female physicians. *Id.* ¶¶ 14, 17-18. Dr. Carmody raised these issues with supervisor, Dr. Femia multiple times, but her complaints fell on deaf ears. *Id.* ¶ 15. Dr. Carmody's efforts and objections to discrimination put a target on her back, one recognized by those around her. *Id.* ¶ 19.

In fact, the ED has a history of gender discrimination and there was a "dearth of senior female faculty." *Id.* ¶ 20. Multiple female doctors noticed and complained about institutional sexism and gender discrimination at NYU stemming from NYU leadership. *Id.* ¶ 21. Egregiously, when Dr. Femia relayed to Dr. Carmody a conversation he had with Dr. Grossman about a female doctor that was pushed out of NYU because of her gender and race, he repeated Dr. Grossman's referring to her a "bitch" and laughed about it. *Id.* ¶ 22.

In addition to her own advocacy efforts, Dr. Carmody refused to participate in Defendants' efforts to suppress the residents and fellow faculty's concerns over the disparity of treatment of patients based on the patients' race and socioeconomic status. *Id.* ¶ 23. In fact, in March 2020, NYU residents and physicians used their access to social media platforms to increase awareness about these disparities. In response, Defendants began to monitor and track resident social media activity and placed residents that spoke out publicly against NYU on a blacklist. *Id.* ¶¶ 24-28. Once Dr. Carmody discovered that Defendants were maintaining such a list, which purpose was to block job prospects for the residents, Dr. Carmody refused to participate in handing over resident names to Dr. Femia and affirmatively objected to such actions because she believed this activity was illegal. *Id.* ¶¶ 29-30. Less than two months later, Dr. Carmody was terminated.

### C. Defendants Terminated Dr. Carmody Following Receipt of the VIP Patient Letter and Without a Meaningful Investigation

On December 6, 2020, Defendants summarily terminated Dr. Carmody and immediately cut off Dr. Carmody's access to NYU's facilities and emails. *Id.* ¶ 32. Defendants initially claimed that Dr. Carmody's termination was based on the attestation in the medical chart concerning the VIP Patient, which Defendants claim was discovered following the receipt of the VIP Patient Letter dated December 1, 2020. The Letter was written by an ██████████████ who was

deemed a "VIP" in NYU's internal computer system. The VIP Patient was admitted to the ED on November 30, 2020 and was under the care of Dr. Carmody and her team. *Id.* ¶¶ 33-34.

When the VIP Patient was admitted to the ED, she complained of symptoms indicating a ███████████████████████ *Id.* ¶ 36. Consistent with ACGME guidelines for teaching hospitals such as NYU, and under Dr. Carmody's direct supervision and monitoring, a fourth-year senior resident on Dr. Carmody's care team, Dr. Ciardiello, put the VIP Patient on a ███████████ pathway after conducting relevant exams and conferring with Dr. Carmody. *Id.* ¶ 37. Dr. Ciardiello conducted a physical examination of the VIP Patient which Dr. Carmody supervised as indicated in her attestation. *Id.* ¶ 38. Based on the VIP Patient's condition when she was admitted, there was no indication of any diagnosis beyond the ████████ and the alerts that NYU had set up to detect for ██████ did not trigger. The VIP Patient later demanded to be discharged, and at the time of discharge the VIP Patient's vital signs were retaken. *Id.* ¶¶ 39-40. The vitals at the time of discharge also did not trigger any of NYU's ███████; however, because the VIP Patient had an ████████████████ at the time of discharge, Drs. Carmody and Ciardiello conferred, and both agreed to change ████████████████████████████████ ██████████. *Id.* ¶ 40. In fact, when Dr. Francois finally sent the VIP Patient's medical record to NYU's epidemiology and infectious disease specialists to review (after having already fired Dr. Carmody), the doctors confirmed that the VIP Patient's medical record indicated ███████, which was treated; they did not mention ████████████. *Id.* ¶ 41.

The VIP Patient Letter accused Dr. Carmody's care team of subpar patient care and that they ███████████████. *Id.* ¶ 42. Specifically, the Letter claimed that after discharge, the VIP Patient went to Lenox Hill's Emergency Department and was diagnosed with ███████████ and was given an antibiotic in the same class as the one given to her by Dr. Carmody's team and

had to be kept for observation overnight before being released without issue. *Id.* ¶ 42. Based on her experience as a doctor in the emergency department for more than a decade, Dr. Carmody did not believe this was a ██████████ because a ██████████ would not have been kept in observation, but rather admitted to a higher level of care. *Id.* ¶ 43.

After receiving the VIP Patient Letter, rather than request further information or records from the VIP Patient or Lenox Hill to investigate the Letter's accusations, Defendants immediately decided to submit the case for a "Morbidity & Mortality" review ("M&M") (a department-wide presentation reserved for suboptimal case outcomes), a "Root Cause Analysis" ("RCA") (a hospital-wide review of cases involving significant adverse outcomes for a patient, such as avoidable death or life-threatening injury), and place Dr. Carmody  who had never previously received a complaint about her care, on a "Focused Professional Practice Evaluation" ("FPPE") (a months-long audit of a physician's work). *Id.* ¶ 44. These are extraordinary actions usually reserved for instances where there is an adverse patient outcome; here there was none. *Id.* ¶ 45.

