UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

KRISTIN A. CARMODY, M.D, M.H.P.E.                    Case No.: 1:21-cv-08186-LGS

      *Plaintiff*,

                - against -                    Hon. Lorna G. Schofield

NEW YORK UNIVERSITY; NYU
GROSSMAN SCHOOL OF MEDICINE; NYU
LANGONE HOSPITALS; ROBERT I.
GROSSMAN, M.D.; FRITZ FRANCOIS,
M.D.; STEVEN B. ABRAMSON, M.D.;
ANDREW W. BROTMAN, M.D.; and
ROBERT J. FEMIA, M.D.

      *Defendants*.

--------------------------------------------------------


# PLAINTIFF'S LOCAL RULE 56.1(b) STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, Plaintiff Dr. Kristin A. Carmody, M.D., M.H.P.E., respectfully submits this 56.1(b) statement of additional material facts in opposition to Defendants' Motion for Summary Judgment.

**Dr. Carmody Is A Well-Respected Doctor and Educator With A Previously Flawless Professional Record**

1.      Dr. Carmody is an award-winning female Emergency Medicine physician and educator, a renowned researcher, and an internationally published author. (Carmody Declaration ¶1).

2.      Throughout the entirety of her fourteen years of medical practice prior to her termination from NYU on December 6, 2020, Dr. Carmody maintained a spotless professional record and reputation, and had not received a single negative review or disciplinary action. (Carmody Dep. 204).[1]

3.      Dr. Carmody was hired by NYU in 2013 as a faculty and clinical physician. Specifically, she was hired as an Assistant Professor of Emergency Medicine, Co-Director of Emergency Ultrasound, and Co-Director of Emergency Ultrasound Fellowship. (Carmody Dep. 16).

4.      In 2015, Dr. Carmody applied for, but was denied a promotion from Assistant Professor to Associate Professor for not having enough research experience even though it was not a requirement for the Associate Professor promotion. (Carmody Dep. 22-23; Carmody Decl. ¶2). Whereas, Dr. Femia did not have to put in an application or go through the same rigorous process and was promoted to Associate Professor at the request of Dr. Grossman and Dr. Abramson without the required credentials. (Carmody Decl. ¶3).

---

[1] "_____ Dep." refers to deposition transcripts. Copies of electronic, text-searchable deposition transcripts are uploaded to the Court via a link provided by Chambers.

5.      In 2017, in recognition of her proactive mentorship role as well as her established research, training, and educational history, Dr. Carmody was offered the position of Vice Chair of Academic Affairs and Education Innovation for the Department of Emergency Medicine at NYU after an extensive application and interview process. (Carmody Dep. 25-26). Whereas, Dr. Femia and Dr. Francois did not have to put in an application and did not even have to interview for their positions, they were appointed by Dr. Grossman. (Femia Dep. 78-79; Francois Dep. 40-41)

6.      In 2017, Dr. Carmody reapplied for promotion to Associate Professor. In order to achieve this promotion, Dr. Carmody had to go through an extensive review process and had to write a letter in support of her promotion on behalf of Dr. Femia for his signature. (Carmody Dep. 50).

7.      In February 2017, Dr. Carmody was promoted to the role of Associate Professor and made Vice Chair of Academic Affairs and Education Innovation. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 3, at 5, ECF No. 95-1).

8.      As the Vice Chair of Academic Affairs and Education Innovation, Dr. Carmody was responsible for all the educational activities of the Emergency Medicine Department, which includes the overall structure and administration of the educational mission and ensuring the education programs met compliance standards or any policies that governed the programs. Within the department, Dr. Carmody had responsibility for overseeing all faculty academic activities, as well as undergraduate medical education, the residency program, the various fellowships, and any other initiative that involved education. Between 2017 and 2020, Dr. Carmody had oversight over or supervision over 90 individuals, with about 20 of those individuals in leadership positions. (Carmody Dep. 27-32).

9.      In 2020, Dr. Carmody held three administrative leadership titles, Vice Chair, Academic Affairs and Education Innovation, Department of Emergency Medicine, Co-Director, Emergency Ultrasound and Co-Director, Emergency Medicine Ultrasound Fellowship. (Carmody Decl. ¶5).

10.     Dr. Carmody is widely respected by physicians and students in the medical field for her mentorship and for her dedication to patients and the medical profession. (Ex. 1 at KC001342-44).[2]

11.     She has also remained particularly beloved by colleagues and mentees for her fearless approach in opposition to discrimination at NYU. (Ex. 1 at KC001342-44).

