# EXHIBIT A

```
                                                                    1
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3     _____
 4     KRISTIN A. CARMODY, M.D.,
 5     M.H.P.E.
 6              Plaintiff,
 7         v.                              Case No:
 8     NEW YORK UNIVERSITY; NYU            1:21-cv-08186-LGS
 9     GROSSMAN SCHOOL OF MEDICINE;
10     NYU LANGONE HOSPITALS; ROBERT I.
11     GROSSMAN, M.D.; FRITZ FRANCOIS,
12     M.D.; STEVEN B. ABRAMSON, M.D.;
13     ANDREW W. BROTMAN, M.D.; and
14     ROBERT J. FEMIA, M.D.
15              Defendants.
       _____
16
                       VIDEOTAPED DEPOSITION
17     _____
18     WITNESS:        Robert J. Femia, M.D.
19     DATE:           Tuesday, February 14, 2023
20     START TIME:     2:00 p.m.
21     END TIME:       3:08 p.m.
22     REPORTED BY:    Kimberly Rawls, CER-1944, Notary Public
23     JOB No.:        14800
24     Conducted by videoconference via the Remote Legal
25     platform.
```

37

```
 1   Carmody should be fired prior to you making the decision
 2   -- you claiming to have made the decision that she
 3   should be terminated?
 4              MR. CERASIA:  Objection to form.
 5   BY MR. CAVALERI:
 6       Q   Yes or no?
 7       A   Can you repeat the question again?
 8       Q   Dr. Femia, did Dean Grossman tell you he
 9   believed Dr. Carmody should be fired prior to you coming
10   to the belief that she should be terminated?
11       A   Dr. Grossman did not force me to do anything.
12       Q   It's not my question, Dr. Femia.  Answer my
13   question that I asked you.
14       A   I am giving you -- just because you don't like
15   my answer you need to let me finish.
16       Q   Dr. Femia, I'm asking you a yes or no
17   question.  Did he tell you he believed Dr. Carmody
18   should be terminated before you made your decision?
19              MR. CERASIA:  He can answer as he deems
20   appropriate.
21              THE WITNESS:  He did not tell me that she
22   needed to be fired.  He -- he told me that he felt this
23   was a termination-type offense, but that the decision
24   would be mine and that I should -- he recommended that I
25   also speak with the others, which is what I did.
```



38

```
 1       I spoke with the others about basically what
 2   had occurred, falsification of a medical record.  A
 3   admission of an exam that wasn't done.  I -- I weighed
 4   what everyone had felt in regards to that this had risen
 5   to the level of termination and I had to make a decision
 6   about it and that's what I did.
 7       Q   The portion of the attestation that you're
 8   referencing about performing a history and physical
 9   examination, that was an automatically inserted template
10   sentence; is that correct?
11              MR. CERASIA:  Objection.  You're
12   exceeding the scope of the judge's order.
13              You can answer.
14              I'm not letting this go on very much
15   longer though.
16              THE WITNESS:  I was referring to the
17   entirety of the medical record documentation, which
18   includes an attestation which can be modified.  Dr.
19   Carmody did not examine the patient.  She had the
20   ability to modify the attestation, which she didn't do.
21   There's nothing in the -- in the medical record that
22   forces you to document something you did not do.
23              She then proceeded to type an abdominal
24   exam that she did not perform and basically admitted
25   that she did not see a patient, that she documented,
```



39

```
 1   that she did not examine the patient, that she
 2   documented she had, and in addition, she further
 3   falsified the record by adding typed words in there of
 4   an abdominal exam.
 5              Putting that all together that is how I
 6   evaluated the documentation of the entire visit, not
 7   just the attestation piece that you mentioned.
 8              MR. CAVALERI:  Okay.  Thank you, Dr.
 9   Femia.
10              I'm going to share with you what's been
11   marked as -- that will be marked Exhibit 1.  It's a text
12   message conversation between Dr. Francois and Ms.
13   Sanchez.
14       (Exhibit 1 marked for identification.)
15   BY MR. CAVALERI:
16       Q   I direct you to her -- to the message, the
17   December 5th text message at 3:45 p.m. when Ms. Sanchez
18   says, "Rob sent me this screenshot"; do you see that?
19       A   Let me see.  I have to scroll.  Where are you
20   on the --
21       Q   12/5/2020 at 3:45 p.m.
22       A   Okay.  And where she says what?
23       Q   "Rob sent me this screenshot."  Do you see
24   that?
25       A   Yes.
```