Between December 1, 2020 and December 5, 2020, Dr. Grossman, the Dean of the medical school and CEO of NYU Langone Health, exchanged multiple text messages and emails with several people about the VIP Patient Letter, which solely focused on the alleged medical care that the VIP Patient received at the ED and expressed that he wanted her fired. *Id.* ¶ 46.  In fact, even ***before*** Dr. Grossman received the Letter, he already wanted to fire Dr. Carmody. *Id.* ¶ 47. Meanwhile, Dr. Femia, Dr. Carmody's direct supervisor, did not believe termination was appropriate, stating to Dr. Brotman on December 4, 2020, that "It's not that cut and dry and [Dr. Carmody] should not be fired." *Id.* ¶ 49. During this time, Dr. Femia even called Dr. Carmody to tell her to "stay positive" and "not to worry about it." *Id.* ¶ 48. Later that night, however, after Dr. Femia had conversations with the other Individual Defendants, he texted Dr. Grossman: ████████

█████████████████████████." *Id.* ¶ 50. Then on December 6, 2020, without any warning, Dr. Femia called Dr. Carmody, promptly terminated her, and told Dr. Carmody that the termination was not about her medical management of the patient, but due to her medical charting. *Id.* ¶ 51. Dr. Femia also threatened to report Dr. Carmody to the New York State Department of Health, which did not happen until after Dr. Carmody filed her complaint in this action. *Id.* ¶ 52. Yet, the medical charting issue that Defendants claimed as a basis for their decision was standard practice for the ED. In fact, that is how new physicians in the ED were taught to chart when they first start at NYU. *Id.* ¶ 53. As Dr. McNamara describes in his expert report, "the attestation issue was widespread and the leadership was aware of the issue but chose to single out Dr. Carmody for termination on these grounds." Overall, Dr. McNamara found that Defendants' decision was disturbing and improper, and executed without due process to Dr. Carmody. *Id.* ¶ 55.

At no point did Defendants comply with NYU's Bylaws of Medical and Dental Staff, which provide certain notice requirements related to the investigation of a practitioner. The Bylaws specify that the affected practitioner shall be advised of an investigation in writing, including the basis for initiation of the investigation. Then, if the committee recommends disciplinary action, the Chief Medical Offer shall send the practitioner notice in writing of the proposed disciplinary action and the reason for the decision. *Id.* ¶ 61. That never happened.

After Defendants terminated Dr. Carmody, Defendants selected Dr. Christopher Caspers to fill Dr. Carmody's role of Vice Chair of Academic Affairs and Education Innovation for the ED, even though Dr. Caspers was not qualified to hold that position. *Id.* ¶ 58. Other attendings at NYU stated that "[p]utting Caspers in your position is complete lunacy." *Id.* ¶ 59. Further, after Dr. Carmody was terminated, Dr. Femia boasted that he got rid of two "████████" faculty members. *Id.* ¶ 60.

D.    **Similarly Situated Male Physicians Accused of Similar, If Not, More Serious Violations Received Better Treatment Than Dr. Carmody**

**Dr. W.** Dr. W, a male physician, made an improper and inconsistent entry into a patient's medical chart that he did not treat. *Id.* ¶ 65. However, NYU took Dr. W at his word that the entry was truthful and did not conduct any further investigation into the matter even though there was evidence the chart entry was inconsistent with the statement made by the child's father. *Id.* ¶ 66. Dr. W did not receive any discipline for this improper and inconsistent entry although Dr. W's action was serious enough to warrant the ED to have an M&M regarding this incident. *Id.* ¶ 67. Rather than any discipline, he merely received an ████████████ *Id.* ¶ 68.



**Dr. F**. Dr. F, a male physician ███████, received multiple complaints from ██████ ███████████████████████████████████████████████ ████████████████████████ which NYU determined ██████████████████████████ ████████ after an extensive investigation. However, even after this determination, Dr. F was not immediately terminated, rather, he was given multiple warnings before he was given time to find another job and resign after that. *Id.* ¶¶ 70-72.



**Dr. C**. Dr. C, a male physician and ██████████████, received multiple complaints from ████████████████████████████████████████████████████ █████████████████████████████████. *Id.* ¶ 73. An August 2021 complaint followed a complaint and HR investigation in February/March 2021. NYU engaged a third-party law firm to conduct an extensive investigation into the numerous complaints against Dr. C, where the law firm interviewed more than 50 individuals. Even though the investigation confirmed that Dr. C ██████████████████████████████████, Dr. C was never terminated from NYU. Rather, Dr. C was asked to step down from his leadership position. The investigation also took into account that Dr. C did not have bad intentions and was not malicious.

*Id.* ¶ 74.

**Dr. I**. Dr. I, a male physician ▓▓▓▓▓▓, received multiple patient complaints regarding the standard of care he provided to the patients. *Id.* ¶ 75. For example, one patient ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ after being seen and treated by Dr. I. During the patient's first visit to the ED, Dr. I did not order a ▓▓▓▓▓▓▓ which would have identified that patient's issue. There are also multiple patient complaints due to Dr. I's failure to meet the expected standard of medical care, e.g., a delay in care for ▓▓▓▓▓▓▓, a delay in care for ▓▓▓▓▓▓▓ and inadequate documentation. *Id.* ¶ 76. Dr. I was never terminated from NYU for his failure to meet the expected standard of medical care.

**Dr. A**. The only male physician that Defendants identify that was terminated effective immediately was Dr. A. *Id.* ¶ 77. Dr. A, a male doctor, was ▓▓▓▓▓▓▓▓▓▓▓▓. Dr. A had inappropriate sexual relations with his patients. Although Dr. A was terminated effective immediately, it was after the allegations against Dr. A were thoroughly investigated, unlike the allegations against Dr. Carmody. NYU also engaged an external firm to conduct the investigation and NYU's human resources department also interviewed NYU's employees prior to Dr. A's termination. *Id.* ¶ 78. There was no such process here.