12.     Dr. Carmody's achievements and expertise have been recognized on numerous occasions, including receiving the Excellence in Educational Innovation Award from NYU in November 2020, one month prior to her termination. (Carmody Dep. at 53-54).

13.     In order to receive the award, Dr. Carmody had to explicitly ask Dr. Femia to nominate her for the award and, again, had to draft Dr. Femia's letter in support of herself for his signature. (Carmody Dep. at 53-55; Ex. 2 at KC003287-88).

**Dr. Carmody Advocated and Supported Others' Advocacy Against Defendants' Gender Discrimination and Retaliation**

14.     Throughout her tenure with Defendants, Dr. Carmody objected to disparities and inequities within NYU. Dr. Carmody discovered that NYU was perpetuating unacceptable gender discrimination, including Defendants' hiring and promoting male candidates over better-performing female peers to faculty and other positions at NYU, the difference in treatment between

---

[2] "Ex. ___" refers to Exhibits annexed to the Declaration of Damian R. Cavaleri, Esq., submitted herewith.

male and female physicians, and the pay and hours disparities between male and female physicians. (Carmody Dep. at 62-65, 76, 280-291; Ex. 2 at KC003216, 3218, 3262, 3302-3).

15.     Dr. Carmody raised these issues with supervisor, Dr. Femia multiple times, but her complaints fell on deaf ears. (Carmody Dep. at 62-65, 76; 280-291; Ex. 2 at KC003262, 3302-3; Ex. 3).

16.     Multiple times after Dr. Carmody raised these issues with Dr. Femia, she was retaliated against by Dr. Femia. (Carmody Dep. at 280-291).

17.     The last time prior to her termination that Dr. Carmody complained to Dr. Femia about pay discrimination due to gender was in the fall of 2020 with respect to ███████ salary. (Carmody Dep. at 63-66).

18.     The last time prior to her termination that Dr. Carmody complained to Dr. Femia about discrimination in the Emergency Department was in November 2020. Specifically, Dr. Carmody had raised complaints to Dr. Femia from residents, faculty, and fellows against Dr. T, a male physician, for his misogyny and racism. However, Dr. Femia had done nothing about it. In November 2020, Dr. Carmody again raised the issues concerning Dr. T to Dr. Femia and finally Dr. Femia decided that Dr. T "needs to retire gracefully" and be asked to step down instead of being terminated. (Ex. 2 at KC003302-3).

19.     Dr. Carmody's efforts and objections to discrimination put a target on her back, which was recognized by those around her. (Ex. 1 at KC001342-46; Ex. 4).

20.     The Emergency Medicine Department at NYU has a history of gender discrimination and there was a "dearth of senior female faculty." (Ex. 5).

21.     Multiple female doctors noticed and complained about institutional sexism and gender discrimination at NYU. (Exs. 6, 7, 8; Ex. 9 at D_012584 (Defendant Dr. Fritz Francois was

identified in a complaint that stated, "█████████████████████████████████████████████ ██████████████████████████████████."); Ex. 10 at D_012569 (Dr. Francois runs the hospital like ████████)).

22.     In a conversation between Dr. Grossman and Dr. Femia, when Dr. Femia notified Dr. Grossman that a female faculty member was leaving NYU, Dr. Grossman said, "what has that bitch done anyway?" When Dr. Femia relayed this conversation to Dr. Carmody he laughed about it. (Ex. 2 at KC003233-34; Carmody Decl. ¶9).

23.     In addition to her own advocacy efforts, Dr. Carmody refused to participate in Defendants' efforts to suppress the residents and fellow faculty's concerns over the disparity of treatment of patients based on the patients' social economic status. (Ex. 2 at KC003251-52, 3255-56).

24.     Beginning in March 2020, residents of NYU, including residents in NYU's Emergency Department started to use their social media platforms to criticize NYU's response to the COVID-19 pandemic. (Ex. 11).

25.     Specifically, they criticized NYU for not providing a safe workplace environment by not providing sufficient PPE and other protections to the medical staff in light of the pandemic. (Ex. 12).

26.     The residents further sent an email to Dr. Francois criticizing NYU's disparate treatment of patients due to the patient's social economic status. (Ex. 13).

27.     Instead of acknowledging or addressing the issues the residents brought to light, Defendants started to maintain a list of residents that were "trouble makers." (Ex. 2 at KC003251-52, 3255-56; Exs. 12, 14, 15, 16).