40

```
 1       Q   Okay.  Did you send Nancy Sanchez a screenshot
 2   of the attestation at some point on or around December
 3   5th, 2020?
 4              MR. CERASIA:  Objection to form.
 5              You can answer.
 6              THE WITNESS:  I don't recall, but I see
 7   that I documented that I did send her a screenshot.  I'm
 8   not sure what that screenshot was.  So I can comment,
 9   I'm not sure what screenshot I sent her.
10              MR. CAVALERI:  Okay.  I'll just show you.
11   Introduce what's going to be marked as Exhibit 2.  It's
12   a document Bates-stamped D_01266.
13       (Exhibit 2 marked for identification.)
14   BY MR. CAVALERI:
15       Q   Do you see that, Dr. Femia?
16       A   Yes.
17       Q   Do you recall sending this to Ms. Sanchez on
18   or around December 5th of 2020?
19       A   I don't recall.
20       Q   Okay.  Looking at this attestation, is it fair
21   to say that that first sentence where it says, "I
22   performed a history and physical examination of"
23   redacted, "and discussed her management with the
24   resident on the treatment team."  That that is a
25   templated sentence?
```



```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF NEW YORK
 3     _____
 4     KRISTIN A. CARMODY, M.D., M.H.P.E
 5           Plaintiff,
 6        v.                               Case No:
 7     NEW YORK UNIVERSITY; NYU GROSSMAN   1:21-cv-08186-LGS
 8     SCHOOL OF MEDICINE; NYU LANGONE
 9     HOSPITALS; ROBERT I. GROSSMAN,
10     M.D.; FRITZ FRANCOIS, M.D.;
11     STEVEN B. ABRAMSON, M.D.; ANDREW
12     W. BROTMAN, M.D.; and ROBERT J.
13     FEMIA, M.D.
14           Defendants.
15     _____
16         VIDEOTAPED DEPOSITION OF ROBERT J. FEMIA, M.D.
17     DATE:          Tuesday, July 19, 2022
18     TIME:          10:04 a.m.
19     REPORTED BY:   Andrew Adams, CER-1632
20     JOB No.:       11072
21                    **CONFIDENTIAL**
22
23     Conducted by videoconference via the Remote Legal
24     platform.
25
```

```
            CONFIDENTIAL - ATTORNEY'S EYES ONLY          113
 1              MR. CERASIA:  Objection to form.  You can
 2    answer.
 3              THE WITNESS:  I mean, generally, yes.
 4    BY MR. CAVALERI:
 5         Q    How many -- how many options did the attending
 6    physicians have?
 7         A    Options for what?
 8         Q    For the -- for the attestation templates.
 9         A    So, typically the attestation templates
10    involve you choosing which type of person you supervise.
11    So, if it was a PA versus a medical resident trainee.
12              So, you would pick which of those -- initially
13    you would pick which you were referring to, care
14    delivered by a PA versus care delivered by a resident.
15    So, in that sense the attestations may have been
16    different, but it's not really different that you're
17    just choosing the accurate person providing the care.
18              All of the templates have the ability to add
19    in text, delete text, and some to require a function key
20    to require you to add text.
21         Q    How did the various hospitals decide what
22    information to include in their attestation templates?
23              MR. CERASIA:  Objection to form.  You can
24    answer.
25              THE WITNESS:  There was a process in
```



```
            CONFIDENTIAL - ATTORNEY'S EYES ONLY          114
 1    place where, across the board, across the institutions
 2    with MCIT involvement, that attestations -- or I should
 3    say, that documentation was frequently looked at based
 4    on maybe changes or documentation requirements from CMS,
 5    changes based on recommendations from compliance or from
 6    coding or from billing.  So, that process was
 7    institutional.
 8    BY MR. CAVALERI:
 9         Q    And the benefit of having a template was that
10    it could be consistent across the various physicians; is
11    that correct?
12         A    As I had mentioned before -- are you, well let
13    me go back.  Are you referring to an attestation
14    template or templates in general?
15         Q    The attestation template.
16         A    The benefit of the attestation template is
17    that it allowed you to accurately and quickly document
18    the care that you provided.
19         Q    And to document in a way that was consistent
20    across the various providers as well, correct?
21              MR. CERASIA:  Objection to form.  You an
22    answer.
23              THE WITNESS:  It was personalized by each
24    of the providers.  It was consistent in that sense that
25    it had some very basic elemental facts that you needed
```



```
            CONFIDENTIAL - ATTORNEY'S EYES ONLY          115
 1    to document on who you supervised, but it's structured
 2    in a way that you could accurately provide how you
 3    actually cared for the patient.
 4    BY MR. CAVALERI:
 5         Q    Dr. Femia, were you ever trained on how to
 6    enter information into Epic?
 7         A    Yes.
 8         Q    Did that training also include the process by
 9    which you could edit the prepopulated language from a
10    template?
11         A    Yes.
12         Q    And did you receive documentation instructing
13    you how you could edit information that was prepopulated
14    by a template?
15         A    I don't recall receiving documentation.
16         Q    Did you receive or view any sort of PowerPoint
17    presentation regarding best practices related to filling
18    an Epic medical record?
19              MR. CERASIA:  Objection to form.  You can
20    answer.
21              THE WITNESS:  I don't recall.
22    BY MR. CAVALERI:
23         Q    Do you recall receiving any documentation or
24    viewing any sort of presentation related to editing any
25    attestation template in Epic?
```



```
            CONFIDENTIAL - ATTORNEY'S EYES ONLY          116
 1         A    We would receive from MCIT educational emails
 2    and examples on numerous topics.  I don't recall if one
 3    of those specifically was about the attestation
 4    template.
 5         Q    Do you know whether the billing department
 6    would ever approach various physician/providers that
 7    edited the attestation template because it did not
 8    conform to the information necessary for billing
 9    purposes?
10         A    You're saying whether the -- the billing
11    department approached physicians?
12              Could you repeat the question?
13         Q    Yes, whether the billing department approached
14    physicians regarding their revisions to any attestation
15    template to ensure that they conformed with the
16    requirements for billing purposes?
17              MR. CERASIA:  Objection to form.  You can
18    answer.
19              THE WITNESS:  The coding and
20    documentation people will make providers aware if their
21    -- their documentation is missing.
22    BY MR. CAVALERI:
23         Q    Will they also make them aware if the
24    documentation has been revised in such a way that it --
25    that it prevents them from properly billing for the care
```