### E.    Defendants Continued to Disparage Dr. Carmody After Her Termination

In the days following Dr. Carmody's termination, Defendants convened a series of meetings at which they attempted to justify Dr. Carmody's termination by disparaging Dr. Carmody's work, character, and integrity. Specifically, during a December 8, 2020 Zoom meeting, Dr. Femia stated that Dr. Carmody had been fired for fraud. *Id.* ¶ 80. During that same meeting, Dr. Femia also said that the decision to terminate Dr. Carmody's employment with NYU was driven by the leadership, indicating the involvement of Drs. Grossman, Abramson, Francois, and Brotman. *Id.* ¶ 80. Around the same time, on December 8 or 9, 2020, Dr. Brotman met with a

resident, Dr. Sarker, and without prompting, Dr. Brotman presented the VIP Patient Letter to Dr. Sarker as an accurate description of the VIP Patient's treatment. Because Dr. Sarker did not understand the gravity of the situation, Dr. Brotman wanted to impress upon Dr. Sarker that the care that the VIP Patient received was not up to standard. *Id.* ¶ 81.

Then on a December 9, 2020 Zoom meeting, Dr. Abramson and Dr. Francois both stated that Dr. Carmody committed "criminal fraud" and an "egregious case of fraud." *Id.* ¶ 82. Dr. Abramson continued and said that it "was egregious fraud and the patient almost died." *Id.* ¶ 82.

At a December 10, 2020 Zoom meeting, it was more of the same. Dr. Femia repeated his defamatory and disparaging statements that Dr. Carmody committed "fraud," and that she "almost killed somebody because of it." *Id.* ¶ 83. During this same meeting, Dr. Femia stated that he tried to get Dr. Carmody her job back, and that the decision to terminate her employment came from higher up. *Id.* ¶ 83.

Dr. Grossman' defamatory statements against Dr. Carmody continued to more than six months after Dr. Carmody's termination. Specifically on July 7, 2021, at an intern orientation for new ED residents, Dr. Grossman stated that the VIP Patient's case was a "classic case" of "unprofessionalism" in the Langone ED, and that a female attending physician had mismanaged a patient and "missed the ███," "missed the ██████████" and "missed everything." *Id.* ¶ 84. Even though Dr. Carmody's name was not used, due to the notoriety of the VIP Patient's case, substantially all the attendees at the orientation knew that Dr. Grossman was speaking about Dr. Carmody. Dr. Grossman did not have a factual basis to make these statements.

### F. Defendants' Investigation After They Terminated Dr. Carmody Confirms That Dr. Carmody Followed Standard Practice and Provided the VIP Patient with Proper Care

On March 23, 2021, months after Dr. Carmody's termination, the Department Review Committee issued a report (the "DRC Report") confirming that Dr. Carmody followed the same

practices as every other attending physician in the ED when she charted the VIP Patient's care and finding that ███████████████████████████████. It also found that NYU's medical charting was "████████████████████████████████████████████ ████████████ *Id.* ¶ 85. The DRC Report also confirmed the existence of the pervasive discriminatory and retaliatory environment that Dr. Carmody had experienced, where the ED's employees reported a ██████████████" from leadership. *Id.* ¶ 86.

Further, the Root Cause Analysis Summary (the "RCA Summary"), confirmed that Dr. Carmody and her team provided adequate care for the VIP Patient and did not ████████. The RCA Summary stated that the ████████████████████████████████, and that "█████████████████████████████████████████████████ ████████████████████████████. *Id.* ¶ 92. The only recommendation that resulted from the RCA Summary was to ████████████████████████████████ ████████████████████ The RCA Summary did not identify any failing of Dr. Carmody's patient care. *Id.* ¶ 93.

## ARGUMENT

### I.    LEGAL STANDARD

The summary judgment standard is well established. Fed. R. Civ. P. 56 (a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2] Yet, summary judgment is an extreme remedy that deprives the non-moving party of the right to present a case to the jury. *See Egelston v. State Univ. Coll. at Geneseo*, 535 F.2d 752, 754 (2d Cir. 1976); *see also Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426,436 (2d Cir. 1999). It is well settled that "credibility conflicts and the choice between these conflicting versions are matter for the jury and [should not be] decided by

---

[2] All internal quotations and citations omitted and all emphasis added unless otherwise noted.

the district court on summary judgment." *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003). In fact, the court "***must disregard all evidence favorable to the moving party that the jury is not required to believe*** . . . the court should give credence to the evidence favoring the nonmovant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (emphasis in original).

In employment discrimination cases, courts must exercise "an extra measure of caution" because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys. Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case", especially "where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

## II.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S DISCRIMINATION CLAIMS UNDER TITLE VII, NYSHRL, AND NYCHRL

Discrimination claims brought against an employer pursuant to Title VII are analyzed using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). A plaintiff first must establish a *prima facie* case by offering evidence: "(1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. "[I]t is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307-08 (2d Cir. 2015).

"To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). "At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred." *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009). Furthermore, district courts "must analyze NYCHRL claims separately and independently from any federal and state law claims" and "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik,* 715 F.3d at 109. This is true "even if the challenged conduct is not actionable under federal and state law." *Id*.

The 2019 amendments to the NYSHRL have the effect of "render[ing] the standard for [NYSHRL] claims closer to the standard under the NYCHRL." *Wellner g. Montefiore Med. Ctr.*, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). *See also* N.Y. Exec. Law § 300 ("The [NYSHRL] shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.").