28.     In discussing the residents' email to Dr. Francois, Dr. Grossman stated, ███████ ████████████████████████████████████████████████ " In which, Dr. Francois " ████████ ████ " and repeated " ██████ " (Ex. 13).

29.     Once Dr. Carmody discovered that Defendants were maintaining such a list, the which purpose of which was to block job prospects for the residents, Dr. Carmody refused to participate in handing over resident names to Dr. Femia and affirmatively objected to such actions because she believed this activity was illegal. (Ex. 2 at KC003251-52, 3255-56).

30.     In fact, Dr. Carmody found out that the residents' letter to Dr. Francois was brought up in some residents' interviews at other academic centers. (Ex. 15).

31.     Dr. Carmody was told that Dr. Femia was "tying the contract thing into a conversation about the residents saying that ████████ 's email didn't help. (Ex. 17).

**Defendants Terminated Dr. Carmody Following Receipt of the VIP Patient Letter and Without a Meaningful Investigation**

32.     On December 6, 2020, Defendants summarily terminated Dr. Carmody and immediately cut off Dr. Carmody's access to NYU's facilities and emails. (Carmody Dep. at 206-8).

33.     Defendants initially claimed that Dr. Carmody's termination was based on the attestation in the medical chart concerning the VIP Patient, which Defendants claim was discovered following the receipt of the VIP Patient Letter on December 1, 2020. (Carmody Dep. at 196, 206-8)).

34.     The Letter was written by a patient connected to an employee at NYU and was deemed a "VIP Patient" (herein the "VIP Patient"). (Carmody Dep. at 196-97; Jamin Dep. at 68-70).

7

35.     The VIP Patient was admitted to NYU's Emergency Medicine Department on November 30, 2020 and was under the care of Dr. Carmody and her team. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 19, ECF No. 95-1).

36.     When the VIP Patient was admitted to NYU's Emergency Department, she was ████████████████████████████, but she complained of symptoms indicating a ██████████ ██████████). (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 18 at D_011721-22, ECF No. 95-1).

37.     Consistent with ACGME guidelines for teaching hospitals such as NYU, and under Dr. Carmody's direct supervision and monitoring, a fourth-year senior resident on Dr. Carmody's care team put the VIP Patient on a ███ treatment pathway after conducting relevant exams and conferring with Dr. Carmody. (Carmody Dep. at 152; Ex. 18; Ciardeillo Dep. at 88-91).

38.     The fourth-year senior resident conducted a physical examination of the VIP Patient which Dr. Carmody supervised as indicated in her attestation. (Carmody Dep. at 156; Ciardello Dep. at 74-75; Ex. D to Cerasia Decl., ECF No. 94-4).

39.     Based on the VIP Patient's condition when she was admitted, there was no indication of any diagnosis beyond the potential ███ and the alerts that NYU had set up to detect for ██████████ did not trigger. (Ciardiello Dep. at 69-70, 90, 111; Ex. A to Cerasia Decl. - Carmody Dep. Ex. 30, ECF No. 95-1).

40.     The VIP Patient later demanded to be discharged, and at the time of discharge the VIP Patient's vital signs were retaken. The vitals at the time of discharge also did not ████████ ████████████████████████████████████; however, because the VIP Patient had █ ██████████ at the time of discharge, the fourth-year senior resident and Dr. Carmody conferred, and both agreed to change the VIP Patient's antibiotic prescription to address possible

████████████████████████████. (Ciardiello Dep. at 104-105; Ex. 19). This fact that confirmed by Dr. Francois's team. (Ex. 19).

41.     In fact, when Dr. Francois sent the VIP Patient's medical record to NYU's epidemiology and infectious disease specialists to review, the doctors confirmed that the VIP Patient's medical record "████████████████," and did not mention anything about ██████ ████. (Ex. 20).

42.     The VIP Patient Letter accused Dr. Carmody's care team of subpar patient care and that they missed a ████████. Specifically, the Letter claimed that after discharge, the VIP Patient went to Lenox Hill's Emergency Department and was diagnosed with ████████ and was given an antibiotic in the same class as the one given to her by Dr. Carmody's team and had to be kept for observation overnight. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 19, ECF No. 95-1).