### A.    Plaintiff Established a *Prima Facie* Case of Gender Discrimination

Plaintiff has met and her minimal burden of establishing a *prima facie* case of gender discrimination. Defendants do not and cannot dispute that Plaintiff was within a protected class or that she was subject to an adverse employment action. Defendants' other arguments fail.

13

1.    **Dr. Carmody was qualified for her position**.

There can be no dispute that Dr. Carmody was qualified for her position as Vice Chair of Academic Affairs and Education Innovation for the ED. Dr. Carmody is a licensed Doctor of Medicine and had been a practicing physician for more than 14 years. She also received an academic excellence award from NYU prior to her termination. 56.1(b) ¶¶ 1-2, 9-10, 12. This is sufficient to satisfy the second prong of the *McDonnell* analysis. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.").

2.    **Dr. Carmody was terminated under circumstances giving rise to an inference of discriminatory intent.**

Plaintiff has established her minimal burden of showing that she was terminated under circumstances giving rise to an inference of discriminatory intent. The inference of discrimination "is a flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.,* 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013). Further, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 538, 533 (2d Cir. 1991). An inference of discriminatory intent can arise from circumstances including, "seek[ing] applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or the timing of the discharge."

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Further, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen*, 928 F.2d at 533. Here, Plaintiff has presented evidence to permit a rational finder of fact to infer a discriminatory motive. This is further confirmed in the Expert Report from Dr. McNamara, finding that neither claimed basis (Dr. Carmody's attestation or the care she provided) supported a decision to terminate Dr. Carmody's employment.

First, after Defendants summarily terminated Dr. Carmody without any type of investigation that was afforded to male doctors, Defendants replaced Dr. Carmody with someone outside of her protected class. Specifically, Defendants selected Dr. Christopher Caspers to fill Dr. Carmody's Vice Chair role (not Dr. Selin Sagalowsky as Defendants assert), even though Dr. Caspers was not qualified to hold that position. 56.1(b) ¶ 58. Other attendings at NYU confirmed this, stating "[p]utting Caspers in your position is complete lunacy." *Id.* ¶ 59. *See Zimmerman v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the . . . analysis.").

Second, the Emergency Department at NYU has a history of gender discrimination and many qualified female residents and doctors were repeatedly blocked from various senior roles. 56.1(b) ¶¶ 20-22. There is also evidence that some of the Individual Defendants used derogatory language to reference a female doctor that had been pushed out. *Id.* ¶ 23. *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 497 (S.D.N.Y. 2014) (finding that "systematic discrimination against [individuals in the protected group] may be considered, and . . . bolster[s] her claim that she personally was the victim of discrimination").

15

Finally, Dr. Carmody was treated worse than similarly situated male physicians. While she was an employee, Dr. Carmody was passed over for a promotion without proper basis, while male physicians did not face the same obstacles. 56.1(b) ¶¶ 4-6. After she was passed over for the promotion, she applied a second time to the Associate Professor role and had to write her own recommendation letter that Dr. Femia simply signed. *Id.* ¶ 6. As part of her promotion to Associate Professor, she was subjected to an intensive interview process that other male physicians did not need to go through. *Id.* ¶ 5. Even after she was promoted to her Associate Professor and Vice Chair positions, as Defendants acknowledge, Dr. Carmody was paid less and received less favorable contract terms than her fellow male Vice Chairs. *Id.* ¶¶ 94-99.

Evidence also demonstrates that Dr. Carmody was also treated less favorably than similarly situated male doctors with respect to the investigation undertaken prior to her termination and the manner of her termination. After receipt of the VIP Patient Letter, Defendants did not conduct any investigation into either the care that Dr. Carmody provided or the alleged "false documentation" of the patient record. Rather, without any warning and in less than a week, Defendants terminated Dr. Carmody from her positions and immediately cut off Dr. Carmody's access to NYU's facilities and emails. *Id.* ¶¶ 32-51. Defendants provided similarly situated male doctors months-long investigations into allegations of comparable seriousness, if not more, and none were terminated from NYU with similar haste. *Id.* ¶¶ 64-79. The Second Circuit has held that the determination that two acts constitute comparable conduct, or are of comparable seriousness, "requires – in addition to an examination of the acts – an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000). The Second Circuit further cautioned courts not to be too rigid in determining whether two offenses are comparable because it would produce "a scenario where evidence of

16

favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination." *Id.*

Typically, the question of whether two employees are similarly situated is a question of fact for the jury. *Id.* at 39. Here, Dr. Carmody has presented evidence that a reasonable jury could find that the male physicians referenced herein are similarly situated to her because they hold similar roles and their offenses are of comparable seriousness to Dr. Carmody's alleged offense. Defendants' argument that none of the referenced male physicians are similarly situated to Dr. Carmody because they did not report to Defendant Femia and thus did not report to the same supervisor as Dr. Carmody fails. To raise an inference of discrimination through comparators, it is not necessary for Plaintiff to show that the comparator reported to the same supervisor. Rather, Plaintiff only needs to show that she was "similarly situated in all material respects," such as "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 39-40. Here, all physicians employed at NYU are subjected to NYU's code of conduct and code of ethics (56.1(b) ¶ 64) and all of the above comparators were alleged to have violated those codes. *Id.* ¶¶ 65-79.