43.     Based on her experience as a doctor in the emergency department for more than a decade, Dr. Carmody did not believe this was a ████ diagnosis because a septic patient would not have only been kept in observation, but rather admitted to a higher level of care. (Carmody Decl. ¶12).

44.     After receiving the VIP Patient Letter, instead of requesting further information or records from the VIP Patient or Lenox Hill to confirm the accusations in the Letter or investigating the accusations further, Defendants immediately decided to submit the case for a "Morbidity & Mortality" or "M&M" review (a department-wide presentation reserved for suboptimal case outcomes), to place Dr. Carmody on a "Focused Professional Practice Evaluation" or "FPPE" (a months-long audit of a physician's work), and to submit the case for a "Root Cause Analysis" or

"RCA" (a hospital-wide review of cases involving significant adverse outcomes for a patient, such as avoidable death or life-threatening injury). (Francois Dep. at 127; Carmody Dep. at 200-202).

45.     These are extraordinary actions usually reserved for instances where there is an adverse patient outcome; here there was none. (Carmody Decl. ¶13).

46.     Between December 1, 2020 and December 5, 2020, Dr. Grossman, the Dean of the medical school and CEO of NYU Langone Health, exchanged multiple text messages and emails with multiple people about the VIP Patient Letter, which solely focused on the alleged medical care that the VIP Patient received at NYU's Emergency Department. (Ex. 21 at D_012596-97; D_012602-9).

47.     Even *before* Dr. Grossman received a copy of the Patient Letter, he expressed to others, including Dr. Brotman that he wanted to fire Dr. Carmody. (Ex. D to Cerasia Decl., ECF No. 94-4; Ex. 21 at D_012596). Specifically, on December 4, 2020, Dr. Brotman told Dr. Femia that Dr. Grossman wants to fire Dr. Carmody. (Ex. D to Cerasia Decl., ECF No. 94-4). But, Dr. Grossman confirmed that as of December 5, 2020, 5:22 PM, he still had not seen a copy of the Patient Letter. (Ex. 21 at D_012596).

48.     During this time, Dr. Femia called Dr. Carmody to tell her he heard about the VIP Patient case and to "not to worry about it" because the VIP Patient was home already and doing fine. (Carmody Dep. at 198).

49.     Meanwhile, Dr. Femia stated to Dr. Brotman on December 4, 2020, that "█████████ ███████████████████████████████████████████████" (Ex. D to Cerasia Decl., ECF No. 94-4).

50. On December 5, 2020, after Dr. Femia had conversations with the other Individual Defendants, Dr. Femia texted Dr. Grossman "████████████████████████████." (Ex. 21 at D_012594).

51. Then on December 6, 2020, without any warning, Dr. Femia called Dr. Carmody, promptly terminated her, and told Dr. Carmody that the termination was not about her medical management of the patient, but due to her medical charting. (Carmody Dep. at 206-8).

52. Dr. Femia also threated to report Dr. Carmody to the New York State Department of Health, which reporting did not happen until after Dr. Carmody filed her complaint initiating this action. (Carmody Dep. at 206-208; Ex. 22).

53. However, the medical charting issue that Defendants claimed they terminated Dr. Carmody for was standard practice for physicians in NYU's Emergency Department. (Ex. 1 at KC001346, 49, 52-53); Ex. 23). In fact, that is how new physicians in NYU's Emergency Department were taught to chart when they first start at NYU. (Ex. 23).

54. Dr. Carmody explained that the text message to her friend that "I probably killed myself on this one" does not mean that she knew she made an incorrect entry into the Epic record, rather, it was because she was speculating on what it could be after Dr. Femia told her she was let go because of what I wrote in the chart. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 21, ECF No. 95-1; Carmody Dep. at 216-17).

55. As Plaintiff's expert, Dr. McNamara describes in his expert report, "the attestation issue was widespread and the leadership was aware of the issue but chose to single out Dr. Carmody for termination on these grounds." (Ex. 24 (McNamara Report) at 6).

56. Further, Dr. McNamara explains that if there is a care issue, then the physician should be provided with due process, an essential right that should be afforded to all physicians.

11

(Ex. 24 (McNamara Report) at 4). And if the issue with the attestation was the basis for Defendants' decision, as represented from time to time, there was no finding or even allegation that Dr. Carmody intended to engage in any fraud. (Ex. 24 (McNamara Report) at 4). Thus, Dr. McNamara stated that based on several issues with Defendants' claimed basis for Dr. Carmody's termination, they were "looking for a reason to oust her." (Ex. 24 (McNamara Report) at 5).