Further, it is disputed whether Dr. Femia was the only Defendant responsible for Dr. Carmody's termination. Dr. Femia stated several times that the decision was made by leadership and the evidence shows that Dr. Grossman and others directed that Dr. Carmody be fired. 56.1(b) ¶¶ 80, 83. Therefore, that some of the above comparators may have reported to different direct supervisors is not dispositive where a reasonable jury could find that the same people—Defendants Grossman, Francois, Brotman, Femia, and Abramson—were ultimately responsible for disciplining Dr. Carmody and her comparators. *See Senno v. Elmsford Union Free Sch. Dist.,* 812

F. Supp. 2d 454, 479 (S.D.N.Y. 2011) (holding that plaintiff and his comparator reported to different supervisors is a "less important [consideration]" and "is not dispositive . . . where . . . the same people . . . were ultimately responsible for discipling both of them").

**B.    Genuine Issues of Material Fact Exist as to Whether Defendants' Reason for Dr. Carmody's Termination Was Pretextual**

Defendants assert that the sole legitimate reason for terminating Dr. Carmody is because "she admittedly falsified the Patient's record." Br. at 12. However, Defendants' reason is demonstrably pretextual. Summary judgment is unavailable if a reasonable jury may conclude that Defendants' justifications are pretextual with a demonstration of "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non[discriminatory] reasons for its action." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 451 (E.D.N.Y. 2014). A "factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). "Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . no additional proof of discrimination is required." *Id.* Further, Plaintiff "is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). Here, Plaintiff has done just that.

If the issue with the attestation was the basis for Defendants' decision, there was no finding or even allegation that Dr. Carmody intended to engage in any fraud, and the DRC actually found that there was a department wide issue with respect to the charting Defendants claim as the basis for termination. 56.1(b) ¶¶ 85, 87-91. And if there was a care issue, then as Dr. McNamara explains

18

in his expert report, the physician should be provided with due process, an essential right that should be afforded to all physicians. 56.1(b) ¶¶ 55-56. Dr. McNamara determined in his expert opinion that given the issues with Defendants' claimed bases for Dr. Carmody's termination, her termination was pretextual and that Defendants were "looking for a reason to oust her." *Id.*

Defendants' pretext is further shown by the inconsistent explanations of Dr. Carmody's termination from the start. During the short few days between receipt of the patient letter and notifying Dr. Carmody of her termination, Dr. Carmody received multiple short calls from Dr. Femia and Dr. Jamin and was briefly questioned about the care that was provided to the patient. She was under the impression that the situation related to "bad medical care, then all of a sudden it changed to that it was about what I wrote in the chart, my documentation." 56.1(b) ¶ 51. Defendant's reasoning continued to vacillate between Dr. Carmody's documentation and the medical care provided after Dr. Carmody's termination, when Defendants cited to "fraud," "missed ████" and the patient almost dying in meetings. *Id.* ¶¶ 80-84. In fact, email and text message correspondence confirms that leadership wanted Dr. Carmody fired without any reference to her documentation. *Id.* ¶ 46.

Even now, Defendants' reason for terminating Dr. Carmody continues to vary between her documentation and alleged substandard medical care, which is surprising given the RCA Summary does not reference poor care by Dr. Carmody, but rather ████████████████ as the basis for not meeting the standard of care. 56.1(b) ¶¶ 92-93. Such shifting explanations are evidence of pretext. *See Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (Defendants' prior inconsistent nondiscriminatory reasons for subjecting plaintiff to adverse action presents triable question of facts as to the truthfulness of the latest nondiscriminatory reason.);

*EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (reasonable jury could infer pretext from discrepancies in employer testimony regarding termination).

Additionally, Defendants' violation of their own policies and procedures in terminating Dr. Carmody by not providing her written notice of any investigation prior to taking disciplinary action is evidence of discrimination. 56.1(b) ¶¶ 61-62; *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (finding that "departures from procedural regularity[], can raise a question as to the good faith of the process where the departure may reasonably affect the decision"); *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x. 659, 664 (2d Cir. 2009) (holding that "[w]here an employer's deviation from its normal decision making procedures resulted in the challenged employment decision, an inference of pretext may arise").

Further, during the post-termination Department Review Committee investigation, it was shown that Dr. Carmody's charting practice was common in NYU's Emergency Department. 56.1(b) ¶¶ 85-91. An Emergency Department attending physician even protested to attesting to "procedures when I was not in the room with the resident, even Cat Jamin told me that is the acceptable legal standard to attest the procedure." 56.1(b) ¶ 88.[3]

Finally, even if Defendants have offered a legitimate explanation for any disciplinary action against Dr. Carmody, which they have not, it does not explain why Dr. Carmody summarily terminated and was not retained in some capacity. As Defendants have done for other male physicians. *See Ibok v. Sec. Industry Automation Corp.*, 369 F. App'x. 210, 214 (2d Cir. 2010).

---

[3] Not understanding why uniform use of the attestation template by all physicians in the Emergency Department would result in termination of only Dr. Carmody's termination, Dr. Carmody expressed her confusion in a text message conversation with her friend and former colleague by speculating why she was terminated based on what Dr. Femia told her when she was terminated. 56.1(b) ¶ 54. Defendants' attempt to recast Dr. Carmody's text message into her admission and acknowledgement that the attestation was the reason for her termination is incorrect. In fact, Dr. Carmody explicitly rejected Defendants' reading of the text message. *See* 56.1(b) ¶ 54.

Therefore, summary judgment must be denied for Plaintiffs' discrimination claims.

## III.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S RETALIATION CLAIMS

Title VII retaliation claims are reviewed under the same three-step burden shifting analysis as Title VII discrimination claims. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). First, the plaintiff must establish a *prima facie* case of retaliation by showing that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 204-05 (2d Cir. 2006). If the employee establishes a *prime facie* case, the burden shifts to the employer to provide a non-retaliatory rationale for the adverse action. *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014). "Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext." *Id.*; *Kwan*, 737 F.3d at 846. Retaliation can be proven either "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . or directly through evidence of retaliatory animus." *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) (alteration in original).