57.    In fact, on December 1, 2020, after Dr. Francois received the Patient Letter, Dr. Francois stated that ███████████████████████████████████████████████ ███████████ ". (Ex. 25).

58.    After Defendants terminated Dr. Carmody, Defendants selected Dr. Christopher Caspers to fill Dr. Carmody's role of Vice Chair of Academic Affairs and Education Innovation for the Department of Emergency Medicine at NYU, even though Dr. Caspers was not qualified to hold that position. (Ex. 26).

59.    Other attendings at NYU stated that "[p]utting Caspers in your position is complete lunacy." (Ex. 27).

60.    After Dr. Carmody was terminated, Dr. Femia boasted that he got rid of two "███████" faculty members. (Ex. 28).

61.    NYU's Bylaws of the Medical and Dental Staff specify that the affected practitioner shall be advised of an investigation in writing, including the basis for initiation of the investigation. Then, if the committee recommends disciplinary action, the Chief Medical Offer shall send the practitioner notice in writing of the proposed disciplinary action and the reason for the decision. (Ex. 29 at D_008170-171).

62. NYU's Code of Ethical Conduct provides that if there are reports of suspected violations of the Code of Ethical Conduct, then the reports of the suspected violations will be investigated by authorized University personnel. (Ex. 30).

63. The Code of Ethical Conduct also states that "[E]ach member of the University is expected to uphold the standards of the New York University and to report suspected violations of the Code or any other apparent irregularity to either his or her Supervisor, Human Resources, financial Compliance and Internal Audit, Research Compliance, the School Compliance Officer, the Office of General Counsel, the University Compliance Officer, or the NYU NO CALLER ID toll-free COMPLIANCE LINE . . . ." (Ex. 30). It also provides that "[t]he University promises that there will be no adverse action, retribution, or other reprisals for good faith reporting of a suspected violated of this Code, even if the allegations ultimately prove to be without merit." *Id.*

**Male Physicians Accused of Similar, If Not, More Serious Violations Received Better Treatment Than Dr. Carmody**

64. NYU's Code of Conduct and Code of Ethical Conduct applied equally to all faculty and physicians that were employed by NYU. (Ex. F to Cerasia Decl., ECF No. 94-6; Ex. 30).

65. Dr. W, a male physician, was alleged to have made an improper and inconsistent entry into a patient's Emergency Department medical chart that he did not treat. (Ex. 31).

66. However, NYU took Dr. W at his word that the entry was truthful and did not conduct any further investigation into the matter even though there was evidence the chart entry was inconsistent with the statement made by the child's father. (Ex. H to Cerasia Decl. – Defs' Response to Interrogatory 26, ECF No. 95-4; Ex. 31).

67. Dr. W did not receive any discipline for this improper and inconsistent entry although Dr. W's action was serious enough to warrant the NYU Emergency Department to have an M&M regarding this incident. (Ex. 32).

68. Rather than any discipline, he merely received an "oral counseling." (Ex. H to Cerasia Decl. - Defs' Response to Interrogatory 30, ECF No. 95-4).

69. Dr. W's actions were reviewed by the Emergency Department leadership, including Dr. Femia and Dr. Jamin. (Jamin Dep. at 123-24).

70. Dr. F, a male physician in ███████████████████████, received multiple complaints from female physicians for ███████████████████████████████ ██████████████████████████, which NYU determined ██████████ ████████████████████████████████. (Ex. 33; Carmody Dep. at 76-80). In fact, Dr. Carmody told Dr. Femia and Dr. Christopher Caspers about the multiple negative comments Dr. F made where ████████████████████ by Dr. F and considered him a ████████. (Carmody Dep. at 76-80).

71. However, even after this determination, Dr. F was not immediately terminated, rather, he was given multiple warnings before he was given time to find another job and resign after that. (Ex. 33).

72. Dr. Carmody objected to giving a final warning to Dr. F and told Dr. Femia that Dr. F should be instead terminated for his ████████████████ behavior. (Carmody Dep. at 79).

73. Dr. C, a male physician and ████████████, received multiple complaints from ████████████████████████████████████████████████ ████████████████████████████████████████████████████. (Exs. 9, 10).