Under the NYCHRL, and the NYSHRL for retaliation that accrued on or after October 11, 2019, *Syeed v. Bloomberg L.P.*, 2022 WL 3447987, at *6 (S.D.N.Y. Aug. 17, 2022), a plaintiff need not prove any "adverse employment action," or show but-for causation but instead must prove that something happened that would be "reasonably likely to deter a person from engaging in protected activity." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 722-23 (2d Cir. 2010). The analysis should "be made with a keen sense of workplace realities, of the fact that the chilling effect of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct." *Mihalik*, 715 F.3d at 112.

21

Similarly, section 215 of the NYLL states that, "No employer . . . shall discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter . . . ." N.Y. Lab. Law § 215. *See also Alvarado v. GC Dealer Serv. Inc.*, 511 F. Supp. 3d 321, 358-59 (S.D.N.Y. 2021).

## A.    Plaintiff Has Established a *Prima Facie* Case of Retaliation

A "'protected activity' refers to action" participated in and/or "taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).    "[T]his notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.*; *see La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir.2010). (opposition to discrimination includes complaints to management); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.'").

**Complaints of Gender Discrimination.** Here, Dr. Carmody participated in protected activity when she complained to Dr. Femia regarding the pay disparities between male and female doctors. 56.1(b) ¶¶ 14-18. In fact, in fall 2020, she complained to Dr. Femia about pay discrimination due to gender, just months before her termination. *Id.* ¶ 17. And, the last time Dr. Carmody complained about discrimination in the ED was November 2020. *Id.* ¶ 18.

Defendants' argument that dismissal of Dr. Carmody's retaliation claims against Drs. Grossman, Francois, Brotman and Abramson because she never complained about gender discrimination to them fails because it is well established that "[i]t is not necessary that Plaintiff prove that the specific actors know of the protected activity as long as Plaintiff can demonstrate

22

general corporate knowledge." *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 283 (E.D.N.Y. 2013); *see also Campbell v. Home Depot U.S.A., Inc.*, 2006 WL 839001, at *11 (S.D.N.Y. Mar. 30, 2006) (finding that "[w]hether or not the individual employees who decided to terminate [the plaintiff] knew of her complaint is immaterial to resolving the knowledge requirement."). Further, evidence shows that all Individual Defendants participated in the decision to terminate Dr. Carmody. 56.1(b) ¶¶ 80, 83. As such, summary judgment against the Individual Defendants must be denied. *See Feingold v. New York,,* 366 F.3d 138, 157-158 (2d. Cir. 2004) (a person who "participates in the conduct giving rise to a [retaliation] claim [may] be held liable under the NYSHRL even though that co-worker lack[s] the authority to either hire or fire the plaintiff.").

Dr. Carmody also established a causal link between her protected activity and her termination. It is well settled that, "mere temporal proximity between a plaintiff's protected activity and an adverse employment action may, by itself, be sufficient to create an inference of retaliation for purposes of proving a *prima facie* case." *Pinkard v. N.Y.C. Dep't of Educ.*, 2012 WL 1592520, at *6 (S.D.N.Y. May 2, 2012); *see also Feingold*, 366 F.3d at 156. While there is no bright line rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference, courts in the Second Circuit have consistently found that a sufficient causal connection could be established even where the retaliation was not immediate. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009) (six month period would permit a finding of a causal connection where defendant may have waited until there was an "opportune time"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980)(eight month period was sufficient to suggest causation where employer could not retaliate in that manner sooner); *Lindner v. Int'l Bus. Machs. Corp.*, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008)

(stating that retaliation claims are rarely dismissed "where the plaintiff has alleged a time period of less than one year" and holding that an eleven-month interval could support an inference of retaliation). Here, Dr. Carmody engaged in protected activity at most six months prior to her termination and, prior to the events of November 30, 2020, Defendants never had an opportunity to retaliate against Dr Carmody. This is sufficient to establish the causal link.

**Blacklisted Residents**: Dr. Carmody also participated in protected activity under the NYLL when she complained about and refused to participate in Defendants' "no-hire" blacklist of residents that publicly criticized NYU. Dr. Carmody was asked to provide the names of residents from NYU's Emergency Department that participated in these activities. 56.1(b) ¶ 29. However, Dr. Carmody refused to provide such names and complained to Dr. Femia about this practice because she reasonably and in good faith believed that such a blacklist is a violation of the New York Labor Laws. 56.1(b) ¶ 29. As with the Dr. Carmody's protected activity with respect to complaint of gender discrimination, Dr. Carmody can also establish a causal link between her complaint about the resident blacklist and her termination because she complained about the resident blacklist a few months before she was terminated.

### B. Genuine Issues of Material Fact Exist as to Whether Defendants' Reason for Dr. Carmody's Termination Was Pretextual

Again, Defendants' argue that the intervening cause in Dr. Carmody's termination was her alleged false documentation of the patient record. For all the same reasons discussed in Section II.B, above, Defendants' argument fails. Additionally, after an extensive departmental review of NYU's ED, it was reported that there had been a pattern of retaliation within the department. 56.1(b) ¶ 86. There was also a history of retaliation against Dr. Carmody. *Id.* ¶ 16. Following Dr. Carmody's termination, Dr. Femia boasted that he got rid of two "███████" faculty members. *Id.* ¶ 60. Therefore, summary judgment must be denied for Plaintiffs' retaliation claims.