74. In September 2021, NYU engaged a third-party law firm to conduct an extensive investigation into the numerous complaints against Dr. C, where the law firm interviewed more

than 50 individuals. Even though the investigation confirmed that ████████████ ████████████████████████████, Dr. C was never fully terminated from NYU. (Exs. 9, 10). Rather, Dr. C was merely asked to step down from his leadership position and remained employed by NYU. (Grossman Dep. at 148). In fact, the investigation took into account that Dr. C does not have bad intentions and is not malicious. (Exs. 9, 10).

75.     Dr. I, a male physician in ████████████████, received multiple patient complaints regarding the standard of care he provided to the patients. (Ex. 34).

76.     For example, one patient ████████████████ after he was sent home after being seen and treated by Dr. I. During the patient's first visit to NYU's Emergency Department, Dr. I did not order a ██████████, which would have identified that patient's issue. When the patient returned about nine hours after he was discharged, he was found ██████████ ██████. There are also multiple patient complaints due to Dr. I's failure to meet the expected standard of medical care. Such as, a delay in care for ██████████ and a delay in care for ██████████████ and inadequate documentation. (Ex. 34 at D_010241). However, Dr. I was never terminated from NYU for his failure to meet the expected standard of medical care.

77.     The only male physician that Defendants were able to point to that was terminated effective immediately was Dr. A. (Grossman Dep. at 140).

78.     Dr. A, a male doctor, was ████████████████████████. Dr. A had sexual relations with his patients. (Grossman Dep. at 141). Although Dr. A was terminated effective immediately, unlike the allegations against Dr. Carmody, the allegations against Dr. A were thoroughly investigated prior to his termination. In fact, NYU engaged an external firm to conduct the investigation and NYU's human resources department also interviewed NYU's employees prior to Dr. A's termination. (Ex. 35).

79.     NYU's Emergency Department also had another near miss of a urinary case that went to Lenox Hill, where the attending for that case was never terminated. (Ex. D to Cerasia Decl., ECF No. 94-4).

**Defendants' Defamatory Statements**

80.     During a December 8, 2020 Zoom meeting, Dr. Femia stated that Dr. Carmody had been fired for "fraud." During that meeting, Dr. Femia also said that the decision to terminate Dr. Carmody's employment with NYU was driven by the leadership. Before Dr. Femia left the meeting, he stated that he would go back to the leadership to see whether they would reinstate Dr Carmody to her position. (Dr. Lindsay Davis Declaration ¶¶5-8).

81.     Then, on December 8 or 9, 2020, Dr. Brotman met with a resident, Dr. Arnab Sarker, and without any prompting, Dr. Brotman presented the VIP Patient Letter to Dr. Sarker because through this conversation with Dr. Sarker, Dr. Brotman got the impression that the Emergency Department did not understand the gravity of the situation as Dr. Sarker explained that the residents and faculty were upset about the situation around the Patient case and the outcome regarding Dr. Carmody. (Brotman Dep. at 66-67, 70-72). Dr. Brotman wanted Dr. Sarker to see the Patient Letter because he did not believe that the Emergency Department understood the Patient case. (Brotman Dep. at 67-69). Further, Dr. Brotman only knew of the details of the Patient case from the Patient Letter. (Brotman Dep. at 67-68).

82.     Then on a December 9, 2020 Zoom meeting, Dr. Abramson or Dr. Francois both stated that Dr. Carmody committed "criminal fraud" and an "egregious case of fraud." Dr. Abramson continued and said that the VIP Patient Letter was "the worst patient letter we have ever received in history" and that it "was egregious fraud and the patient almost died." (Exs. 36, 37; Dr. Jeremy Branzetti Declaration ¶¶ 5-7).

83.     Then on a December 10, 2020 Zoom meeting, Dr. Femia repeated his defamatory and disparaging statements that Dr. Carmody committed "fraud," and that somebody almost died because of it. (Ex. 38 (December 10, 2020 meeting recording) at 40:23-42:06; Davis Decl. ¶¶9-10). During this same meeting, Dr. Femia repeated his statement that he tried to get Dr. Carmody her job back, and further stated that the decision to terminate her employment "came from higher up." (Ex. 38 (December 10, 2020 meeting recording) at 1:19:18-1:20:14; Davis Decl. ¶11-12).

84.     Dr. Grossman continued to make defamatory statements against Dr. Carmody more than six months after Dr. Carmody's termination. Specifically on July 7, 2021, at an intern orientation for new ED residents, Dr. Grossman stated that the VIP Patient's case was a "classic case" of "unprofessionalism" in the Langone ED, and that a female attending physician had mismanaged a patient and "missed the █████," "missed the ████████," and "missed everything." (Grossman Dep. at 153).