IV.    **SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S DEFAMATION CLAIMS**

The elements of a cause of action for defamation under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the appliable level of fault on the part of the speaker, and (vi) either causing special harm or constituting slander per se. *See Dillon v. City of New York*, 261 A.D.2d 34, 37-38 (1st Dep't 1999). Here, Dr. Carmody has presented evidence that preclude summary judgment on defamation against all the Individual Defendants.

First, all of the alleged statements are defamatory statements of fact because all of the alleged statements are regarding Dr. Carmody's alleged sub-standard care of a patient as a physician that would tend to injure Dr. Carmody's profession. *See Albert v. Loksen*, 239 F.3d 256, 267 (2d Cir. 2001) ("Accusing a hospital worker . . . of compromising the welfare of patients . . . may induce an evil opinion of him in the minds of right thinking persons . . . and are therefore capable of a defamatory meaning."). Further, statements that a person committed a crime are also typically considered defamatory per se statements. *Knutt v. Metro Int'l, S.A.*, 91 A.D.3d 915, 916 (2d Dep't 2012) ("Imputing a serious crime to the plaintiff constitutes defamation per se.").

**Dr. Brotman**. Dr. Brotman re-published the VIP Patient Letter to a resident, Dr. Sarker, without any prompting and as part of the campaign to justify the leadership's decision to fire Dr. Carmody. However, Dr. Brotman did not confirm or conduct any investigation into whether the Letter's accusations of Dr. Carmody were correct. 56.1(b) ¶ 81.  Therefore, the act of re-publishing the VIP Patient Letter to Dr. Sarker to make the point that Dr. Carmody's termination was due to a serious patient care infraction is an actionable defamatory statement. *See Alianza Dominicana, Inc. v. Luna*, 229 A.D.2d 328, 329 (1st Dep't 1996) (holding that a defamatory statement of an unconfirmed rumor is actionable and should not be dismissed). Further, Dr. Brotman re-publishing

of the VIP Patient Letter is not a non-actionable statement of opinion because it can be implied that the accusations in the patient letter were already confirmed through an investigation. *See Chiavarelli v. Williams*, 256 A.D.2d 111, 113 (1st Dep't. 1998) ("Where the author of a derogatory statement of opinion implies that it is based on facts not disclosed to his audience, a claim for defamation may be premised on this implied factual assertion.").

**Drs. Francois, Abramson, and Femia**. As an initial matter, Drs. Francois, Abramson, and Femia's declarations that they "did not make the statements attributed to" themselves at the Zoom meetings after Dr. Carmody was terminated just "raises questions of fact." *See D'Amico v. Zingaro*, 135 A.D.3d 805, 806 (2d Dep't. 2016); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility" and "choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Indeed, there is sufficient evidence from which a jury could properly conclude that defamatory statements against Dr. Carmody were made at the Zoom Meetings. 56.1(b) ¶¶ 80, 82-83.

The defamatory statements from Drs. Brotman, Dr. Francois, Abramson, and Femia about how Dr. Carmody almost killed a patient are not mere opinions because they imply that an investigation was conducted to determine that the VIP Patient Letter was accurate, which there was not. In fact, no one ever questioned the accusations in the VIP Patient Letter or requested the medical records from Lenox Hill; they merely took the accusations at face value. 56.1(b) ¶ 44. Further, Drs. Francois, Abramson, and Femia's defamatory statements that Dr. Carmody committed criminal fraud was demonstrably false when made because even Dr. Femia admitted that Dr. Carmody only "made an error." *Id.* ¶ 49. And for an action to constitute criminal fraud, it requires intent, which all of these individuals knew Dr. Carmody lacked.

**Dr. Grossman**. Dr. Grossman admitted that he told residents that an attending physician

missed ▮▮▮ and missed ▮▮▮▮▮. 56.1(b) ¶ 84. However, because Dr. Carmody's case was so well known at NYU at the time Dr. Grossman made those statements, the physicians and residents in the audience understood that the attending physician Dr. Grossman spoke about was Dr. Carmody. *See DeBlasio v. North Shore Univ. Hosp.*, 213 A.D.2d 584, 584 (2d Dep't 1995) ("[W]here the person defamed is not named in a defamatory publication, it is necessary, if it is to be held actionable as to him, that the language used be such that persons reading it will, in the light of the surrounding circumstances, be able to understand that it refers to the person complaining."). At the time Dr. Grossman made those defamatory statements, it was known to Defendants that Dr. Carmody did not miss sepsis. 56.1(b) ¶ 90-93. It was also known to Defendants that Dr. Carmody did not miss ▮▮▮▮▮, but in fact treated the VIP Patient for ▮▮▮▮▮ prior to discharging her. This fact was confirmed by Dr. Francois and his staff. *Id.* ¶ 40. Thus, there is at least an issue of fact whether Dr. Grossman knew the statement to be false when he said it to the physicians and the attendings, which may constitute actual malice and would defeats any qualified privilege. *See Albert*, 239 F.3d at 273 ("a defendant acts with actual malice by making false statements with knowledge of their falsity"); *United States v. City of N.Y.*, 717 F.3d 72, 82 (2d Cir. 2013) (questions of "subjective intent can rarely be decided by summary judgment").

Therefore, summary judgment must be denied for Plaintiffs' defamation claims because the Individual Defendants made defamatory statements against Dr. Carmody and there is at least an issue of fact as to whether Defendants made the defamatory statements with malice. *Hicks,* 593 F.3d at 170.