**Defendants' Investigation After They Terminated Dr. Carmody**

85.     In the months following Dr. Carmody's termination, Defendants released an internal report that confirmed that Dr. Carmody followed the same practices as every other attending physician in the NYU Emergency Department when she charted the VIP Patient's care. Specifically, on March 23, 2021, Dr. Femia presented the Department Review Committee Report (the "DRC Report"), which reported that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████. (Ex. 39 at D_009673-74).

86.     The DRC Report also confirmed the existence of the pervasive discriminatory and retaliatory environment that Dr. Carmody had experienced as one widely shared by NYU's

Emergency Department employees who reported a ███████████████ from leadership. (Ex. 39 at D_009672, 9674-75).

87.     Other physicians have also confirmed that attesting to a resident's note without re-examining the patient physically was common practice. (Ex. 23).

88.     In fact, when a physician was not willing to attest to procedures when they were not in the room with the resident, Dr. Jamin told the physician that it was the acceptable legal standard to attest to the procedure. (Ex. 23).

89.     It was also the way recent graduates were instructed to attest to notes in their orientations. (Ex. 23).

90.     Further, ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████. (Ex. 40).

91.     An intern also estimated that attendings ████████████████████████████████
█████████████████████. (Ex. 41).

92.     Further, the final Root Cause Analysis Report (the "RCA Report"), confirmed that Dr. Carmody and her care team provided adequate care for the VIP Patient and did not miss sepsis. In fact, the RCA Report stated that "████████████████████████████████████████
█████████████████████████████████████████████████████," and that "████████████████████████████████████████████████████████████
█████████████████████████████████████" (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 30, ECF No. 95-1).

93.     The only recommendation that resulted from the RCA Report was to ████████████
██████████████████████████████████████████████████████████████.

Nothing in the RCA Report pointed to any failing of Dr. Carmody's patient care. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 30, ECF No. 95-1).

**Differences in Pay, Contract Terms, and Benefits Between Dr. Carmody's Contract and Substantially Equal Male Physician Contracts**

94.     Dr. Carmody's 2017 contract for her Vice Chair position stated that her total compensation is $███████, which included 33% for clinical hours ($███████), 27% for her role as Co-Director, Emergency Medicine Ultrasound Fellowship ($██████), and 40% for her position as Vice Chair, Academic Affairs and Education Innovation, Department of Emergency Medicine ($██████). (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 3, ECF No. 95-1).

95.     Dr. Carmody's contract was only a one-year contract and did not include a guaranteed raise structure if certain goals were achieved. (Ex. A to Cerasia Decl. - Carmody Dep. Ex. 3, ECF No. 95-1).

96.     █████████████ contract for his Vice Chair position for the year 2017 stated that his total compensation is $██████, which included 20% for clinical hours ($██████), and 80% for his position as Vice Chair for Clinical Operations, Emergency Medicine ($██████). (Ex. 42).

97.     ████████ contract was a ████████ contract and included a guaranteed raises if certain goals were achieved. (Ex. 42).

98.      was promoted to Vice Chair ████████████████████ ████████████████████ on August 1, 2019. ████████' contract stated that his total compensation is ████████, which included 20% for clinical hours (████████), 40% for his role as Chief, Emergency Medicine Observation, Department of Emergency Medicine, NYU Langone Health System (████████), and 40% for this position as Vice Chair, ████████████ ████████████████████████████████████████. (Ex. 43).

99.     Dr. Femia testified that to his knowledge none of the Vice Chairs ever negotiated their contracts. (Femia Dep. at 136-37).

100.     Another woman physician also complained about pay discrimination in the Emergency Department. First, she found out that a male physician that was hired about the same time as her, but was junior to her and had less administrative responsibility was making substantially more money than her. She complained to Dr. Femia regarding this pay disparity and after multiple conversations with Dr. Femia finally received a salary adjustment that left her making less than this male physician. (Ex. 44).

101.     Second, she found out another male physician that was her subordinate was making more money than her. She complained to Dr. Femia and Dr. William Goldberg about this pay disparity, and after about five months received a salary adjustment. (Ex. 44).

HOGUET NEWMAN REGAL & KENNEY, LLP


By: _____
Damian R. Cavaleri
Wendy Tsang
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Plaintiff*
*Dr. Kristin A. Carmody*, M.D, M.H.P.E.