## V.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S PAY DISCRIMINATION CLAIMS

Dr. Carmody has adduced sufficient evidence on her pay discrimination claims to preclude summary judgment. To prove a prima facie case of discrimination under the Equal Pay Act, 29

U.S.C. § 206(d)(1), a plaintiff need only establish that: 1) an employer pays different wages to employees of the opposite sex; 2) the work performed is "substantially equal" in the required skill, effort, and responsibility; and 3) the jobs are performed under similar conditions. *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999); *see also Lavin-McEleney v. Marist Coll.,* 239 F.3d 476, 480 (2d Cir. 2001).

The Second Circuit has held that "[w]hether two positions are substantially equivalent for Equal Pay Act purposes is a question for the jury." *Id*. Further, "[t]o establish a claim under the Equal Pay Act, a plaintiff need not prove that her job is identical to a higher paid position, but only demonstrate that the two positions are substantially equal." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir. 1993); *see also Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.*, 2008 WL 4356219, at *9 (S.D.N.Y. Sep. 23, 2008).

Here, it is clear that a comparison between Dr. Carmody's contract and the male physicians that held the Vice Chair roles at the exact same time reveals that she was paid less, performed additional work, and received fewer benefits than her male counterparts. For example, Dr. Carmody's contract incorporated a salary of $███ for her Vice Chair role for a total salary of ███ annually and for a one-year term. 56.1(b) ¶¶ 94-95. Whereas, ███ Vice Chair contract incorporated a salary of $███ for his Vice Chair role (twice the amount attributed to Dr. Carmody's Vice Chair role) for a total salary of $███ for a ███ term with annual guaranteed raises. *Id.* ¶¶ 96-97. Although the total salary is the same, the contracts make clear that the only reason Dr. Carmody's salary is the same as ███ is due to her work outside of her leadership role, which required more time, in addition to her Vice Chair responsibilities. *See Ciarrochi v. Provident Nat. Bank*, 83 F.R.D. 357, 364 (E.D. Pa. 1979) (holding that allegations

that plaintiff was assigned more work yet received the same salary as similarly situated males raises an Equal Pay Act claim).

Further, in 2020, ██████████████, Vice Chair, ██████████████, received total annual compensation of ██████████ and Dr. Carmody received total annual compensation of ██████████ Defendants argue that Dr. Caspers' role is not substantially equal to Dr. Carmody's role because he had more administrative roles than Dr. Carmody and that his scope of responsibilities were significantly broader than Dr. Carmody's. However, ██████████ shared his Vice Chair ██████████████ role with ██████████, which effectively splits his responsibilities in half. Further, in 2020, Dr. Carmody had oversight over 90 plus individuals, with 20 of them in leadership positions, whereas ██████████ only supervised about 13 individuals in leadership roles. 56.1(b) ¶ 8. Thus, when ██████████ was appointed to replace Dr. Carmody's role after her termination, physicians in the ED found it to be "complete lunacy" because ██████████ was not qualified to fill that role. Thus, if anything, Dr. Carmody's Vice Chair role required higher qualifications and was responsible for substantially the same scope of work if not more.

Therefore, summary judgment must be denied for Plaintiffs' pay discrimination claims because Dr. Carmody has proffered sufficient evidence for a jury to find that her compensation was less than her male comparators due to gender discrimination.

## VI.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S BREACH OF CONTRACT CLAIMS

"New York cases make clear . . . that workplace policies—including those that govern a university's relationship with its faculty—can create binding contracts." *Joshi v. Trs. of Columbia Univ. in City of New York,* 2018 WL 2417846, at *5 (S.D.N.Y. May 29, 2018). For example, in *O'Neill v. New York University*, 97 A.D.3d 199, 211 (1st Dep't 2012), the Appellate Division of the First Department reinstated a professor's action against his university-employer for breach of

contract based on retaliation, holding that the university's Code of Ethics, Code of Conduct, Non-Retaliation Policy, and Research Misconduct Policy, in combination, evidenced an express promise by the university not to retaliate against the professor for reporting research misconduct. *See also Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 307 (1st Dep't 1995) ("Thus, since this reporting requirement and reciprocal promise of protection in the manual impose an express limitation on the right of [the employer] to terminate employees who make such reports, plaintiff possess a cause of action for breach of contract.") (alteration in original).

Similarly, here, NYU's Code of Ethics include NYU's express promise that it will protect employees from reprisal for reporting discriminatory conduct or any suspected violations of the Code. Specifically, NYU's Code of Ethics states that "[e]very member of the University is prohibited from discriminating on the basis of race, color, religion, sexual orientation, gender and/or gender identity or expression . . . ." Further, the Code states that "each member of the University is expected to . . . report suspected violations of the Code . . . to either his or her Supervisor . . . ." Importantly, the Code assures that "the University promises that there will be no adverse action, retribution, or other reprisals for good faith reporting . . . ." 56.1(b) ¶ 60. Therefore, here, Dr. Carmody's breach of contract claim is more akin to the claim in O'Neill when Dr. Carmody was summarily terminated for reporting gender discrimination claims.

## <u>CONCLUSION</u>

For the foregoing reasons and Plaintiff's 56.1(b) statement of additional facts, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.[4]

---

[4] In light of Defendants' upcoming production of text messages pursuant to the Court's recent order (ECF No. 102), Plaintiff reserves the right to request an opportunity to further supplement her opposition to Defendants' Motion for Summary Judgment.

Dated: New York, New York
December 6, 2022

HOGUET NEWMAN REGAL & KENNEY, LLP


By: _____
Damian R. Cavaleri
Wendy Tsang
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Plaintiff*
*Dr. Kristin A. Carmody*, *M.D, M.H.P.E.*